Exhibit 1

*California Valley Miwok Tribe v. Haaland*, 24-CV-947 (D.D.C.)

Motion to Dismiss

Manuel Corrales, Jr., Esq. SBN 117647
**ATTORNEY AT LAW**
17140 Bernardo Center Drive, Suite 358
San Diego, California 92128
Tel: (858) 521-0634
Fax: (858) 521-0633
Email: mannycorrales@yahoo.com

Attorney for Plaintiffs
CALIFORNIA VALLEY MIWOK TRIBE,
THE GENERAL COUNCIL, SILVIA BURLEY,
RASHEL REZNOR, ANJELICA PAULK and
TRISTIAN WALLACE

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA VALLEY MIWOK TRIBE**, a federally-recognized Indian tribe, **THE GENERAL COUNCIL, SILVIA BURLEY, RASHEL REZNOR; ANJELICA PAULK;** and **TRISTIAN WALLACE**<br><br>Plaintiffs,<br><br>vs.<br><br>**SALLY JEWELL**, in her official capacity as U.S. Secretary of Interior, et al.,<br><br>Defendants<br><br>**THE CALIFORNIA VALLEY MIWOK TRIBE**, et al.<br><br>Intervenor-Defendants. | Case No.: 2:16-cv-01345-WBS-CKD<br><br>**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 30, 2017<br>Time: 1:30 p.m.<br><br>Judge: Hon. William B. Shubb<br>Courtroom 5 |

Plaintiffs, CALIFORNIA VALLEY MIWOK TRIBE, THE GENERAL COUNCIL, SILVIA BURLEY, RASHEL REZNOR, ANJELICA PAULK, and TRISTIAN WALLACE respectfully move, pursuant to Federal Rule of Civil procedure 56(b), for an Order granting summary judgment in favor of Plaintiffs. The grounds for Plaintiffs' motion are set forth in the accompanying Memorandum of Points and Authorities

and the administrative record on file with the Court, including the following:

1. The AS-IA Kevin Washburn Decision of December 30, 2015 (AS-IA 2015 Decision) is erroneous as a matter of law, is an arbitrary and capricious trial agency action under 5 U.S.C. Section 706(2)(A);

2. The AS-IA 2015 Decision is erroneously predicated on a time-barred claim that the Tribe's 1998 Resolution establishing the General Council was invalid at the outset;

3. The issue of the validity of the 1998 Resolution establishing the General Council was never referred to the AS-IA for review by the Interior Board of Indian Appeals;

4. The AS-IA 2015 Decision erroneously concluded that the 1998 General Council was established merely to "manage the process of organizing the Tribe;"

5. The AS-IA 2015 Decision erroneously concluded that prior federal cases have held that the Tribe is larger than five (5) members;

6. The AS-IA 2015 Decision's "eligible group system" is contrary to fundamental Indian law;

7. Dixie's fraud estops him from challenging the 1998 Resolution; and

8. The AS-IA Echo Hawk August 31, 2011 Decision was correct and should be reinstated as the final agency action resolving the dispute between the Dixie and Burley factions.

1        This motion is based upon the declaration of Manuel

2    Corrales, Jr., the Plaintiffs' Request for Judicial Notice, the

3    complete file and record in this action, and such oral

4    documentary evidence as may be presented at the time of hearing.

5

6

7    DATED: 3/2/2017

                    Manuel Corrales, Jr., Esq.

8                        Attorney for Plaintiffs
                    CALIFORNIA VALLEY MIWOK TRIBE, THE

9                        GENERAL COUNCIL, SILVIA BURLEY,
                    RASHEL REZNOR, ANJELICA PAULK and

10                       TRISTIAN WALLACE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Manuel Corrales, Jr., Esq. SBN 117647
**ATTORNEY AT LAW**
17140 Bernardo Center Drive, Suite 358
San Diego, California 92128
Tel: (858) 521-0634
Fax: (858) 521-0633
Email: mannycorrales@yahoo.com

Attorney for Plaintiffs
CALIFORNIA VALLEY MIWOK TRIBE,
THE GENERAL COUNCIL, SILVIA BURLEY,
RASHEL REZNOR, ANJELICA PAULK and
TRISTIAN WALLACE

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA VALLEY MIWOK TRIBE**, a federally-recognized Indian tribe, **THE GENERAL COUNCIL, SILVIA BURLEY, RASHEL REZNOR; ANJELICA PAULK;** and **TRISTIAN WALLACE**<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>**SALLY JEWELL**, in her official capacity as U.S. Secretary of Interior, et al.,<br><br>　　　　Defendants<br><br>**THE CALIFORNIA VALLEY MIWOK TRIBE**, et al.<br><br>　　　　Intervenor-Defendants. | ) Case No.: 2:16-cv-01345-WBS-CKD<br>)<br>)<br>) **MEMORANDUM OF POINTS AND**<br>) **AUTHORITIES IN SUPPORT OF**<br>) **PLAINTIFFS' MOTION FOR**<br>) **SUMMARY JUDGMENT**<br>)<br>)<br>) Date: May 30, 2017<br>) Time: 1:30 p.m.<br>)<br>) Judge: Hon. William B. Shubb<br>) Courtroom 5<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................. iv

I.   INTRODUCTION ..................................... 1

II.  STATEMENT OF FACTS .............................. 4

     A. HISTORY OF THE TRIBE ......................... 4

     B. DIXIE'S FRAUD AND TRIBAL LEADERSHIP DISPUTE ... 9

     C. THE JANUARY 28, 2010 IBIA DECISION ........... 10

     D. AS-IA LARRY ECHO HAWK'S AUGUST 31, 2011
        DECISION .................................... 11

     E. U.S. DISTRICT COURT DECEMBER 2013 ORDER
        REMANDING TO AS-IA FOR RECONSIDERATION ....... 13

     F. THE BURLEY FACTION'S INABILITY TO APPEAL
        THE DISTRICT COURT ORDER OF REMAND ........... 15

     G. AS-IA WASHBURN'S DECEMBER 30, 2015 DECISION ... 15

III. ARGUMENT ....................................... 16

     A. AS-IA WASHBURN'S 2015 DECISION IS
        ERRONEOUSLY PREDICATED ON A TIME-BARRED
        CLAIM THAT THE 1998 RESOLUTION ESTABLISHING
        THE GENERAL COUNCIL WAS INVALID AT THE
        OUTSET ...................................... 16

     B. THE U.S. DISTRICT COURT IMPROPERLY DIRECTED
        THAT THE AS-IA RECONSIDER HIS 2015 DECISION
        BASED ON A TIME-BARRED CLAIM ................. 27

     C. PLAINTIFFS PRESERVED THE STATUTE OF
        LIMITATIONS ISSUE BEFORE THE U.S
        DISTRICT COURT IN DIXIE'S FEDERAL ACTION ...... 28

     D. THE ISSUE OF THE VALIDITY OF THE 1998
        RESOLUTION ESTABLISHING THE GENERAL
        COUNCIL WAS NEVER REFERRED TO THE AS-IA
        FOR REVIEW BY THE INTERIOR BOARD OF
        INDIAN APPEALS .............................. 31

     E. THE 2015 DECISION ERRONEOUSLY CONCLUDED
        THAT THE 1998 GENERAL COUNCIL WAS ESTABLISHED

MERELY TO "*MANAGE THE PROCESS* "OR
REORGANIZING THE TRIBE" ....................... 33

F. THE 2015 DECISION INCORRECTLY CONCLUDES
THAT PRIOR FEDERAL COURT DECISIONS HAVE
HELD THAT THE TRIBE'S MEMBERSHIP IS LARGER
THAN FIVE MEMBERS AND HAS MISCONSTRUED THE
HISTORY OF THE CALIFORNIA RANCHERIAS ......... 35

G. THE "ELIGIBLE GROUP SYSTEM" IMPROPERLY
FORCES THE TRIBE TO "RE-ORGANIZE" ............ 37

H. THE DIXIE FACTION IS ESTOPPED FROM
CHALLENGING THE 1998 RESOLUTION .............. 38

I. AS-IA ECHO HAWK'S SHOULD BE REINSTATED
AND ADOPTED AS THE MOST LEGALLY CORRECT
DECISION ON THE TRIBE'S GOVERNING BODY
AND MEMBERSHIP ............................... 39

J. EVERONE AND THE DIXIE FACTION HAVE
COMMITTED FRAUD UPON THE COURT AND THE
BIA BY FALSELY CREATING A TRIBAL LEADERSHIP
DISPUTE TO JUSTIFY RE-ORGANIZING THE TRIBE ... 40

  1. Dixie's Last Will and Testament. ....... 44

  2. Everone's team sought to influence
     the Commission to "freeze" the Tribe's
     RSTF money. ........................... 44

  3. Everone is soliciting "investment
     money" for the building of a casino,
     and is offering the Tribe's RSTF
     money as security. ..................... 45

IV.   CONCLUSION ...................................... 47

TABLE OF AUTHORITIES

CASES

Acri v. Int'l Ass'n of Machinists & Aerospace Workers

    (9th Cir. 1986) 781 F.2d 1393, 1396 ...................18

Alan-Wilson v. Sacramento Area Dir.

    (1997) 30 IBIA 241, 255 ...........................37

Alvarado v. Table Mountain Rancheria

    (N.D.Cal. July 28, 2005) 2005 WL 1806368 .............37

California Valley Miwok Tribe v. Jewell

    (D.D.C.2013) 5 F.Supp.3d 86, 100 ...............19, 28, 35

California Valley Miwok Tribe v. Pacific Director, BIA

    (01/28/2010) 51 IBIA 103, 120 ......................11,
    32-33

Hardwick v. U.S.

    (Dec. 22, 1983) Civ. No. C-79-1710 ..................5-8

Hopland Band of Pomo Indians v. United States

    (Fed.Cir.1988) 855 F.2d 1573, 1576 ................ 26

Lukovsky v. City and County of San Francisco

    (9th Cir. 2008) 535 F.3d 1044, 1052 ...................39

Menominee Indian Tribe of Wisconsin v. Thompson

    (W.D.Wis.1996) 943 F.Supp 999 .......................39

Muwekma Ohlone Tribe v. Salazar

    (D.D.C.2011) 813 F.Supp.2d at 191 ...................18-19

Santa Clara Pueblo v. Martinez

    (1978) 436 U.S. 49, 55-56, 72, fn. 32 ...............38

Shiny Rock Mining Corp. v. United States

    (9th Cir. 1990) 906 F.2d 1362, 1364 ...................27

Sissten-Wahpeton Sioux Tribe v. United States

    (9th Cir. 1990) 895 F.2d 588, 592 .....................26

Spannaus v. U.S. Dep't of Justice

    (D.C.Cir.1987) 824 F.2d 52, 56 .........................18

United States v. Kubrick

    (1979) 444 U.S. 111, 122 ..............................17

Wilk v. Vencill

    (1947) 30 Cal.2d 104, 107 .............................39

Wilton Miwok Rancheria v. Salazar

    (N.D.Cal. June 8, 2009) No. C-07-02681 ...............36

Wind River Min. Corp. v. U.S.

    (9th Cir. 1991) 946 F.2d 710, 713 .....................17


OTHER AUTHORITIES

25 U.S.C. Sections 476 and 478 ......................... 5

28 U.S.C. § 1291 ....................................... 15

Act of Aug. 18, 1958, Pub.L. No. 85-671, 72 Stat. 619 .. 5

Cal. Evid. Code §623 ................................... 39

Plaintiffs CALIFORNIA VALLEY MIWOK TRIBE ("the Tribe" or "the Miwok Tribe"), THE GENERAL COUNCIL, SILVIA BURLEY ("Burley"), RASHEL REZNOR ("Rashel"), ANJELICA PAULK ("Angelica"), and TRISTIAN WALLACE ("Tristian") (collectively "the Burley Faction"), submit the following Memorandum of Points and Authorities in Support of their Motion for Summary Judgment.

## I.

## INTRODUCTION

In 1998, Yakima Dixie ("Dixie") enrolled Burley, his distant cousin, and her two family members into the Tribe. At the time, the Tribe had dwindled down to Yakima Dixie and his brother, Melvin Dixie, as the last known remaining Tribal members. Melvin Dixie's whereabouts were unknown at the time. The Bureau of Indian Affairs ("BIA") recognized this and encouraged Dixie and his newly adopted Tribal members to organize the Tribe with a governing body known as a "General Council." The BIA directed that Dixie do so by resolution and provided Dixie with a sample resolution to follow. Both Dixie and Burley prepared the document and called it Resolution #GC-98-01 (herein after sometimes called "the 1998 Resolution"), which established the General Council as the governing body of the Tribe. The Tribe had only five (5) members and the General Council was comprised of Dixie as Tribal Chairman, Burley as Vice Chairperson, and Rashel Reznor as Secretary.

Sometime after the General Council was established and the Tribe began engaging in government-to-government relations with the federal government, Dixie voluntarily resigned as Tribal Chairman, and signed a written resignation to that effect. Burley was elected as the new Tribal Chairperson, and Dixie signed a written document consenting to that as well. Soon after Dixie's resignation, a white, non-Indian by the name of Chadd Everone contacted Dixie and told him about the new 1999

California State Compacts the Governor had signed, allowing various tribes in California to build and operate gambling casinos and generate high amounts of income.  Because the Tribe was a federally-recognized tribe and qualified to have a gambling casino, no matter how small it was, Everone was interested in using Dixie's name to build and operate a gambling casino to enrich Everone and other non-Indian investors.  The only problem at the time was that Dixie had already resigned, and control of the Tribe was with Burley.

To accomplish his scheme of taking over control of the Tribe for his own personal, financial gain of building a casino, Everone conspired with Dixie to have him falsely claim that he never resigned as Tribal Chairman, and that Dixie's resignation was forged.  This created the Tribal leadership dispute that Everone used to further his scheme of creating uncertainty in the Tribal governing body and working toward trying to get the Tribe "re-organized" through the Dixie faction which he continues to control.  This Tribal leadership dispute has crippled the Tribe over the years and has caused havoc in its ability to function and operate as a federally-recognized tribe. Dixie ultimately admitted in 2012 in a sworn deposition that he in fact resigned and that his resignation was never forged.  By the time Dixie was forced to admit he in fact resigned, he had filed numerous declarations, pleadings and other documents in both state and federal court falsely stating under penalty of perjury that he never resigned and that his resignation was forged.

Faced with this damning evidence, the Dixie faction has attempted to downplay Dixie's false statements about his resignation and fraud he perpetrated on the courts, by arguing the issue is "irrelevant," because the General Council established under the 1998 Resolution was purportedly invalid at

the outset.  This argument misses the point that <u>but for</u> Everone and Dixie's fraud in creating a false and fraudulent Tribal leadership dispute, the Tribe would be functioning today under the General Council and receiving federal contract funding and Revenue Sharing Trust Fund ("RSTF") payments under the California State Compacts without interruption.

Everone sought and obtained sympathy from the BIA, which was led to believe, falsely, that Burley "stole" the Tribe from Dixie.  The BIA sought to accommodate Everone's claims, and took it upon itself to "re-organize" the Tribe in an attempt to indirectly resolve the ongoing Tribal leadership dispute.  The Burley faction challenged the BIA's efforts to do so, and the matter was taken up to the Interior Board of Indian Appeals ("IBIA") who then in turn referred the issue to the Assistant Secretary of Interior, Indian Affairs ("AS-IA").  The AS-IA Larry Echo Hawk decided the issue in August 2011 and concluded that the BIA had no right to attempt to re-organize the Tribe against its wishes, that the Tribe was not required to re-organize under the Indian Reorganization Act of 1934 ("IRA") in order to receive federal funding, or for any reason, that its governing body comprising of the General Council established under the 1998 Resolution would be recognized as the Tribe's governing body having a government-to-government relationship with the federal government, and that the Tribe consisted of five (5) enrolled members subject to enlargement as to be determined by the General Council without interference by the BIA.

The Dixie faction controlled by Everone challenged Echo Hawk's 2011 decision, and the U.S. District Court ordered the AS-IA reconsider its decision.  By the time the U.S. District Court made its order, AS-IA Echo Hawk has retired and was replaced by Kevin Washburn.  On his last day in office on

December 31, 2015, before he, too, retired, AS-IA Washburn reversed AS-IA Echo Hawk's decision and concluded that the Tribe was not limited to five (5) members and that the General Council was never properly organized by the 1998 Resolution, because it did not consist of valid representatives of the Tribe.  He refused to recognize the General Council as the governing body of the Tribe, and then directed that unenrolled, "potential" (but not actual) members be allowed to participate in re-organizing the Tribe under the IRA.  In short, Washburn did a complete 180 degree turn on the Echo Hawk decision.

The Burley faction then filed this action challenging Washburn's decision, because it is erroneous as a matter of law and an arbitrary and capricious final agency action.  The 2011 Echo Hawk decision should be reinstated, because it is based upon correct principles of Indian law.

**II.**

**STATEMENT OF FACTS**

**A.   HISTORY OF THE TRIBE**

In 1915, the United States government purchased approximately 0.92 acres of land in Calaveras County, California, for the benefit of twelve (12) named Indians living on the Sheep Ranch Rancheria. (AR-CVMT-2011-001687). The Indian agent who recommended the purchase of the land for these Indians described the group as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as 'Sheepranch.'" (Id.).

In 1934, Congress passed the Indian reorganization Act ("IRA"), which, among other things, required the U.S. Secretary of Interior ("the Secretary") to hold elections through which the adult Indians of a reservation decided whether to accept or reject the applicability of certain provisions of the IRA to

their reservation, including provisions authorizing tribes to organize and adopt a constitution under the IRA.  25 U.S.C. Sections 476 and 478. (AR-CVMT-2011-001687).  In 1935, Jeff Davis, the only Indian living on the Rancheria, voted in favor of the Tribe being organized under the IRA. (Id.).  However, the process was never followed through, and as a result the Tribe was never organized under the IRA. (Id.).

In 1958, in keeping with the then-popular policy of assimilating Native Americans into American society, Congress enacted the California Rancheria Act, which authorized the Secretary to terminate the federal trust relationship with several California tribes, including several Rancherias, and to transfer tribal lands from federal trust ownership to individual fee ownership. (Act of Aug. 18, 1958, Pub.L. No. 85-671, 72 Stat. 619).  To this end, the BIA prepared a plan in 1966 to distribute the assets of the Sheep Ranch Rancheria as a prelude to termination. (AR-CVMT-2011-001687).  At that time, Mabel Hodge Dixie was the only adult Indian living on the Rancheria who was entitled to receive the assets of the Rancheria. (Id.).  She, therefore, voted to accept the distribution plan and was issued a deed to the land in 1966. (AR-CVMT-2011-001687-88).

Although the Sheep Ranch Rancheria land had been distributed to Mabel Dixie pursuant to a distribution plan, the Secretary never published a final notice of termination and had accepted the land back from Mabel Dixie through a quitclaim deed.  As a result, the Tribe was administratively "unterminated" before it could be formally terminated.  In other words, the Tribe was never terminated.  (AR-CVMT-2011-002051, 1399, 1689).

In 1979, individuals from a number of terminated Rancherias filed an action in the U.S. District Court, Northern District, styled Hardwick v. U.S. (Civ. No. C-79-1710).  The Hardwick

plaintiffs sought restoration of their status as Indians, entitlement to federal Indian benefits, and the right to re-establish their tribes as formal government entities. Specifically, the Hardwick plaintiffs sought by injunction to undo the effects of the California Rancheria Act and to require the Secretary to "unterminate" each of the subject Rancherias and to "treat all of the subject Rancherias as Indian reservations in all respects."  The Hardwick lawsuit ended in a settlement between the tribes and the federal government, culminating in a series of stipulated judgments.  In the settlement, the Secretary agreed to restore "any of the benefits or services provided or performed by the United States for Indians because of their status as Indians" and to "recognize the Indian Tribes, Bands, Communities or groups of the seventeen Rancherias...as Indian entities with the same status as they possessed prior to distribution of the assets of these Rancherias under the California Rancheria Act." (Stipulation and Order, Hardwick v. United States, No. C-79-1710 (Dec. 22, 1983)).

In 1994, Yakima Dixie ("Dixie"), the son of Mabel Dixie, wrote to the BIA asking for BIA assistance for home repairs on the Rancheria, and described himself as "the only descendent and recognized...member" of the Tribe. (AR-CVMT-2011-001688). At that time Dixie and his brother, Melvin Dixie, were the only surviving children of Mabel Dixie, but Melvin Dixie's whereabouts were unknown. (AR-CVMT-2011-000177). Melvin later died in 2008. (AR-CVMT-2017-001400, fn. 20).

In the mid-1990s, Burley contacted the BIA for information related to her Indian heritage. (AR-CVMT-2011-001688). The BIA provided her with information that showed she was related to Jeff Davis who had initially voted in favor of the Tribe being organized under the IRA. (Id.). Burley was also related to

Dixie. (Id.).  Thereafter, Burley contacted Dixie and told him about her interest in her Indian heritage that ultimately led to him and his dwindling Tribe. (Id.).

On August 5, 1998, Dixie, as "Spokesperson/Chairman" of the Tribe, signed a statement accepting Burley as an enrolled member of the Tribe, and also enrolled Burley's two daughters and her granddaughter. (AR-CVMT-2011-001688).  As a result of Dixie's actions, the Tribe in 1998 consisted of six enrolled members: (1) Yakima Dixie; (2) Melvin Dixie; (3) Silvia Burley; (4) Anjelica Paulk; (5) Rashel Reznor; and (6) Tristian Wallace. (Id.).

In September of 1998, Yakima Dixie and Burley met at the Rancheria with BIA staff to discuss organizing the Tribe. (AR-CVMT-2011-001688).  One of the issues discussed was developing criteria for membership in the Tribe. (Id.).  At the time, the whereabouts of Melvin Dixie, Yakima's brother, were unknown.  As a result, the BIA staff told Yakima Dixie that he had both the authority and the broad discretion to decide the criteria for membership.  According to the BIA, Yakima Dixie, his brother Melvin Dixie, Burley and Burley's adult daughter were the "golden members" of the Tribe. (Id.).  And because Melvin Dixie's whereabouts were unknown, the BIA concluded that the three adult members consisting of Yakima Dixie, Burley and her adult daughter were the General Council of the Tribe that had the authority to take actions on behalf of the Tribe. (AR-CVMT-2011-001688-89).

Because the Tribe was never formally terminated, there was no court decision, like Hardwick, supra, that affected the Tribe, and to which the Tribe and the BIA could look to so as to determine who was a member of the Tribe or otherwise entitled to organize it.  Typically, California tribes who had been unlawfully terminated by the federal government regained federal

recognition through litigation like Hardwick, supra, and the court judgment in that litigation identified the class of persons entitled to organize the tribe, e.g., the distributes and their dependents, and their lineal descendants.  However, in the case of the Sheep Ranch Rancheria, although the land had been distributed to Mabel Dixie pursuant to a distribution plan preparatory to termination, the Secretary never actually followed through and published a final notice of termination.  Instead, the Secretary accepted the land back from Mabel Dixie through a quitclaim deed, thus essentially administratively "unterminating" the Tribe before it had ever been formally terminated. (AR-CVMT-2011-001689).

Therefore, because of the unique circumstance that the Sheep Ranch Rancheria found itself in never being terminated, the BIA concluded that "for purposes of determining the initial membership of the Tribe," Yakima Dixie and Melvin Dixie must be included, because they were the remaining heirs of Mabel Dixie. (Id.).  In addition to these two initial members, the BIA recognized that Yakima Dixie had adopted Burley, her two daughters, and her granddaughter, into the Tribe.  As a result, the BIA concluded that Burley and her adult daughter, together with Yakima and Melvin Dixie had "the right to participate in the initial organization of the Tribe." (Id.).

On September 24, 1998, the BIA told Yakima and Burley that it "recommend[ed] the Tribe operate as a General Council," because of its "small size," so that they could elect or appoint a chairperson and conduct business. (Id.).  To this end, the BIA offered the Tribe $50,000.00 in grant money for purposes of improving its tribal government, and provided Dixie and Burley with a draft resolution "form" for them to use in requesting the grant. (Id.).  The draft resolution contained language establishing the General Council.

Using the draft resolution form prepared by the BIA, Dixie and Burley prepared and signed a resolution on November 5, 1998, establishing a General Council consisting of all adult members of the Tribe, to serve as the governing body of the Tribe. (AR-CVMT-2011-001690, 00172-176).  The resolution became known as Resolution #CG-98-01, which the BIA accepted as the governing document of the Tribe. (AR-CVMT-2011-000179).  The document was signed by Yakima Dixie and Silvia Burley, and later by Rashel Reznor, and specifically noted that the whereabouts of Melvin Dixie were at that time unknown.  Resolution #GC-98-01 vested the General Council with the governmental authority of the Tribe to conduct the full range of government-to-government relations with the United States. (AR-CVMT-2011-000178).

Pursuant to Resolution #GC-98-01, Yakima Dixie was appointed and elected as the Tribal Chairman. (AR-CVMT-2011-002052).

**B.   DIXIE'S FRAUD AND TRIBAL LEADERSHIP DISPUTE**

On April 20, 1999, Yakima Dixie signed a notice of resignation as Tribal Chairman. (RJN "32", Letter to Washburn from Corrales, 6/6/2014, Ex. "46" to Decl. of MCJ).  On the same date, Yakima Dixie also signed a document confirming his resignation as Tribal Chairman and agreeing to the appointment of Silvia Burley to replace him as the new Tribal Chairperson. (Id.).

Sometime after he resigned, Yakima Dixie was approached by a non-Indian, Chadd Everone, who sought Yakima's cooperation in taking control of the Tribe in order to build a gambling casino using the name and status of the Tribe. (AR-CVMT-2017-000955-56).  The problem was that Yakima Dixie had already expressly resigned.  To regain control of the Tribe, Everone conspired with Yakima to have Yakima falsely say that he never resigned and that his written resignation was a forgery.  Yakima Dixie

then thereafter falsely told the BIA and others that he never resigned and that his resignation was forged.  This then created a Tribal leadership dispute between Yakima Dixie and Burley that has since 1999 caused havoc with the Tribe and crippled the Tribe's ability to operate effectively over the years. (AR-CVMT-2011-002051, 001573-75).  Yakima maintained that claim from 1999 up through February 7, 2012, when he was deposed and testified in a California state action that he in fact resigned in April of 1999, that his resignation was not forged as he had previously claimed, and that the signatures on the Tribal resignation documents were in fact his. (RJN "33", Letter to Washburn from Corrales, 7/9/2014).

Despite Dixie's claim that he never resigned, the BIA chose to acknowledge Burley as the Chairperson of the Tribe, and, as a result, accepted and honored numerous Tribal resolutions passed by the General Council under Burley's leadership from 1999 through July 2005. (AR-CVMT-2011-001691).  For example, from 1999 through July 2005, the BIA entered into annual P.L. 638 federal contracts with the Tribe under Burley's leadership, and awarded the Tribe federal contract funding. (Id.).  The California State Gambling Control Commission ("the CGCC") followed the BIA's lead and acknowledged Burley as the authorized Tribal representative to receive $1.1 million in annual RSTF payments for the Tribe.  However, behind the scenes, Everone continued to stir up false claims of a Tribal leadership dispute between Dixie and Burley, causing the BIA to stop awarding the Tribe 638 federal contract funding in August 2005, which in turn caused the CGCC to withhold RSTF payments to the Tribe as well.  (AR-CVMT-2017-000958-963).

C.   **THE JANUARY 28, 2010 IBIA DECISION**

Because of the ongoing Tribal leadership dispute was not coming to an end, the BIA took it upon itself, through the

urging of Everone and the Dixie faction, to begin a process of "re-organizing" the Tribe under the IRA. (AR-CVMT-2011-001684-85). It invited several nonmembers it called "potential" or "putative" members to participate in a general council meeting in this re-organization process, which included enrolling new members. (AR-CVMT-2011-001684).  The BIA claimed these actions were necessary, because, according to the Interior Board of Indian Appeals ("IBIA") it felt "until the tribal organization and membership issues were resolved, a leadership dispute between Burley and Yakima...could not be resolved, and the resolution of that dispute was necessary for a functioning government-to-government relationship with the Tribe." CVMT v. Pacific Regional Director, BIA (Jan. 28, 2010) 51 IBIA 103, 103-104. (AR-CVMT-2011-001684-85).

The Burley faction appealed the Pacific regional Director's decision to the IBIA. (AR-CVMT-2011-001684).  The IBIA, however, deemed the matter to be a membership enrollment dispute, because it involved the issue of whether the BIA could re-organize the Tribe under the IRA without the Tribe's consent and force the enrollment of nonmembers to participate in that re-organization. (AR-CVMT-2011-001703).  Because the IBIA did not have jurisdiction over enrollment disputes, it referred the issue to the Assistant Secretary of Interior, Indian Affairs ("AS-IA"). (Id.).

The IBIA did not refer to the AS-IA any issue concerning whether the 1998 Resolution establishing the General Council was invalid for any reason.  Nor did the Burley faction raise that as an issue before the IBIA. (AR-CVMT-2011-001684-1705).

D.   AS-IA LARRY ECHO HAWK'S AUGUST 31, 2011 DECISION

On August 31, 2011, the AS-IA Larry Echo Hawk, in response to the IBIA's referral of the enrollment dispute, made the following decisions concerning the Tribe:

1.   He reaffirmed that the Tribe is a federally recognized tribe whose entire citizenship, as of August 31, 2011, consists of five acknowledged citizens;

2.   The 1998 Resolution established a General Council form of government, comprised of all the adult citizens of the Tribe, with whom the Department may conduct government-to-government relations;

3.   The Department shall respect the validly enacted resolutions of the General Council; and

4.   Only upon a request from the General Council will the Department assist the Tribe in refining or expanding its citizenship criteria, or developing and adopting other governing documents.

5.   Although the Tribe's General Council does not render the Tribe organized under the IRA, as a federally recognized tribe, the Tribe is not required to "organize" under the IRA.

6.   It is impermissible to treat the Tribe, as a non-IRA tribe, differently from tribes organized under the IRA and not allow it to receive federal benefits. (AR-CVMT-2011-002049-50).

Echo Hawk, therefore, determined that there was "no need for the BIA to continue its previous efforts to organize the Tribe's government, because it is already organized as a General Council, pursuant to the 1998 General Council Resolution it adopted at the suggestion of the BIA." (AR-CVMT-2011-002049). It concluded further that there was "no need for the BIA to continue its previous efforts to ensure that the Tribe confers tribal citizenship upon other individual Miwok Indians in the surrounding area." (Id.).

In his decision, Echo Hawk observed that the BIA wrongly concluded it had an obligation to potential members in the surrounding community. (AR-CVMT-2011-002050-51).  He made it

clear that only the Tribe's General Council has the exclusive authority to decide who can be enrolled as members.  He stated:

> "...the BIA clearly understood in 1998 that the acknowledged CVMT citizens had the right to exercise the Tribe's inherent sovereign power in a manner they chose. It is unfortunate that soon after the 1998 General Council resolution was enacted, an intra-tribal leadership dispute erupted, and both sides of the dispute found, at various points in time in the intervening years, that it served their respective interests to raise the theory that the BIA had a duty to protect the rights of approximately 250 'potential citizens' of the Tribe.  A focus on that theory has shaped the BIA's and the Departments' position on the citizenship question ever since.  By contrast, today's decision clears away the misconceptions that these individuals have inchoate citizenship rights that the Secretary has a duty to protect.  They do not.  The Tribe is not comprised of both citizens and potential citizens. Rather, the five acknowledged citizens are the only citizens of the Tribe, and the General Council of the Tribe has the exclusive authority to determine the citizenship criteria for the Tribe...."

(Id.).

## E.   U.S. DISTRICT COURT DECEMBER 2013 ORDER REMANDING TO AS-IA FOR RECONSIDERATION

Dixie challenged the Echo Hawk 2011 decision in federal court. (AR-CVMT-2011-000024).  In December 2013, the federal district court ("the District Court" or "U.S. District Court") granted summary judgment in favor of Dixie and his Tribal Faction and remanded to the AS-IA for him to "reconsider" his August 31, 2011 decision, because he "assumed" certain factual issues rather than determined them factually. CVMT v. Jewell (U.S.D.C. 2013) 5 F.Supp.3d 86, 100-101.  Specifically, the U.S. District Court remanded back to the AS-IA for him to reconsider his August 31, 2011 decision, because, according to the U.S. District Court, the AS-IA merely assumed the Tribe's membership is limited to five persons and further merely assumed that the Tribe is governed by a duly constituted General Council, without

setting forth its reasons for these conclusions, in light of the administrative record that questioned the validity of those assumptions. (Id.). Indeed, although much of the decision is predicated on an existing Tribal leadership dispute, the court there did not have the benefit of the deposition transcript of Yakima Dixie taken in the California State case, wherein he admits resigning as Tribal Chairman, because it was not part of the administrative record.

As a result, the U.S. District Court was misled into thinking that Dixie still maintained that he never resigned as Tribal Chairman, and the court relied upon that on-going claim in her court as a basis for her ruling.  For example, the U.S. District Court stated:

> Here, the August 2011 Decision fails to address
> *whatsoever* the numerous factual allegations in the
> administrative record that raise significant doubts
> about the legitimacy of the General Council.  From as
> early as April 1999, Yakima contested the validity of the
> Council. *See* AR 000182 (April 21, 1999 letter from
> Yakima to the BIA stating that he "cannot and will not
> resign as chairman of the Sheep Ranch Indian Rancheria");
> *see also,* AR 000205 (October  10, 1999 letter from Yakima
> to BIA raising questions about Burley's authority); AR
> 001690, 000231(Yakima notifying the BIA of "fraud and
> misconduct" with respect to the Tribe's leadership).

5 F.Supp.3d 86, 100-101. Accordingly, based solely on the administrative record, the U.S. District Court concluded that Dixie's claim that his resignation was forged and that he never resigned raised doubts about the validity of the General Council under the Burley Faction.

Moreover, the U.S. District Court's order was largely based on Dixie's time-barred claim that the 1998 Resolution was invalid at the outset, and therefore was erroneous as a matter of law. (Id.)

**F.   THE BURLEY FACTION'S INABILITY TO APPEAL THE DISTRICT COURT ORDER OF REMAND**

The Dixie Faction has argued that Plaintiffs "cannot re-litigate" the U.S. District Court decision granting summary judgment in the Dixie Faction's favor, because Plaintiffs "did not appeal that decision."  This is inaccurate and misleading.

The Burley Faction were Intervenor-Defendants in the Dixie Faction's suit challenging AS-IA Echo Hawk's August 31, 2011 Decision.  The Federal Defendants in that suit chose not to appeal the decision.  When the Burley Faction attempted to appeal, the Federal Defendants moved to dismiss the appeal for lack of jurisdiction, pointing out that "a private party – unlike the government – may not appeal a district court's order remanding to an agency because it is not final within the meaning of 28 U.S.C. § 1291."  (Ex. "1," Motion to Dismiss Appeal for Lack of Jurisdiction, RJN "1").  The Burley Faction conceded this point and stipulated to voluntarily dismiss their appeal.  (Ex. "2" Stipulation of Voluntary Dismissal, RJN "2").

Accordingly, Plaintiffs here are not "re-litigating" issues decided by the U.S. District Court that remanded the matter back to the AS-IA to "reconsider" his 2011 Decision.  That remand order was not final.  Plaintiffs' suit instead is against the AS-IA relative to his December 30, 2015 Decision.

**G.   AS-IA WASHBURN'S DECEMBER 30, 2015 DECISION**

On remand, the AS-IA Kevin Washburn erroneously concluded that the Tribe's membership is more than five people, and that the 1998 General Council does not consist of valid representatives of the Tribe. (AR-CVMT-2017-001402).  He erroneously concluded that the Tribe was never properly "reorganized" back in 1998, leaving questions as to the overall membership of the Tribe, and therefore the Tribe must be reorganized. (AR-CVMT-2017-001401).  He then wrongfully directed

that un-enrolled, potential members be allowed to participate in reorganizing the Tribe. (AR-CVMT-2017-001402). He refused to acknowledge the Tribe's governing document, Resolution #GC-98-01, which established the Tribe's General Council, despite the fact that this governing document has been in place for over 18 years. (AR-CVMT-2017-001401). His decision stated:

> At the time of its enactment, the 1998 Resolution undoubtedly seemed a reasonable, practical mechanism for establishing a tribal body to *manage the process* of reorganizing the Tribe.  But the actual reorganization of the Tribe can be accomplished only via a process open to the whole tribal community.  Federal courts have established, and my review of the record confirms, the people who approved the 1998 Resolution (Mr. Dixie, Ms. Burley, and possibly Ms. Burley's daughter Rashel Reznor) are not a majority of those eligible to take part in the reorganization of the Tribe.  Accordingly, I cannot recognize the actions to establish a tribal governing structure taken pursuant to the 1998 Resolution.  Ms. Burley and her family do not represent the CVMT [the Tribe].

(AR-CVMT-2017-001401). However, these conclusions are based upon Dixie's time-barred claim that the 1998 resolution was invalid at the outset.  Moreover, the IBIA never referred that issue to the AS-IA for resolution.

### III.

### ARGUMENT

**A.   AS-IA WASHBURN'S 2015 DECISION IS ERRONEOUSLY PREDICATED ON A TIME-BARRED CLAIM THAT THE 1998 RESOLUTION ESTABLISHING THE GENERAL COUNCIL WAS INVALID AT THE OUTSET**

The issue of whether the validity of the 1998 Resolution was barred by the statute of limitations was raised before AS-IA Washburn upon reconsideration of the AS-IA's decision. (Ex. "47", RJN "33").

Dixie filed a Complaint against the federal government on January 24, 2011, challenging the AS-IA's December 22, 2010

decision recognizing the General Council established under the 1998 Resolution.  After the AS-IA withdrew his December 22, 2010 decision, he issued another decision on August 31, 2011, reaffirming his December 2010 decision.  Dixie then amended his Complaint on October 17, 2011 challenging the AS-IA's August 31, 2011 decision. (AR-CVMT-2017-000023, 53).  Dixie's original Complaint included a claim that the 1998 Resolution establishing the Tribal Council was invalid at the outset, even though that was not an issue referred to the AS-IA to decide.  In his amended Complaint, Dixie reasserted that claim. (Id. At 000032-33).  Specifically, Dixie's attack on the validity of the 1998 Resolution was that "the identification of the Burleys as members was incorrect because Yakima Dixie did not have the authority to enroll them into the Tribe without the consent of the Tribe's existing members," which Dixie alleged to be members who were "living in the vicinity of the Sheep Ranch Rancheria in 1998" who "were readily identifiable as Tribal members, and were known or should have been known to the BIA." (AR-CVMT-2017-000032).  Dixie's claim in his federal action attacking the validity of the 1998 Resolution was, however, time-barred, and the AS-IA's decision based upon that claim was, therefore, erroneous as a matter of law.

Actions for judicial review of final agency actions brought under the Administrative Procedure Act are subject to a **six-year** statute of limitations.  Wind River Min. Corp. v. U.S. (9th Cir. 1991) 946 F.2d 710, 713; 28 U.S.C. § 2401(a).  Generally, a claim subject to the six-year statute of limitations period under § 2401(a) first accrues when the plaintiff comes into possession "of the critical facts that he has been hurt and who has inflicted the injury." United States v. Kubrick (1979) 444 U.S. 111, 122.  Under federal law, a cause of action accrues when the plaintiff is aware of the wrong and can successfully

bring a cause of action. <u>Acri v. Int'l Ass'n of Machinists & Aerospace Workers</u> (9th Cir. 1986) 781 F.2d 1393, 1396.  Stated another way, "[t]he moment at which a cause of action first accrues within the meaning of Section 2401(a) is when 'the person challenging the agency action can institute and maintain a suit in court.'" <u>Muwekma Ohlone Tribe v. Salazar</u> (D.D.C.2011)(quoting <u>Spannaus v. U.S. Dep't of Justice</u> (D.C.Cir.1987) 824 F.2d 52, 56).

In <u>Muwekma</u>, supra, the U.S. District Court concluded that the Tribe's claims under the APA against the Department of Interior ("DOI") and its agency officials for purportedly terminating its tribal status was barred by the six year statute of limitations under 28 U.S.C. § 2401(a).  It found that the Tribe's claim first accrued and thus it could have pursued a cause of action against the agency on the following three occasions:

(1)  in 1927, when the Muwekma contends that "the Department provided [it with only] a fraction of the federal funding and services allocated to ... Indian tribes;

(2)  in 1979, when the Muwekma "was not listed on the Federal Register list of entities recognized by the Secretary of Interior as a tribe;" and

(3)  in 1989, when the Muwekma filed its petition for federal acknowledgment.

813 F.Supp.2d at 191. The Court then stated:

> Of these three dates, the Court finds that the most obvious point at which the Muwekma **could have brought suit** against the agency for purportedly terminating its tribal status was **in 1989, when it was clear that it was aware that it was not a federally recognized tribe**.  Given that the Muwekma did not bring this action against the Department until 2001, approximately twelve years after it undoubtedly **possessed knowledge** that it **lacked acknowledgment by the federal government as a tribe**, its unlawful termination of

tribal status claim is plainly barred by the limitations period of 28 U.S.C. § 24001(a).  (Emphasis added).

813 F.Supp.2d at 191.

For the same reasons, the Dixie Faction's claim that the 1998 Resolution was purportedly invalid is barred by the six year statute of limitations, because Dixie knew more than six years before he and his Faction filed suit against the DOI and its agencies on January 24, 2011, that the DOI and the BIA were acknowledging and accepting the General Council established under the 1998 Resolution while he was simultaneously objecting to it.  As in the case of Muwekma, supra, there were several dates that Dixie could have brought suit against the DOI and the AS-IA for purportedly acknowledging and recognizing the General Council established under the 1998 Resolution which the Dixie Faction claimed in its 2011 suit was invalid at the outset. These dates are as follows:

(1)  The U.S. District Court noted that "from as early as April 1999" Dixie "contested the validity of the [General] Council."  It stated:

> Here, the August 2011 Decision fails to address *whatsoever* the numerous factual allegations in the administrative record that raises significant doubts about the legitimacy of the General Council.  **From as early as April 1999, Yakima [Dixie] contested the validity of the Council.** *See* AR 000182 (April 21, 1999 letter from Yakima to the BIA stating that he "cannot and will not resign as chairman of the Sheep Ranch Indian Rancheria"); *see also*, AR 000205 (October 10, 1999 letter from Yakima to BIA raising questions about Burley's authority); AR 001690, 000231 (Yakima notifying the BIA of "fraud and misconduct" with respect to the Tribe's leadership). (Emphasis added).

California Valley Miwok Tribe v. Jewell (D.D.C.2013) 5 F.Supp.3d 86, 100.

(2)    On February 4, 2000, the BIA wrote to Dixie in response to his allegations of "fraud or misconduct" concerning

the change in Tribal leadership that Dixie claims occurred in
April and May of 1999.  The BIA letter memorialized a meeting
between BIA personnel and Dixie that occurred in December 1999.
The letter recounts that Dixie presented the BIA with his own
"constitution" for governing the Tribe that was purportedly
adopted by Dixie and his Faction on December 11, 1999.  The BIA
returned the document to Dixie in its letter and stated that:

> "...the body that acted on December 11, 1999, upon the
> document **does not appear to be the proper body to so act.**"
> (Emphasis added).

(AR-CVMT-2011-000241, 245).  In short, the BIA unequivocally
informed Dixie that it was recognizing the General Council
established under the 1998 Resolution, and not the Dixie
Faction's Tribal Council, despite Dixie's claim of fraud in
connection with its formation.

     (3)  On March 7, 2000, the BIA wrote Silvia Burley, as the
Chairperson of the Tribe, and summarized discussions its
personnel had with Dixie on February 4, 2000.  The letter
recounts that Dixie was challenging his enrollment of Burley and
her family into the Tribe.  (Ex. "5," BIA letter to Burley dated
March 7, 2000, page 2).  His argument was obviously that if he
never intended to enroll them as Tribal members, then the
General Council established under the 1998 Resolution was
invalid at the outset.  The BIA indicated that it rejected
Dixie's claims and requested he submit his grievances to the
Tribe's General Council, thus reaffirming the BIA's recognition
of the General Council established under the 1998 Resolution.
The letter stated:

> "**We also reiterated [to Dixie] our view**, notwithstanding a
> Tribal decision to the contrary, **that the appropriate
> Tribal forum is the General Council [established under the
> 1998 Resolution]**.  At present, we view, again
> notwithstanding a Tribal decision to the contrary, the

General Council as comprised of Yakima Dixie, Rashel
Reznor, and you [Burley]..." (Emphasis added).

(AR-CVMT-2011-000249-250).

(4)  On July 18, 2001, Dixie filed suit in the U.S.
District Court, Eastern District of California, alleging fraud
against Burley in connection with the formation of the General
Council established under the 1998 Resolution.  Dixie alleged
that the Tribe was "small," and that he, his brother Melvin and
his son "Rocky" were the only members of the Tribe by virtue of
being "lineal descendants of the Sheep Ranch Miwok Tribe." (Ex.
"6," Complaint, "Sheep Ranch Miwok Tribe v. Burley, et al.,"
Case No. CIV.S-01-1389 MLS-DAD, pp. 14, 27, 30-31, filed July
18, 2001, RJN "3").  He alleged that his enrollment of Burley
and her family was conditioned on them "following his
leadership." Id.  He alleged that Burley and her family by fraud
voted her to become the Tribal Chairperson and that they never
intended to follow his leadership.  Id.  He alleged that had he
known of Burley's true intentions, he would have never accepted
her and her family as members.  Id.

The U.S. District Court dismissed Dixie's suit and observed
as follows:

> As an initial matter, the court may take judicial notice of
> evidence that defendants Silvia Burley and Rashel Reznor
> are **recognized by the BIA as the sole members of the
> governing body of the Sheep Ranch Rancheria of Me-Wuk
> Indians**. See BIA July 12, 2000 Letter of Recognition,
> Burley Decl. Exh. C. (Emphasis added).

(Ex. "23," Order, January 24, 2002, No. CIV. S-01-1389 LKK/DAD,
page 3, lines 12-16, AR-CVMT-2011-000278, 280).  Dixie never
appealed this order of dismissal.  The BIA letter of July 12,
2000, which was attached to the motion to dismiss, and which
Dixie obviously got a copy of during the briefing of the motion,
explicitly states:

"The Bureau of Indian Affairs, Central California Agency, recognizes the following individuals as members of the Tribal Council, governing body, of the Sheep Ranch Rancheria of Me-Wuk Indians:

      1.   Silvia F. Burley, Chairperson
      2.   Vacant, Vice-Chairperson
      3.   Rashel K. Reznor, Secretary/Treasurer

"Please contact Raymond Fry, Tribal Operations Officer, at (916) 566-7124 should you require additional information with regard to this matter."

(Ex. "7," BIA letter of July 12, 2000, to Burley, AR-CVMT-2011-000257).  As stated, Dixie got a copy of this letter during the briefing of the motion to dismiss, and was therefore <u>put on notice</u> of the BIA's position with respect to the validity of the General Council established under the 1998 Resolution, at least as far back as January 24, 2000, the date of the order.

     (5)   On October 30, 2003, Dixie wrote a letter to the U.S. Department of the Interior ("DOI") attempting to appeal the BIA's 1999 recognition of Burley as the Chairperson of the Tribe, and requesting that the DOI "nullify her appointment and her and her families' adoption as member of the Tribe."  His appeal states in pertinent part:

"In this appeal, I Yakima K. Dixie, as Appellant, am contesting the administrative action (without my knowledge and consent) by agents of the Bureau of Indian Affairs, in which Silvia Burley fraudulently came to be the recognized authority for and Chairperson of my ancestral tribe, of which I am the <u>hereditary</u> Chief and **rightful** Chairperson by lineal descent.  As explained herein, I was tricked by Silvia Burley and others; and I, the Appellant, am requesting the nullification of both her appointment as Chairperson and the nullification of her original adoption and the adoption of her daughter and two grand-daughters into my tribe, which, again, I allege was fraudulent..." (Emphasis added as to "hereditary" only; other emphasis in the original).

(Ex. "8," Dixie Notice of Appeal, dated October 30, 2003, page 1, RJN "4").  Here, Dixie is claiming to have hereditary rights and powers as the "hereditary chief" of the Tribe, notwithstanding the 1998 Resolution, which specifically provides:

> "**RESOLVED**, That all other <u>inherent rights</u> and powers not specifically listed herein shall <u>vest</u> in the <u>General Council</u>..." (Emphasis added).

(Ex. "9," Resolution #GC-98-01, "Establishing a General Council to Serve as the Governing Body of the Sheep Ranch Band of Me-Wuk Indians," dated November 5, 1998, page 1, AR-CVMT-2011-000177). Accordingly, Dixie's 2003 Notice of Appeal is clear evidence that he was attempting to challenge the validity of the General Council established under the 1998 Resolution, and thus was aware of the existence of such a claim more than six years from the time he filed his Complaint against the AS-IA on January 24, 2011.

In any event, Dixie's appeal was dismissed on procedural grounds and as untimely.  In a letter dated February 11, 2005, the BIA wrote to Dixie as follows:

> "I am writing in response to your appeal filed with the office of the Assistant Secretary-Indian Affairs on October 30, 2003...In that appeal, you challenged the Bureau of Indian Affairs' ("BIA") recognition of Sylvia Burley as tribal Chairman and sought to 'nullify' her admission, and the admission of her daughter and granddaughters into your Tribe.  Although your appeal raises many difficult issues, I must dismiss it on procedural grounds.
>
> * * *
>
> "In addition, your appeal appears to be untimely.  In 1999, you first challenged the BIA's recognition of Ms. Burley as Chairman of the Tribe.  In February 2000, the BIA informed you that it defers to tribal resolution of such issues.  On July 18, 2001, you filed a lawsuit against Ms. Burley in the United States District court for the Eastern

District of California challenging her purported leadership of the Tribe. **On January 24, 2002, the district court dismissed your lawsuit, without prejudice and with leave to amend, because you had not exhausted your administrative remedies by appealing the BIA's February 2000 decision.** After the court's January 24, 2002, order, you should have pursued your administrative remedies with the BIA. Instead, you waited almost a year and a half, until June 2003, before raising your claim with the Bureau. As a result of your delay in pursuing your administrative appeal after the court's January 24, 2002, order, your appeal before me is time barred." (Emphasis added).

(Ex. "10," BIA letter to Dixie, dated February 11, 2005, pages 1-2, AR-CVMT-2011-000610). As the BIA explained to Dixie in this letter of February 11, 2005, Dixie could have challenged the BIA's recognition of the General Council established under the 1998 Resolution as far back as 1999, by first exhausting his administrative remedies and then filing suit in the U.S. District Court. The District Court nevertheless gave Dixie another chance and allowed him to proceed with his claims after exhausting his administrative remedies, but he never followed through with that requirement. In the same way he was time-barred in February 2002, he was also time-barred under the six-year statute of limitations when he attempted to challenge the validity of the General Council established under the 1998 Resolution in his January 24, 2011 suit in federal court.

In addition, Dixie's attempt to "nullify" Burley and her family's adoption as members of the Tribe goes to the heart of the validity of the 1998 Resolution establishing the General Council, which states in pertinent part:

"**RESOLVED,** That Yakima Dixie, Silvia Fawn Burley, and Rashel Kawehilani Reznor, as a majority of the adult members of the Tribe, hereby establishes a General Council to serve as the governing body of the Tribe..."

(Ex. "9," Resolution #GC-98-01, "Establishing a General Council to Serve as the Governing Body of the Sheep Ranch Band of Me-Wuk

Indians," dated November 5, 1998, page 2, AR-CVMT-2011-000178). Without these adopted members, there could be no General Council, and the Tribe would not have been organized with a General Council governing body.

(6)   On May 5, 2004, Yakima Dixie executed a "Will & Testament."  In this document, Dixie reiterates he is the "Chief and rightful authority of the Sheep Ranch Rancheria of MiWok Indians of California a.k.a. California Valley Miwok Tribe," because of his "hereditary and lineal descent." (Ex. "11," Yakima Dixie Will & Testament, May 5, 2004, page 1).  The document also references the establishment of a Tribal Council, separate and apart from the "General Council" established under the 1998 Resolution, and states:

> "At the time of this signing, the only member of the Tribal Council is Velma WhiteBear, who is designated as the Executive Director of the Tribe."

(Ex. "11," Yakima Dixie Will & Testament, May 5, 2004, page 2, RJN "5", AR-CVMT-2017-000957).  The document then lists ten (10) persons as the only members of the Tribe, but does not name Burley and her three family members Dixie adopted into the Tribe in 1998. (He was also contradicting his claims that the Tribe consists of more than 200 members).  Thus, at the time of the execution of his Last Will & Testament, dated May 5, 2004, Dixie was denying the validity of the General Council established under the 1998 Resolution.  Together with his October 30, 2003 letter to the DOI and previous letters to the BIA objecting to the BIA's recognition of Burley as Chairperson of the Tribe and the BIA's recognition of Burley and her family as adopted members of the Tribe, Dixie therefore knew he had a claim against the federal government for recognizing the Tribe's General Council that was purportedly invalid at the outset, more than six years from the date he filed suit on January 24, 2011.

(7)   Notice that the Tribe had changed its name to the California Valley Miwok Tribe was published in the July 12, 2002 Federal Register.  (See Ex. "12," copy of 2002 Federal Register and Ex. "13," June 7, 2001, letter from BIA to Burley accepting new name for publication, RJN "7").   The placement of the new name of the Tribe was an act of recognition by the DOI of the validity of the General Council established under the 1998 Resolution, after the General Council passed a resolution to change the name of the Tribe and submitted it to the BIA for approval.  As the DOI stated in a letter to Silvia Burley on June 7, 2001:

> "The *Sheep Ranch Rancheria* (Tribe) is a small tribe that does not have a tribal constitution.  The tribe has a tribal council and conducts tribal business through resolution.  A tribal resolution, such a resolution No. R-1-5-07-201, enacted by the Tribal council on May 7, 2001, is sufficient to effect the tribal name change.  The Tribe's new name has been included on the Tribal Entities list that will be published in the FEDERAL REGISTER later this year."

(Ex. "13," Letter from Sharon Blackwell at BIA to Burley, dated June 7, 2001, RJN "7").

The DOI's publication of the Tribe's new name in the FEDERAL REGISTER was adequate notice to Dixie and his followers that on July 12, 2002, the DOI recognized the validity of the General Council established under the 1998 Resolution, thereby giving Dixie critical facts to institute a lawsuit.

"[S]tatute of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the government." Hopland Band of Pomo Indians v. United States (Fed.Cir.1988) 855 F.2d 1573, 1576; Sissten-Wahpeton Sioux Tribe v. United States (9th Cir. 1990) 895 F.2d 588, 592 ("Indian Tribes are not exempt from statute of limitations governing actions against the United

States"). Also, [a]ctual knowledge of government action...is not required for a statutory period to commence." <u>Shiny Rock Mining Corp. v. United States</u> (9th Cir. 1990) 906 F.2d 1362, 1364. Instead, "[p]ublication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." <u>Id</u>. Accordingly, the notice published in the Federal Register on July 12, 2002, was adequate to apprise Dixie and his followers that the federal government was acknowledging the validity of the General Council established under the 1998 Resolution. Thus, based on the Federal Register publication alone, a timely action challenging the validity of the 1998 Resolution establishing the General Council should have been filed before July 12, 2008, six years after the 2002 FEDERAL REGISTER publication.

**B.   THE U.S. DISTRICT COURT IMPROPERLY DIRECTED THAT THE AS-IA RECONSIDER HIS 2015 DECISION BASED ON A <u>TIME-BARRED CLAIM</u>**

As indicated, the Burley Faction, as an Intervenor-Defendant in Dixie's federal suit challenging the August 2011 AS-IA's decision, was unable to appeal the U.S. District Court's order granting summary judgment in favor of the Dixie Faction, because the Federal Defendants chose not to appeal and the remand order was not final. As a result, the AS-IA reconsidered its August 2011 decision based on erroneous remand instructions that included an order that the AS-IA address the issue of whether the General Council as established under the 1998 Resolution was valid at the outset, as pled in the Dixie Faction's complaint.

The U.S. District Court stated:

The August 2011 Decision declares: "[t]he [November] 1998 Resolution established a General council form of government, comprised of all adult citizens of the Tribe, with whom the [BIA] may conduct government-to-government

relations. AR 002056.  Once again, in reaching this conclusion, the Assistant Secretary simply assumes, without addressing, the validity of the General Council...

The Court finds that the August 2011 Decision is unreasonable in light of the facts contained in the administrative record...Before invoking the principle of tribal self-governance, it was incumbent on [the Assistant Secretary] to first determine whether a duly constituted government actually exists...

Here, the August 2011 Decision fails to address *whatsoever* the numerous factual allegations in the administrative record that raise significant doubts about the legitimacy of the General Council.  From as early as April 1999, Yakima contested the validity of the Council...

...Accordingly, the Court will remand this issue to the Secretary for reconsideration. (Emphasis added).

California Valley Miwok Tribe v. Jewell (2013) 5 F.Supp.3d 86, 99-101.

However, as stated, the issue of whether the General Council was invalid at the outset was barred by the six-year statute of limitations.

**C.   PLAINTIFFS PRESERVED THE STATUTE OF LIMITATIONS ISSUE BEFORE THE U.S DISTRICT COURT IN DIXIE'S FEDERAL ACTION**

On March 26, 2012, the Burley Faction filed a motion to dismiss the Dixie Faction's FAC in the federal action challenging the AS-IA's 2011 Decision.  Among other things, the Burley Faction alleged that the Dixie Faction's claims were barred by the six-year statute of limitations, including the claim challenging the validity of the General Council established under the 1998 Resolution.  The motion stated in pertinent part as follows:

"...Claims which arise under the APA are subject to the statute of limitations governed by 28 U.S.C. §2401(a), which bars civil actions against the United States that are not filed within six years after the right of action first accrues...

* * *

> "Plaintiffs' Amended Complaint also very clearly challenges
> the September 24, 1998 BIA final agency action which first
> recognized the tribe's five member citizenship and their
> authority to establish a Tribal government, alleging that
> the BIA acted 'erroneously'...Neither the Non-Members...nor
> Mr. Dixie ever challenged the 1998 Final Agency Action.
> Nor did Plaintiffs challenge subsequent BIA final agency
> actions issued on February 2000 and March 2000, which
> reaffirmed the authority of the Tribe's governing body,
> pursuant to Resolution #GC-98-01, and its five federally
> recognized members...."

(Ex. "14," PAs in Support of Intervenor-Defendant's Motion to
Dismiss, filed 3/26/2012, pages 18-19, RJN "8").

    The U.S. District Court's Order denying the motion to
dismiss on these grounds was factually and legally erroneous.
It stated:

> It is true that in February 2000, the Secretary accepted
> the "General Council...as the governing body of the Tribe,"
> A.R. at 236, and the Dixie Faction could have challenged
> his determination then.  Any such challenge would have been
> mooted, however, by the Secretary's reversal in February
> 2005, when he held "the [Bureau] does not recognize any
> tribal government."  Non-Recognition Letter, A.R. at 611.
> Because the Secretary's decision on review "mark[ed] a 180-
> degree change of course" by once again recognizing the
> General Council as the Tribe's government, the Dixie
> Faction's challenge is timely.  Decision Letter, A.R. at
> 2050.

(Ex. "15," Memorandum Opinion Denying Motion to Dismiss,
9/06/2013, pages 13-14, AR-CVMT-2017-000762, 774-775).  This
conclusion is erroneous.  First of all, the February 11, 2005
letter relied upon by the Court states that because the Tribe
was at that time not "organized" under the IRA, the BIA did not
recognize its governing body, but it did "recognize" Silvia
Burley as a "person of authority within the California Miwok
Tribe."  The letter further stated that the BIA would not

recognize either Burley or Dixie as "Chairman" of the Tribe, until the Tribe organized itself under the Indian Reorganization Act of 1934 ("IRA").  The BIA was clearly trying to get the Tribe to "re-organize" itself under the IRA, but was continuing to recognize Burley as a person with authority with whom the BIA was at that time conducting government-to-government relations. The letter never stated that the BIA considered the General Council established under the 1998 Resolution to be invalid. Indeed, recognizing Burley as a person of "authority" within the Tribe would seem to contradict that notion, since her authority was derived from the General Council.  Thus, the statute of limitations issue was not mooted by the BIA's February 2005 letter.

Secondly, the February 11, 2005 letter did not address the issue of whether the General Council was invalid or not recognized, but simply made passing reference to a letter from the BIA dated March 26, 2004 that indicated the Tribe was not organized, and, because of that, the BIA stated in its February 11, 2005 letter that it therefore could not "defer to any tribal dispute resolution process at [that] time" with respect to the BIA's recognition of Burley as the Tribal Chairperson and the admission of Burley's family as Tribal members.

Third, the AS-IA's 2011 Decision was not a "180-degree change of course" which "once again" "recognize[ed] the General Council as the Tribe's government," as the U.S. District Court characterized it in its Order.  Rather, the 2011 Decision made it clear that its "180-degree change of course" was only with respect to its "finding (6)" that stated:

> "Under the IRA, as amended, it is impermissible for the Federal government to treat tribes not 'organized' under the IRA differently from those 'organized' under the IRA (25 U.S.C. §§ 476(f)-(h))."

(Ex. "16," AS-IA's August 31, 2011 Decision, page 2, AR-CVMT-2011-002050).  Up to that point, the DOI was requiring the Miwok Tribe to "reorganize" itself under the IRA in order for it to be eligible to receive federal benefits.  The 2011 Decision further stated:

> "I reject as contrary to § 476(h) the notions that a tribe can be compelled to 'organize' under the IRA and that a tribe not so organized can have 'significant federal benefits' withheld from them.  Either would be a clear violation of 25 U.S.C. § 476(f)."

(Id. At 2054).  This different (180 degree) policy direction was that the BIA should no longer require the Tribe to re-organize its governing body under the IRA, in order to be eligible to receive federal benefits, including P.L. 638 federal contract funding.  The "policy" was not whether the General Council was to be recognized as a valid governing body or whether it was invalid at the outset, as the Court was suggesting.

Dixie's claim that the General Council established under the 1998 Resolution was invalid at the outset was time-barred, and the Burley Faction's motion to dismiss this claim should have been granted.  Instead, the Court allowed this time-barred claim to proceed against the federal government and improperly ordered the AS-IA to re-evaluate on remand whether the 1998 Resolution establishing the General Council was invalid at the outset.

**D.   THE ISSUE OF THE VALIDITY OF THE 1998 RESOLUTION ESTABLISHING THE GENERAL COUNCIL WAS NEVER REFERRED TO THE AS-IA FOR REVIEW BY THE INTERIOR BOARD OF INDIAN APPEALS**

The issue of improper referral was also raised before Washburn on reconsideration. (Ex. "47", RJN "33").

The issue the Interior Board of Indian Appeals ("IBIA") referred to the AS-IA for resolution was limited to an "enrollment dispute," i.e., whether the BIA could force the

Tribe to organize under the IRA and convene a "general council" meeting without the Tribe's consent and have non-members in the surrounding community participate in that "re-organization." Ex. "17," <u>California Valley Miwok Tribe v. Pacific Director, BIA</u> (01/28/2010) 51 IBIA 103, 120.  (AR-CVMT-2011-001701).  As stated, the BIA was forcing this issue, not because it felt the General Council was invalid at the outset, but rather because it felt the Tribe could not qualify for federal benefits without being re-organized under the IRA.  <u>The IBIA did not refer any issue concerning the validity of the General Council</u>.  It referred this "enrollment" dispute to the AS-IA because the IBIA lacked jurisdiction to decide that issue.  It stated:

> "...<u>In this appeal, Burley contends that BIA exceeded its authority in determining who would constitute the 'greater tribal community,' or class of 'putative members,' and in deciding that they could participate as part of a 'general council' meeting of the Tribe, to decide membership and organizational issues</u>.

> "As evidenced by the decisions of the Superintendent and the Regional Director, and the public notices published by BIA in 2007, BIA apparently has decided to create a base roll of individuals who satisfy criteria that BIA has determined to be appropriate and who will be entitled to participate—effectively as members (albeit in a somewhat undefined capacity)—in a 'general council' meeting of the Tribe to organize the Tribe.  <u>Although the facts of this case render BIA's decision far from a typical enrollment adjudication, we conclude [...], in substance, that is what it is</u>.  Whether or not some or all of the individuals BIA would determine, under the Decision, to be 'putative members' of the Tribe will ultimately be enrolled, BIA's determination of their 'putative membership' apparently will effectively 'enroll' them as members of the 'general council' that is to meet.  <u>And that general council, as apparently envisioned by BIA, will have the authority to determine permanent membership criteria</u>.

> "Understood in the context of the history of this Tribe, and BIA's dealings with the Tribe since approximately 1999, **this case is properly characterized as**

**an enrollment dispute**...Because the Board lacks jurisdiction to adjudicate tribal enrollment disputes, we dismiss this claim and refer it to the Assistant Secretary." (Emphasis added).

51 IBIA at 120-121, AR-CVMT-2011-001701-1702.

In the same way the AS-IA observed as undisputed that the Tribe was a federally-recognized Tribe (AS-IA August 31, 2011 Decision, page 1), the AS-IA in his August 2011 Decision observed as undisputed the fact that the Tribe "operates under a General Council form of government, pursuant to Resolution #CG-98-01." (Id. at page 2).  Whether the General Council was invalid at the outset was not referred to him for resolution. Nor could it have been, because **Burley was not disputing that issue in her appeal before the IBIA**.  Nor was the BIA.  As stated, the issue first came up when Dixie, not Burley, raised it in his January 24, 2011 complaint he filed in federal court challenging the AS-IA's December 22, 2010 Decision, and again on October 17, 2011, when he challenged the August 31, 2011 AS-IA's Decision.

Accordingly, it was improper and erroneous for the AS-IA to entertain and decide that issue in his December 30, 2015 Decision.

**E.   THE 2015 DECISION ERRONEOUSLY CONCLUDED THAT THE 1998 GENERAL COUNCIL WAS ESTABLISHED MERELY TO "*MANAGE THE PROCESS* "OR REORGANIZING THE TRIBE"**

In his 2015 Decision, the AS-IA concluded that the 1998 Resolution establishing the General Council was enacted merely to "*manage the process* of re-organizing the Tribe." (2015 Decision, page 5, AR-CVMT-2017-001401).  The AS-IA used this erroneous statement to justify its further determination that the Tribe was required to re-organize under the IRA with the participation of non-members ("putative members") in the surrounding community, all in opposition to the determinations

made by the previous AS-IA in his August 2011 Decision.  In truth and fact, nowhere in the 1998 Resolution is there any mention that it was established to "manage the process of re-organizing the Tribe."

While the Tribe had the option of re-organizing under the IRA, and the record reflects the Tribe pursued that option for a while but decided against it, the 1998 Resolution clearly provides that it "establishe[d] a General Council to serve as the governing body of the Tribe." (Page 2 of Resolution).  It was not established to "manage the process of reorganizing the Tribe" under the IRA.  Indeed, the title of the Resolution clearly states:

> "ESTABLISHING A GENERAL COUNCIL TO SERVE AS THE GOVERNING BODY OF THE SHEEP RANCH BAND OF ME-WUK INDIANS"

(Ex. "9," Resolution #GC-98-01, page 1, AR-CVMT-2011-000177). If, pursuant to 25 U.S.C. § 476(h), the Tribe is not required to "organize" under the IRA, and the Tribe decides not to pursue that option, then the General Council remains as the governing body of the Tribe.  As stated in the 1998 Resolution:

> "**RESOLVED,** That the General Council shall exist until a Constitution is formally adopted by the Tribe and approved by the Secretary of the Interior or his authorized representative, unless this resolution is rescinded through subsequent resolution of the General Council." (Emphasis added).

(Ex. "9," Resolution #GC-98-01, AR-CVMT-2011-000179).

In addition, the BIA initially suggested the Tribe operate either as a General Council or an Interim Tribal Council, but the Tribe chose the first option, strongly suggesting that it did not want to be tied to the idea of having to re-organize under the IRA if it later decided against it. (Ex. "18," BIA letter to Dixie, dated September 24, 1998, pages 2-3).  Indeed, the Tribe ultimately chose to simply operate as a General

Council outside the IRA, and that's where the trouble began with the BIA later trying to force the Tribe to re-organize under the IRA.

**F.   THE 2015 DECISION INCORRECTLY CONCLUDES THAT PRIOR FEDERAL COURT DECISIONS HAVE HELD THAT THE TRIBE'S MEMBERSHIP IS LARGER THAN FIVE MEMBERS AND HAS MISCONSTRUED THE HISTORY OF THE CALIFORNIA RANCHERIAS**

The 2015 Decision states that "[a]ll of the Federal court decisions examining the CVMT dispute make clear that the Tribe is not limited to five individuals." (Page 3 of AS-IA December 30, 2015 Decision, AR-CVMT-2017-001399). This is inaccurate.

No federal court decision involving the Tribe directly addressed the issue of whether the Tribe's membership consists of five members and whether the General Council is the duly constituted government of the Tribe. Indeed, the U.S. District Court remanding the AS-IA's 2011 Decision for reconsideration made the same observation. In rejecting the Dixie Faction's argument that collateral estoppel bars the Secretary from recognizing the General Council, the Court observed in a footnote as follows:

> ...*CVMT I* and *CVMT II* do not share the same contested issue with this case. (citation). The only issue before the courts *CVMT I* and *CVMT II* was whether the Secretary had the authority to refuse to approve a constitution submitted under IRA § 476(h)(1). The courts did not directly address the issues raised here, namely whether the Tribe's membership consists of five members and whether the General Council is the duly constituted government of the Tribe...

5 F.Supp.3d at 101, fn. 15. The U.S District Court remanding the 2011 Decision for reconsideration merely criticized the AS-IA for simply assuming that the Tribe consists of five members, but made no ruling or holding itself that it was. 5 F.Supp.3d at 99 ("...rather than simply assume that the Tribe consists of five members, the Assistant Secretary was required to first

determine whether the membership had been properly limited to these five individuals"). Thus, no Court has ever held that the Tribe includes more than five members.

In addition, the AS-IA recounted an inaccurate history of the California Rancherias to further support its erroneous conclusion that the Tribe is not limited to five members. It stated without any evidentiary support as follows:

> "When a parcel on a Rancheria came available, BIA would assign the land to such a non-resident Indian who was associated with the band, if possible...Thus, such associated band Indians who were non-residents were potential residents. And since membership in an unorganized Rancheria was tied to residence, potential residents equated to potential members."

(Ex. "19," AS-IA's December 30, 2015 Decision, page 4, AR-CVMT-2017-001400). There has never been an occasion where the BIA has determined that the membership lists of unorganized California Rancherias should be culled from "potential residents," and neither the AS-IA nor the Dixie Faction can provide evidence of such instances.

In most instances, the California Rancherias were terminated by the Rancheria Termination Act, i.e., P.L. 85-671. Thereafter, many unorganized Rancherias sought restoration of their status as federally recognized tribes through litigation. In those instances, following restoration of these Rancherias through stipulated judgments, the BIA looked to the *actual* residents and relied on distributee lists created during the termination period as the most accurate representation of the active members of a particular tribe and determined that only those individuals were entitled to participate in the tribes' reorganization. See Stipulated Judgment, Paragraph 6, Wilton Miwok Rancheria v. Salazar (N.D.Cal. June 8, 2009) No. C-07-02681, Dkt. 61 (stipulation between the United States and the

Wilton Miwok Rancheria that "the initial tribal organization of the Tribe shall be a General Council consisting of all distributes and dependent members listed in the Distribution Plan...."); <u>Alvarado v. Table Mountain Rancheria</u> (N.D.Cal. July 28, 2005) 2005 WL 1806368, at *1 (noting that the restoration of the Table Mountain Rancheria involved reference to "Indians named in the distribution plan of the assets of the Table Mountain Rancheria and their successors in interests"), *aff'd on other grounds*, (9th Cir. 2007) 509 F.3d 1008; <u>Alan-Wilson v. Sacramento Area Dir</u>. (1997) 30 IBIA 241, 255 (concluding that the individuals entitled to participate in the organization of the Cloverdale Rancheria was based on the list of distributees and the distributees' lineal descendants).  These cases show that when the BIA has had to determine who is eligible to reorganize a tribe, it has looked to the distribute list—reflecting <u>actual</u> residence on the Rancheria—as a reliable record to determine membership.  There is no legal basis whatsoever—in the case of terminated tribes or tribes that maintained federal recognition—for treating ***potential*** residents as members for purposes of reorganization as the AS-IA's 2015 decision states.

Accordingly, the AS-IA relied upon these inaccurate facts to support its erroneous conclusion that the Tribe is not limited to five members.

## G.  THE "ELIGIBLE GROUP SYSTEM" IMPROPERLY FORCES THE TRIBE TO "RE-ORGANIZE"

The AS-IA's 2015 Decision establishing the novel "Eligible Group" system creates a system contrary to federal precedent and the requirements of the IRA that equates <u>potential</u> membership with <u>actual</u> membership.

When Burley and her family were adopted into the Tribe by Dixie, their enrollment changed their status from individuals

with Miwok ancestry to members of a small tribe.  In fact, the 2015 Decision recognizes that at the time of the Burley family's enrollment the Tribe was suffering from the effects of a "dwindling tribe." (Ex. "19," AS-IA's December 30, 2015 Decision, page 4, fn. 20, AR-CVMT-2017-001400).  Inexplicably, the 2015 Decision rejects the 1998 Resolution establishing the General Council on the purported ground that "the people who approved the 1998 Resolution...are not the majority of those eligible to take part in the reorganization of the Tribe."  (Id. at page 5).  The 2015 decision then erroneously creates an "Eligible group" system to facilitate the reorganization of the Tribe that includes a larger pool of eligible people based not upon membership, but based upon descent, contrary to well established Indian law.

To be sure, the purported "Eligible group" system improperly places persons with only Miwok ancestry on par with enrolled members.  See Santa Clara Pueblo v. Martinez (1978) 436 U.S. 49, 55-56, 72, fn. 32.  It also violates the provisions of 25 U.S.C. § 476(f) and (h), because it forces the Tribe to reorganize under the IRA in order to receive federal benefits.

## H.   THE DIXIE FACTION IS ESTOPPED FROM CHALLENGING THE 1998 RESOLUTION

The record is clear that Dixie participated in the drafting and approval of the 1998 Resolution establishing the General Council.  He now claims the whereabouts of his brother, Melvin Dixie, were known at the time of the 1998 Resolution, even though he represented to the BIA and to Burley and others that his whereabouts were unknown.  To now contend that the 1998 Resolution is now defective or invalid because Dixie in fact knew where he could be contacted, but that he may have simply lied about it, runs contrary to the principles of equity.

As stated in <u>Menominee Indian Tribe of Wisconsin v.
Thompson</u> (W.D.Wis.1996) 943 F.Supp 999, "it is inaccurate to say
that equitable defenses can never apply to Indian tribes." 943
F.Supp at 1021( the court also stating that it is aware of no
cases holding that collateral estoppel or res judicata can never
apply to an Indian tribe).  The doctrine of equitable estoppel
provides that "whenever a party has, by his own statement or
conduct, intentionally and deliberately led another to believe a
particular thing is true and to act upon such belief, he is not,
in any litigation arising out of such statement or conduct,
permitted to contradict it." Cal. Evid. Code §623; <u>Wilk v.
Vencill</u> (1947) 30 Cal.2d 104, 107.  California equitable
estoppel is thus similar to and not inconsistent with federal
common law. <u>Lukovsky v. City and County of San Francisco</u> (9th
Cir. 2008) 535 F.3d 1044, 1052.

Accordingly, Dixie is equitably estopped from attacking the
validity of the 1998 Resolution establishing the General Council
on the grounds that his brother, Melvin did not sign the
resolution and could have been contacted, because he expressly
misled the BIA and Burley into believing that the whereabouts of
Melvin were unknown at the time the parties executed and passed
the resolution.

**I.   AS-IA ECHO HAWK'S SHOULD BE REINSTATED AND ADOPTED AS THE
MOST LEGALLY CORRECT DECISION ON THE TRIBE'S GOVERNING BODY
AND MEMBERSHIP**

The AS-IA's August 2011 Decision is clearly a correct
statement of Indian law and should be re-instated as the final
agency action resolving the dispute between the two factions.

///
///
///
///

**J. EVERONE AND THE DIXIE FACTION HAVE COMMITTED FRAUD UPON THE COURT AND THE BIA BY FALSELY CREATING A TRIBAL LEADERSHIP DISPUTE TO JUSTIFY RE-ORGANIZING THE TRIBE**

As stated, Everone conspired with Dixie to concoct a Tribal leadership dispute, so that the BIA would question the governing body of the Tribe and, at the urging of the Everone and Dixie, reorganize the Tribe's governing body.  The sole purpose of these actions was to "hijack" or take over control of the Tribe from Burley, so that Everone and his non-Indian investors can build a gambling casino and enrich themselves at the expense of the Tribe.  These issues were raised before AS-IA Washburn when the 2011 AS-IA decision was remanded for him to reconsider. (AR-CVMT-2017-000954 [Memo 1/17/2014: Origination of the CVMT Dispute]; Letter to Washburn 6/6/2014 from Corrales, RJN "32" Ex. "46").

Everone sowed confusion with the BIA and the DOI which he used to implement his casino plans and build a casino.

In 1999, two non-Indian California developers named Bill Martin ("Martin" and Leroi Chappell ("Chappell") read a newspaper article about Yakima Dixie and the Tribe's plight. (AR-CVMT-2017-000955).  The Governor had just signed various state-Compacts allowing various federally-recognized tribes to own and operate gambling casino in California.  Since the Tribe was federally-recognized and had very few members, it was an easy target to use for this venture.  Shortly after reading the newspaper article, Martin and Chappell quickly headed up to Calaveras County, California, to sign up Dixie to represent him in developing an Indian casino.  Thinking they could profit from Dixie's situation, they contacted Dixie and entered into an agreement with him to build a tribal gambling casino. Unfortunately, Dixie had already resigned as Chairperson of the Tribe, and Burley was the current Chairperson.  Martin and

Chapell then contacted Everone who agreed to take over and help formulate a plan. (AR-CVMT-2017-000956).

Everone then took over control of Dixie's affairs, and made himself Dixie's and the Dixie Faction's Tribal "Deputy & Consol General". (AR-CVMT-2017-000956).  Everone is white and is not an Indian, and is not a member of any Indian tribe.  As the Dixie Faction's "Deputy and Consul General," Everone is the managing agent and "officer" of that organization.  Everone manages all loaned money for this scheme through an entity called "Friends of Yakima." (Id.).  He also managed and directed Dixie's litigation in the state and federal cases and manages the "Tribal Organization," known as the "Dixie Faction."

Everone himself admits he "controls" Dixie.  For example, he stated:

> "They [Chadd Everone and Bill Martin] asked for investment monies and provided me with a prospectus without asking how much I could give.  They said my return would be by November 2006.  I then asked them why would I give monies to Yakima who can't stay out of jail, and how is he going to run an Indian Casino?  Both laughed and **Everone stated he controlled Yakima and the casino venture** and told me not to worry about that..." (Emphasis added)

(August 31, 2006 Email quoting Everone in meeting). Thus, in light of Dixie's instability, serious criminal history, including murder and alcohol problems, Everone was easily able to manipulate and control Dixie, and use him for his own personal, financial benefit. (Id.).

When he met Dixie in late 1999, one of the first things Everone did was to tackle the problem of Burley being the Chairperson of the Tribe as a result of Dixie's resignation. (Id.).  He told someone he thought was a potential investor that he "went to work using the UC Berkeley Law Library to study up on Indian Law to begin his quest for removing Burley as Chairperson of the Tribe."  For his scheme to take over control

of the Miwok Tribe to work, however, he needed Dixie to be the Chairperson, not Burley.  His plan was simply to fabricate a forgery claim with respect to Dixie's letter of resignation.

The fact that the issue of forgery relative to Dixie's resignation letter was never raised until <u>after</u> the Everone team became involved strongly suggests that it was, and continues to be, a sham claim as part of Everone's scheme to take over the Tribe for his own financial purposes.  Indeed, Everone admitted as much, when he was interviewed by someone he thought was a potential investor.  He is reported to have said the following:

> "Only after signing up Yakima did Chapelle (later) find out (from the BIA) that the Tribe was under the control of Silvia Burley.  That was when Martin enlisted the help of Everone who came up with a plan to take the tribe out of Silvia's control by saying Yakima only gave up [the] 'spokesperson' role to Silvia and not the Chair."  (Emphasis added).

(Email from C. Ray, dated August 31, 2006, AR-CVMT-2017-000955).  Dixie's ultimate admission in his deposition on February 7, 2012 that he in fact resigned, and that his signature on his resignation was not forged after all, only further supports the view that Everone in fact concocted this false claim to the detriment of the Tribe, and conspired with Dixie to assert it in the litigation and thwart the Tribe's efforts to govern under the General Council.

Moreover, Dixie's false claim that his resignation letter is a forgery is contradicted by several other documents he admits signing thereafter.  For example, after resigning, Dixie admits signing another Tribal document appointing Burley as the new Chairperson.  Then, ten (10) days after resigning, Dixie signs a document for the development of a casino with the Tribe. However, he signs as "Tribal Member" under the signature of Silvia Burley who signed as "Chairperson" of the Tribe.  On July

7, 1999, Dixie wrote the BIA, through his attorney who had a power of attorney, and referred to himself as the "Vice President" of the Tribe, not the Chairman (RJN "33").  Later, on July 23, 1999, Dixie signed an Addendum to the Development Agreement.  He again signed as "Tribal Member," not as Tribal Chairperson, under the signature of Burley who signed as "Chairperson" of the Tribe. (RJN "33").  Dixie obviously signed these documents <u>before</u> he met with Bill Martin and Everone who most likely convinced Dixie that he could develop a casino without Burley.  It is also clear that he knew that Burley was signing as the Chairperson of the Tribe, since that her signature block appears directly above his, yet he signed these documents as a mere Tribal member, not as the Tribe's Chairman. The false notion that Dixie never resigned and that his resignation was forged were then concocted by Everone and Dixie, and that has been their "story," though false, up until February 2012, when Dixie ultimately recanted his story under oath at his deposition.

Thus, by the time Everone and his group came up with the false notion that Dixie's "resignation letter" could be claimed as a purported forgery in late 1999, Dixie had already confirmed Burley's right to be Tribal Chairperson by signing multiple documents to that effect from April 10, 1999 through the end of July 1999.

This forgery claim was carried over into the recent state court actions and against the California Gambling Control Commission by Dixie's litigation team controlled by Everone.  In addition to the forgery claim being alleged in the Complaint in Intervention in the recent action against the Commission, Dixie submitted a false declaration in support of the motion to intervene, stating that his resignation letter from the Tribe was a purported "forgery."

**1.  Dixie's Last Will and Testament.**

In an obvious attempt to protect his financial interests, in the event Dixie should die, Everone and his team arranged to have Dixie sign a "Will and Testament", wherein Dixie confirms his agreements with the Everone group to allow them to build a casino, in the event their scheme succeeds in stealing the Tribe away from Burley, after he dies. (AR-CVMT-2017-000957).

**2.  Everone's team sought to influence the Commission to "freeze" the Tribe's RSTF money.**

As part of his plan, Everone contacted and hired Arlo Smith, a former California Gambling Control Commissioner, and Pete Melnicoe, a former Chief Counsel for the Commission. (AR-CVMT-2017-000961).  His plan was to get the Commission to stop paying Revenue Sharing Trust Fund ("RSTF") money to the Tribe under Burley's leadership, and to have the money paid to Dixie instead. (AR-CVMT-2017-000961).  RSTF money are licensing payments made by Compact tribes which are shared with Non-Compact tribes.  The Miwok Tribe is a non-Compact Tribe entitled to receive $1.1 million per year from the Commission.  Those payments have been suspended since 2005 because of the current Tribal leadership dispute.  Everone is planning on using the Tribe's RSTF money "as security" to convince other non-Indians to invest in his scheme to take the Tribe away from Burley and place it under Everone's control with Dixie as the "puppet" Tribal Chairman. (Id.).

To this end, Everone wrote an Email boasting that his hired team was successful in "influencing" the then Chief Counsel for the Commission, Cyrus Rickards, to stop RSTF payments to the Tribe, beginning in 2005.  He stated:

> "I have hired Peter Melnicoe and Arlo Smith (the former Chief Counsel and the former Commissioner of that agency, respectively); and they were instrumental in getting the money frozen." (Emphasis added).

(AR-CVMT-2017-000961, September 11, 2006 Email from Everone).

**3.   Everone is soliciting "investment money" for the building of a casino, and is offering the Tribe's RSTF money as security.**

In connection with his strategy to solicit investment money from non-Indians to finance his scheme, Everone prepared a "Bridge-loan Agreement & Prospectus" in 2004, which states in pertinent part as follows:

> "...[A]dministrative procedures and litigation are now in progress  to return control of the tribe to Yakima so that he may receive about $1.2 million in income  that currently accrues to the tribe from the California Gambling Control Commission and so that the tribe can be position[ed] to create a casino.
>
> "A sum, not to exceed $250,000.00 is being sought, in the form of Bridge Loans, to pay for the expenses that are necessary to regain control of the tribe to Yakima, to reorganize the tribe, and to negotiate the location and financial backing for a casino..."

(AR-CVMT-2017-000957, Bridge Loan document, dated February 26, 2004).  In addition, the prospective investors were promised a "bonus interest" which would be paid to them "from gambling revenue to the tribe...for a period of 5 years after the casino is created."  The prospectus then adds that Burley is still the target, stating:

> "This $1.2 million royalty [RSTF money on deposit in 2004] presently goes to the tribe but is under the control of the Chairperson whose appointment we are attempting to nullify in administrative appeal and  litigation." (Emphasis added).

(AR-CVMT-2017-000957, Bridge Loan prospectus).  Thus, Everone and his group of investors are not concerned at all about membership or the welfare of other potential Tribal members. They are only concerned about "nullifying" Burley as Chairperson, and stealing the Tribe, so that they can build a

casino for their own financial gain.  Dixie is just a tool for their plans.

In fact, the Dixie faction's claims that the Tribe consists of over 200 adults and their children is <u>contradicted</u> by statements made in Yakima Dixie's "Bridge-loan Agreement and Prospectus" under his letterhead purportedly on behalf of the Tribe, which states:

> "'Sheep Ranch…' is a **very small (<10 members)**, long-established (1916), federally recognized California Indian tribe that is qualified to receive benefits, including the right to establishment a Class III gambling facility..." (Emphasis added).

(Yakima Dixie "Bridge-loan Agreement & Prospectus, 2/26/2004, RJN "33").  The sign "<" means "less than."  Thus, Dixie's statement here is that the Tribe consists of "less than 10 members," not "over 200 adults and their children" as falsely stated by him to the AS-IA and the courts.

Everone has made it clear that any outcome of the litigation favorable to Dixie means ultimate control of the Tribe for his group of investors, not any potential members of the Tribe.  Getting control of the Tribe means, to Everone, control for him.  For example, in 2006, he wrote in an Email the following:

> "[Burley's] last two court maneuvers were dismissed; and the BIA is moving forward with its determination on the authority for  the tribe, which almost certainly **will give control to Yakima's faction, and that means to us**." (Emphasis added).

(AR-CVMT-2017-000958, Everone Email dated September 29, 2006). In short, it is not about control of the Tribe for Dixie, but control of the Tribe for Everone and his investors bent on stealing the Tribe so they can build a casino.  Finally, Everone puts it all in context, when he stated:

"There are few opportunities to 'make a financial killing' and this, I sincerely believe, is one of them." (Emphasis added).

(AR-CVMT-2017-000958, Everone Email dated September 29, 2006).

**IV.**

**CONCLUSION**

For the foregoing reasons, summary judgment should be entered in favor of the Burley faction.  The AS-IA should be ordered to reconsider his 2015 decision, and specifically reconsider reinstating his August 2011 decision.

DATED: 3/2/2017

Manuel Corrales, Jr., Esq.
Attorney for Plaintiffs
CALIFORNIA VALLEY MIWOK TRIBE, THE
GENERAL COUNCIL, SILVIA BURLEY,
RASHEL REZNOR, ANJELICA PAULK and
TRISTIAN WALLACE