Exhibit 2

*California Valley Miwok Tribe v. Haaland*, 24-CV-947 (D.D.C.)

Motion to Dismiss

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CALIFORNIA VALLEY          )
MIWOK TRIBE, ET AL.,       )
                           )          CV No. 19-917
          Plaintiffs,      )
                           )          Washington, D.C.
          vs.              )          April 12, 2019
                           )          11:00 a.m.
U.S. DEPARTMENT            )
OF INTERIOR, ET AL.,       )
                           )
          Defendants.      )
_____)


TRANSCRIPT OF MOTION HEARING VIA VIDEOCONFERENCE PROCEEDINGS
          BEFORE THE HONORABLE ROYCE C. LAMBERTH
            UNITED STATES SENIOR DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          Peter D. Lepsch
                             FREDERICKS,
                             PEEBLES & PATTERSON LLP
                             401 9th Street, NW
                             Suite 700
                             Washington, D.C. 20004
                             202-450-4887
                             plepsch@ndnlaw.com

APPEARANCES CONTINUED:

For the Defendants:          Brian M. Collins
                             U.S. DEPARTMENT OF JUSTICE
                             ENRD
                             P.O. Box 7611
                             Washington, D.C. 20044
                             (202) 305-0428
                             brian.m.collins@usdoj.gov

For the Proposed Intervenors: Christopher M. Loveland
                             SHEPPARD MULLIN
                             RICHTER & HAMPTON LLP
                             2099 Pennsylvania Avenue, NW
                             Suite 100
                             Washington, D.C. 20006
                             (202) 747-1924
                             cloveland@sheppardmullin.com

                             Robert J. Uran (via telephone)
                             James F. Rusk (via telephone)

Court Reporter:              William P. Zaremba
                             Registered Merit Reporter
                             Certified Realtime Reporter
                             Official Court Reporter
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2           DEPUTY CLERK:  Hi, Judge Lamberth.  We have the
 3   parties here in Civil Case 19-917, California Valley Miwok
 4   Tribe, et al., versus the United States Department of
 5   Interior, et al.
 6           Counsel, if you could please approach the lectern
 7   and identify yourselves for the record.
 8           MR. LEPSCH:  Peter Lepsch with the law firm of
 9   Fredericks, Peebles representing the plaintiffs.
10           THE COURT:  All right.
11           MR. COLLINS:  Good morning, Your Honor.
12           Brian Collins with the Department of Justice
13   representing the federal defendants.
14           THE COURT:  All right.
15           MR. LOVELAND:  Good morning, Your Honor.
16   Christopher Loveland representing the proposed intervenors.
17           Also with us on the telephone are Robert Uram and
18   James Rusk.
19           THE COURT:  Okay.
20           MR. RUSK:  Good morning, Your Honor.
21           THE COURT:  Let me start with:  Is there an
22   objection to the motion for intervention by either plaintiff
23   or defendant?
24           MR. LEPSCH:  There is an objection, Your Honor.
25           THE COURT:  Okay.
```

```
 1              MR. LEPSCH:  We believe that before the plaintiffs
 2    have had an opportunity to respond to the intervention, if
 3    you look at the -- our pleadings, we're not certain whether
 4    or not the intervenors have standing and whether or not
 5    their rights could be effectively dealt with by the Federal
 6    Government, I think, is pretty clear, because it's the
 7    Federal Government that's applying the statute.
 8              THE COURT:  And what's the Federal Government's
 9    position?
10              MR. COLLINS:  Federal defendants have no objection
11    to intervention, Your Honor.
12              THE COURT:  All right.
13              Do the intervenors want to speak to that?
14              And is there a reason I couldn't listen to you in
15    terms of amicus for today and not have to decide
16    intervention today?
17              MR. LOVELAND:  Your Honor, one of my colleagues
18    from California would definitely like to address it, and
19    I think it would be appropriate to hear us in that role,
20    Your Honor.
21              THE COURT:  Okay.
22              MR. RUSK:  Your Honor, this is James Rusk.
23              I'm sorry, but we're unable to hear what
24    Your Honor is saying.  We can hear the folks in the
25    courtroom.
```

1          Perhaps Mr. Loveland can repeat the question.

2          MR. LOVELAND:  Yes.

3          If you wouldn't mind addressing the merits of the

4    argument as to why we believe intervention is appropriate

5    here.

6          MR. RUSK:  Yes, Your Honor.

7          First, there's ample case law stating that the

8    government cannot adequately represent the interests of

9    private litigants in situations like this.

10          And here, there's a long history of both sides in

11    this dispute being allowed to intervene in challenges

12    brought by the other side, including the last several rounds

13    of litigation.

14          THE COURT:  Actually, let's not spend the time on

15    that.  I'll just hear your amicus today and I'll reserve

16    on --

17          MR. LOVELAND:  Mr. Rusk, if you could hold on for

18    one moment.

19          THE COURT:  I'll just reserve on the question.

20    I'll hear your amicus today.

21          So let's go ahead and have the plaintiff argue the

22    TRO, preliminary injunction.

23          MR. LOVELAND:  Mr. Rusk, we're going to proceed

24    with the TRO arguments; the Court is going to reserve ruling

25    on the issue.

1          MR. RUSK:  Yes, Your Honor.

2          MR. LEPSCH:  Good morning, Your Honor.  May it

3    please the Court.

4          We'd like to think that the Federal Government

5    oftentimes follows the law.  And as a United States citizen,

6    I have a high expectation that typically, the United States,

7    and specifically agencies, do follow the law most of the

8    time.

9          The historic record within BIA and the Department

10   of Interior related to Indians oftentimes, however, is that

11   the rules have been played fast and loose when it's

12   convenient for them.

13         Issues of membership and leadership disputes have

14   led, over the last 40 years, to a set of circumstances,

15   where, oftentimes, the strict application of the various

16   statutes, or even the fundamental principles and policies of

17   Indian affairs, are oftentimes left aside for convenience.

18         And while that is true that each Indian tribe has

19   a unique and complex history with the United States,

20   oftentimes, there is no substitute for the rule of law.

21         This case very squarely is distinguishable from

22   the earlier cases because we are now at a place where, while

23   there may be people who are eligible to be members of the

24   California Valley Miwok Tribe, those eligible folks are

25   petitioning to invoke a reorganization of the Tribe via the

1    Indian Reorganization Act, Sections 16 and 19.

2         And my comments here today, Your Honor, should be

3    looked at within the context of the plain language of

4    Section 16, and the first three words are, "an Indian

5    tribe," and Section 19, which defines an Indian tribe, and

6    others that may make up an Indian tribe that would satisfy

7    the term "Indian tribe" within the context of Section 16's

8    initial phrasing.

9         And what we see here is, is that, well, there very

10   well may be members that are eligible to be members.

11        We have had historic legacy that tribes can and

12   have organized, by themselves, traditionally, we know that's

13   true today, around the United States, many of the houses of

14   the Haudenosaunee Iroquois Tribe are not organized under an

15   IRA Tribe.

16        And one of those cases, in *Ransom v. Babbitt*,

17   before this District in 2002, led to the determination that

18   the Bureau of Indian Affairs was heavily -- with a heavy

19   hand, attempted to overwhelm the traditional Three Chief

20   System of the Mohawk Tribe, that it pre-dated the

21   United States, in North America, and that judge, still

22   seated today in this District, determined that the Bureau of

23   Indian Affairs had overstepped its authority, by trying to

24   force an IRA Constitution on a previously organized tribe.

25        Now, what I should be careful to distinguish is

1    that tribes are inherently organized with or without the

2    fact that the Department of Interior exists.

3            And Mohawk Saint Regis Tribe in New York, that is

4    the tribe at issue in *Ransom v. Babbitt*, is a good example

5    of a tribe like that.

6            Another tribe that is organized outside the IRA is

7    the Navajo in Arizona.

8            The Navajo do not even have a written

9    Constitution, but we treat them and respect them as their

10   organizational status being straightforward.

11           Now, I understand, Your Honor, that the Bureau of

12   Indian Affairs has a very tricky and complicated history

13   with the State of California.

14           The State of California has had various issues,

15   because treaties were not approved in California.  They --

16   groups of Indians, especially in the Central Valley, are

17   groups of people that had to avoid being hunted for their

18   scalps in the 1850s and '60s, and scattered widely,

19   especially the Miwoks, into the hills; and so, therefore, we

20   have various bands of Miwok Indians and families that were

21   inherently separated because of this fear that the

22   settlement basically created.

23           But still, to circle back to the main argument

24   here, Your Honor, is no substitute for the rule of law, and

25   what this means is that we have traditionally organized

 1    groups.

 2              Now, the California Valley Miwok, as you've seen

 3    in my briefing, has -- since prior to 1972, was recognized

 4    as a federally recognized tribe.  The United States,

 5    throughout the 1970s, put this in writing, that they were a

 6    federally recognized tribe.  And there was no question that

 7    the status organization of that tribe existed.

 8              The Indian Reorganization Act itself is an

 9    affirmative right of tribal governments to form a

10    Constitution under the auspices of the United States.  It's

11    a congressional right that has been given to Indian tribes

12    to create a new Constitution that is more formal, more

13    modern.

14              Now, many people that are commentators within

15    Indian Affairs right now would suggest that the Indian

16    Reorganization Act is outdated.

17              Why would a tribe inherently exist with a tribal

18    organizational status?  Why would they need to re-form a

19    government that has been -- to a Constitution of the Bureau

20    of Indian Affairs' liking, when they traditionally follow

21    maybe a three-judge system or a maternalistic system?

22              This is a question that is open for debate of why

23    the IRA continues to exist as it does.  But the important

24    point is that only an Indian tribe that we federally

25    recognize and conduct government-to-government business

1    with, relations with the United States, may affirmatively

2    request either an organization -- a reorganization, which is

3    why it's called an Indian Reorganization Act, because there

4    was an inherent belief that tribes were already organized in

5    their traditional systems, or the members of that tribe or

6    tribe itself would actually make fundamental changes to

7    their already adopted IRA Constitution.

8           In this instance, when you look specifically at

9    Section 16 and 19, we have a very clear, plain meaning --

10   looking at the plain meaning of the statute, is that only an

11   Indian tribe may affirm themselves of this.

12          Defendants in this case have attempted to

13   bootstrap the idea that of all the wins they have created,

14   with all the litigation that's been under the water, and

15   there's clearly so much litigation, discussion of what all

16   that means, squarely before this Court is a discussion that

17   we've never had before.

18          Once we've made the determination that, sure, the

19   Federal Government may very well have had power to help the

20   California Miwok Tribe identify who their lineage was under

21   some authority, maybe based on what defendants argue in

22   *Miwok II*.

23          But simultaneously, they -- there is no

24   government -- there's no federal statute, and there

25   certainly is no judicial order that provides that we convert

1   those eligible members into those that are then may invoke,

2   that are eligible to invoke the actual statute itself to

3   actually reorganize the tribe.

4           So we're left with a bit of a conundrum in many

5   ways, because the Assistant Secretary in 2015 said he

6   couldn't tell the difference of who the prior government is,

7   and that may very well be the case.

8           But what we have is that even if I'm wrong about

9   the *Goodface* argument that I make within the TRO on the --

10  that goes to the merits of whether or not my clients

11  continue to be the recognized government because there

12  cannot be a hiatus in the government in terms of federal

13  recognition, we are still left with the problem of whether

14  or not that is squarely before this Court -- we'll go to the

15  merits -- of whether or not the intervenors in this case,

16  we will call them, are eligible to actually invoke.

17          And there's nothing on the record that indicates

18  that the United States Government and the Department of

19  Interior made a determination that they are an Indian tribe

20  or they are members of an Indian tribe, as required under

21  the IRA and Section 19 and 16 read together.

22          Now, I'll go a step further.  They point to the

23  regulations and admit that, of course, you need members to

24  be enrolled.

25          But when you look at what they're suggesting in

1    section -- part 81.57(b), the bottom line is that they don't

2    quote the language, but the language itself says that it's

3    the members' signatures, not just the eligible voters, as

4    you saw in 81.4, but 81.57(b) says members are those.  So we

5    then have to circle back.  That's your check, that 81 has to

6    comply with part 16 and 19 of the IRA.

7           So fundamentally, Your Honor, I am advocating for

8    a position that currently, I believe that, very clearly, we

9    have the opportunity to win on the merits based on the plain

10   language of the statute.

11          The United States has placed into, I think,

12   discussion before this court on the merits of whether or not

13   25 U.S.C. Section 2, the organic act of the United States

14   Department of Interior gives the Secretary of Interior broad

15   authority, essentially, to displace or make up new

16   definitions for its regulations and/or the statute itself.

17          That certainly would -- with more full briefing by

18   both sides, would be an issue that, I think, would concern

19   even current Supreme Court precedent related to the

20   nondelegation doctrine.

21          Finally, I think, Your Honor, not only would we

22   win on the merits, and, therefore, I think we've met the

23   two -- one of them, four significant parts, or the two

24   significant parts of the task for a TRO, I believe that

25   we would suffer irreparable harm.  And the reason that our

 1   clients would suffer irreparable harm is because the

 2   standard in this District, and I recognize, very clearly,

 3   that it's a rare occurrence that a Temporary Restraining

 4   Order is put into place; that we maintain the status quo

 5   ante.

 6          But when we look at the cases that I cited in the

 7   motion, the memorandum in support of the motion, you look at

 8   *League of Women Voters*, where this Court actually did

 9   provide a TRO within the last couple of years.

10          Fundamentally, we are talking about a set of

11   circumstances that is about politics, it's about politics of

12   a community and sovereign nation.

13          And when the United States puts its thumbprint of

14   legitimacy on an election; and in this case, it's

15   technically I would refer to it as a referendum, to adopt a

16   new Constitution, you now have interfered, essentially, with

17   the actual sovereignty that then will create a set of

18   ongoing regulatory circumstances, where that new group of

19   people will not only form a new government, they'll create

20   enrollment ordinances, give themselves new leadership.  And

21   you cannot unring that bell.  That cannot be undone.

22          And so if we look at the actual standards where

23   you see courts weigh in on this, and the cases are fairly

24   well cited in the brief, the bottom line is that there is no

25   remediation to undo the politics.

1          And as I cited in my brief last night, we talk and
2    we look at that *Giles v. Harris* case from 1903.  And it's
3    the dissent of Justice Holmes that basically is saying, when
4    the Courts deal with efforts related to equity, and we will,
5    if we had to, on the merits of this case, actually have to
6    review this case as an equitable remedy, because there are
7    no damages that we're going to be looking for.

8          This is a case that's fundamentally about
9    politics, and, therefore, equity, when it's involving
10   politics, and I think there's plenty of modern case law that
11   we can get to on the merits in the briefing, cannot unwind
12   this situation and put my clients, the plaintiffs, and the
13   California Valley Miwok Tribe, back in the position of
14   status quo ante, as we are today on the 12th of April 2019.
15   And so, therefore, Your Honor, I think we've met the key
16   burdens of the Temporary Restraining Order on their face.

17         I believe, obviously, there are no hardships right
18   now.  Currently, the circumstances for the federal
19   government is just that -- what I find fascinating,
20   Your Honor, about this is that if this were so important to
21   the Bureau of Indian Affairs or others, like the *Timbisha*
22   case that happened, both in the District of Columbia here
23   and in California.  Why wasn't a -- why didn't Yakima Dixie,
24   while he was a member of the Tribe, actually petition for a
25   Secretarial election?

1        If you think about it, if you go through my brief

2    carefully and think about that context, I cannot make the

3    same arguments, standing here today, about the applicability

4    of Section 16 and 19 to the actions of December 2018, to

5    validate a secretarial election, because, fundamentally, if

6    Yakima Dixie had put in a request for a Secretarial

7    election, he would have met the definition of Section 19 and

8    we would have been in the same position as where the

9    *Timbisha* case would have been, and my clients would have

10   been foreclosed from having a situation where they could

11   actually come before this Court.

12        So the hardship in and of itself to the government

13   is not so great because we've waited this long.  So why

14   don't we take a pause and step back and work through the

15   issues, either at the agency or here with -- before

16   Your Honor, to make sure that we get the application of this

17   statute correct.  It would be a shame and the precedent

18   related to non-IRA tribes around the country would be

19   devastating.

20        The public policy of allowing this decision to

21   stand puts other non-IRA tribes, that are governed by maybe

22   one or two families, that have often been subject to

23   criticism by other people in their region for not allowing

24   other people into their tribe, whether that's for gaming

25   reasons or otherwise.

1            And they could clearly point to this precedent,

2    maybe not win after the end of this case, but they certainly

3    would look to this case as a way forward to say, ah, I had

4    been shut out of that tribe before, I can now ask the Bureau

5    of Indian Affairs for membership in that tribe because

6    they're not representing the whole community.

7            There should also be a pause in this case,

8    Your Honor, because I don't think that we've worked through

9    all of the potential impacts for allowing the election to go

10   forward.

11           Since they are not members of the tribe and

12   they're not an Indian tribe to invoke this, how can we --

13   there's nothing on the record from December 2018 -- be

14   certain that all 298 people that they claim are eligible

15   voters are actually Indians for purposes of the IRA.

16           Secondly, the question that -- in the greater

17   administrative record, Your Honor, there are circumstances

18   where many of the names cross-referenced that have appeared

19   on previous eligibility lists for voting in this type of

20   election are members -- are individuals who have potentially

21   joined the Wilton band of Indians near Elk Grove,

22   California, and others, their names may very well appear on

23   a petition under Part 83 for federal acknowledgment.

24           And so the question becomes whether or not we have

25   the right group of Indians.  And those decisions on true

1   membership of a tribe go to the fundamental reason why the

2   United States makes -- allows internally tribes to make

3   those decisions on membership.

4            So I submit to the Court that I believe that we've

5   met a very heavy, which I will recognize, the burden for a

6   TRO, to put a pause on this, for both public policy reasons

7   and for the potential impact on allowing an election to go

8   forward that we feel is unlawful, and we feel it is -- that

9   is well outside the boundaries of where Congress thought the

10  relationship should be for the Department of Interior with

11  Indians.

12           Again, typically in these circumstances, and

13  I think this is a really important point, the United States

14  does not interfere with internal tribal matters and it can

15  only in specific circumstances.

16           I cited in one of the briefings, that you see a

17  statute from 1906 for the Osage Tribe in the Midwest.

18           Congress specifically told the Department of

19  Interior how to create the membership and the government

20  system for that particular tribe.  But that was under the

21  plenary authority of the United States.

22           In California, the circumstances become more

23  complicated, because we have essentially stipulated

24  judgments under the *Tillie Hardwick* class action suit for

25  those Indian tribes that were terminated under the 1958

1    Termination Act and the subsequent amendment in 1964.

2          And I will draw your attention to the fact that

3    this tribe, while there was an effort to terminate this

4    tribe, is not a terminated tribe, and so, therefore, the

5    stipulated judgment proceedings and actions that are

6    authorized by the Department of Interior only apply to the

7    17 tribes that are within the stipulated judgments related

8    to Tillie Hardwick.

9          And in this instance since we are not Tillie, we

10   have a very strange set of circumstances where determining

11   eligibility under the *Tillie* proceedings offered people the

12   opportunity to restore their tribe.

13         In this instance, there was -- and this,

14   I understand, is water under the bridge in previous

15   litigation here, but there is a certain context to how we

16   got to today, and that context is that I draw your attention

17   to the fact that this is not a Tillie Tribe and, therefore,

18   you -- the operation of the IRA is more akin to how the IRA

19   would apply across the country, rather than within

20   California.

21         And it's easy to understand by why the Bureau of

22   Indian officials in California might believe that they can

23   apply the standards of *Tillie* or some similar standards to

24   this tribe, the California Valley Miwok, because so many of

25   their kin tribes, throughout the Central Valley of

 1  California, were essentially caught up in the *Tillie*

 2  process.

 3          But this is an unusual set of circumstances.

 4          I will make one final comment that is in a rare

 5  occasion, I cannot find another set of circumstances where

 6  we have this precise question before -- that is before this

 7  Court, which, also, I believe, goes to a reason why we

 8  should push the pause button in this case, is that this is

 9  the first time that, what we at least are characterizing on

10  its face, and I believe facially the facts indicate this,

11  that an outside group of non-member Indians of a specific

12  tribe that might be related, and whether or not they are may

13  not matter, is asking the Bureau of Indian Affairs to

14  reorganize a tribe, and the question of whether or not --

15  before this Court is whether or not what part of the IRA

16  needs to be applied first before you can even apply validly

17  the regulations in Part 81.

18          And I submit my argument to the Court, and I'm

19  happy to take questions.

20          THE COURT:  Thank you very much.

21          Let me hear from the government.

22          MR. COLLINS:  Good morning, Your Honor.

23  Brian Collins on behalf of federal defendants.

24          I think I agree with one of the last things that

25  Mr. Lepsch said in his comments, is that there is an

1   important context in understanding this case.  I think it's

2   a fairly straightforward context.

3           You have a tribe that's not organized under the

4   Indian Reorganization Act.

5           The Courts have repeatedly told BIA that in order

6   for this tribe to validly organize, they must ensure that a

7   majority of the tribal members, the eligible tribal members,

8   have a voice in how that organization takes place.

9           BIA put together a decision determining the

10  criteria for how those eligible tribal members would be

11  identified.  That decision was challenged by these

12  plaintiffs; it was upheld as a reasonable decision to get to

13  the initial organization question for this tribe.  That was

14  affirmed by the Ninth Circuit.

15          A group of those tribal members, eligible tribe

16  members --

17          THE COURT:  So both the D.C. Circuit and the Ninth

18  Circuit have basically upheld that -- how you decide who the

19  members are?

20          MR. COLLINS:  They -- well, the D.C. Circuit came

21  before the 2015 decision.

22          But the D.C. Circuit did say, we know that

23  Ms. Burley is not the tribal members, and we know that

24  Ms. Burley is not the validly organized tribe.

25          THE COURT:  Right.

1          MR. COLLINS:  So they affirmed that she was not.

2          The Ninth Circuit affirmed the BIA's

3     determination:  This is how we get to determining a true

4     path forward on organization.

5          THE COURT:  Right.

6          MR. COLLINS:  Okay.

7          A group of those tribal members, the eligible

8     tribal members, got together and did the genealogical

9     legwork to identify the universe of people that would be

10    eligible to meet those criteria; they found 289 people.

11         153 of those 289 signed a petition under the

12    Part 81 regulations, saying, we would like to vote on

13    adopting a Constitution for our tribe.

14         170 people actually registered to vote in that

15    election, and those ballots were mailed out, those people

16    are voting as we speak, Your Honor.  The ballots are coming

17    in, due to be counted on Monday.  Now, that's the context.

18         On the other side, you have the plaintiffs here,

19    Ms. Burley and her children, who are telling this Court and

20    telling the BIA, again and again, no, no, no, we are the

21    only members of this tribe, we are the only ones who can say

22    who gets into this tribe, and our Constitution, the one that

23    we want, is the only one that can govern anything.  And

24    that's just simply not the case, Your Honor.

25         THE COURT:  And that is basically what the

1  Ninth Circuit rejected, isn't it?

2         MR. COLLINS:  It's exactly what the Ninth Circuit

3  rejected.

4         Now, they've tried to couch this particular

5  litigation in terms of, well, we're not necessarily

6  explicitly saying that we're the only members of this tribe

7  and that we're the only organized government, but these

8  petitioners, under this definition of Indian tribe in

9  Section 16, can't possibly petition.

10        But we know that's not true, because the plain

11  language of the statute and its implementing regulations

12  make clear:  An Indian tribe may petition, right?  The

13  Indian tribe is the Miwok Valley Tribe, in the California

14  Valley, Miwok Tribe.  That's a federally recognized tribe.

15        The petitioners are eligible members of that tribe

16  and they are seeking to organize pursuant to the election.

17        Now, plaintiffs make it sound like, well, only the

18  tribe and some sort of formal organized fashion can petition

19  for an election.  But that's just not the case.

20        We know -- aside from the definitional issues,

21  which I'll sort of get to in a second, we also know that the

22  regulations themselves contemplate, in 81.6 -- and I

23  apologize, this particular language was not in our papers --

24  but in 25 C.F.R. Section 81.6, how a Secretarial election is

25  requested, the regulations say:  "To request a Secretarial

1    election, the tribe or petitioner must submit."  And then it

2    goes through explaining what must be as part of a petition.

3    So it recognizes that it's more than just a tribe that is

4    eligible to submit a petition.

5            The other way we know that the plain language

6    supports the government's position here is because the next

7    section of the IRA Section 16 says:  "An Indian tribe shall

8    have the right to organize, which shall become effective

9    when ratified by a majority vote of the adult members of the

10   tribe."

11           And this gets at the argument that I think we laid

12   out clearly in our papers, Your Honor:  That "members of the

13   tribe" is not defined in the statute.  It is, however,

14   defined in the regulations.

15           And in the regulation, a member of a tribe or

16   tribal member means any person who meets the criteria for

17   membership in a tribe, and, if required, may be formally

18   enrolled.

19           So the government is not saying that these people

20   are enrolled members of the tribe.  They are people who meet

21   the initial organization membership criteria so that they

22   can establish their right to petition to organize their

23   tribe.

24           That is the -- that's the heart of the merits on

25   this question, Your Honor.  It is a straightforward

1    interpretation of those definitions in the statute and the

2    regulations that recognize, very clearly, a -- when a

3    tribe -- and especially when a tribe is initially

4    organizing, as this one is, because there is no organized

5    tribe right now, that the eligible members are the ones who

6    get to vote.  And that's what the Court decisions in the

7    D.C. Circuit and the Ninth Circuit have both stressed to BIA

8    repeatedly:  Is that this must be an exercise that includes

9    the people who are eligible; otherwise, it's just a sham and

10   you're depriving those people of their voice in organizing

11   this tribe.

12          So those are the key pieces on the likelihood of

13   success on the merits.  We don't think there's any reading

14   of these regulations or statute that plaintiffs can point to

15   that is supportive of their position that only Mrs. Burley

16   and only the formally organized tribe can actually petition

17   for -- to organize.

18          Now, I think the plaintiffs have also failed to

19   establish any irreparable injury here to stop this election

20   in its tracks.

21          Their entire injury, in their papers, is tied to

22   being ousted as the only members of a federally recognized

23   tribe and the lawfully organized body.  They are neither.

24          As Your Honor just pointed out, the Ninth Circuit

25   has expressly upheld the determination that they are

1    neither.  The D.C. Circuit has said that the organization is

2    not effective that Ms. Burley tried to put through in the

3    earlier litigation, and she is not the organized tribe, and

4    she's definitely not the only member of this tribe, and her

5    children are not the only members of this tribe.

6         Now, putting aside -- so they haven't alleged a

7    valid injury whatsoever.  But even putting that aside, even

8    if they had a valid injury, it's not irreparable.

9         This election can go forward.  The BIA can count

10   the results.  We don't know what the results of that

11   election are going to be.  The votes are coming in.  We're

12   going to count them.  It may very well be that the

13   Constitution is not adopted.  Perhaps a majority of the

14   people won't vote for the Constitution.  In that case,

15   Ms. Burley, again, has no injury.

16        If the Constitution is adopted, she has avenues

17   for appeal of that decision.  The Secretarial Election Board

18   has to certify the results of the election, and those

19   decisions are challengeable under the regulations as

20   explicit final agency action, they can seek judicial review.

21        And just to focus, again, on the language of the

22   regulations -- so 81.43, says any person listed on the

23   Eligible Voters List, who submitted a voter registration

24   form, which Ms. Burley and her family did, may challenge the

25   results of a Secretarial election.

1          81.45 lays out:  If a challenge alleges errors

2    that would invalidate the election, and the Authorizing

3    Official accepts the challenge, then he is empowered to

4    conduct a new election or re-vote.

5          If the Authorizing Official denies those

6    challenges, that decision is final agency action, subject to

7    judicial review.

8          So when Mr. Lepsch says we just want to push the

9    pause button here, we don't need to push the pause button.

10   We can find out what the will of these individual eligible

11   members are and hear what they have to say first.

12         And then if Ms. Burley and her children don't like

13   the results of that election, they can then come to this

14   Court and say, hey, we don't think this was a valid

15   election, and they can push all those same arguments again

16   at that point.  But there's absolutely no reason to push

17   this election off now.

18         That brings me to the last point that I would make

19   on the balancing of the equities.

20         And here, I don't think there's any question that

21   the equities in the public interest weigh heavily in favor

22   of these petitioning members.

23         On the two sides of the scale, you've got 289

24   eligible members, some of whom registered to vote, some of

25   whom are actually already voting, expressing their voice as

1  to how they want this tribe to organize.

2  And on the other side of the scale, you have

3  Ms. Burley and her four children seeking to maintain their

4  stranglehold on the government and membership of this

5  particular tribe.

6  So there doesn't seem to be any question

7  whatsoever that these people, who have been -- represent the

8  class of people judicially identified as eligible members to

9  take part in this organization, their public interest in

10  exercising their rights to organize their tribe, have a

11  voice in the tribal sovereignty and take advantage of that,

12  far outweighs those of Ms. Burley and her children.

13  So with that, Your Honor, if Your Honor has any

14  additional questions, I'm happy to answer them.

15  THE COURT:  No.

16  Thank you, Mr. Collins.

17  MR. COLLINS:  Thank you.

18  THE COURT:  If someone wants to argue for the

19  amicus, I'll hear them before I hear from the plaintiff in

20  rebuttal.

21  MR. LOVELAND:  Your Honor, my colleague, Mr. Rusk,

22  would like to briefly address the plaintiffs' motion.

23  THE COURT:  Your Honor, unfortunately, we're

24  having some technical issues.  The parties on the phone are

25  having trouble hearing you and vice versa, so that may cause

1   a problem.

2          MR. LOVELAND:  I'll be here, Your Honor, to

3   communicate any questions you may have to my colleagues.

4          THE COURT:  All right.

5          DEPUTY CLERK:  They can't hear him.

6          MR. RUSK:  Yes, Your Honor.  This is James Rusk.

7   We will ask Mr. Loveland to interrupt and repeat any

8   questions the Court may have, because we're unable to hear

9   you.

10          Your Honor, a few quick points.

11          First of all, the plaintiffs' claim that they are

12   the tribe's government and that they are the tribe's only

13   members is simply false.

14          THE COURT:  I'm not hearing anything if you're

15   speaking.

16          MR. RUSK:  In arguing that they are --

17          MR. LOVELAND:  Mr. Rusk, one moment, please.

18          MR. RUSK:  Yes, Mr. Loveland.

19          MR. LOVELAND:  Your Honor --

20          THE COURT:  Yes.

21          MR. LOVELAND:  Your Honor, I'm sorry, I heard you

22   say something, Your Honor.

23          THE COURT:  I didn't hear anything if they were

24   speaking.

25          MR. LOVELAND:  Oh, okay.

1          Mr. Rusk, the Judge cannot, unfortunately, hear
2    anything that you're saying.

3          MR. RUSK:  Okay.

4          Mr. Loveland, perhaps you could repeat that for
5    the Judge.

6          MR. LOVELAND:  Yeah, I can briefly address the
7    intervenors' position, Your Honor.

8          THE COURT:  Okay.

9          MR. LOVELAND:  The plaintiffs filed their motion
10   for a Temporary Restraining Order purporting to maintain the
11   status quo, but the exact opposite is true.

12         This action and the motion for Temporary
13   Restraining Order are based entirely on a premise that has
14   already been rejected by the U.S. Court of Appeals for the
15   Ninth Circuit.  They expressly rejected the contention that
16   the Burleys are the lawfully organized governing body of the
17   tribe and the only members of the tribe.

18         In addition, the D.C. Circuit has already found
19   that this tribe has more than 250 members.  The Burleys
20   cannot meet any of the required elements of a TRO.

21         First, they cannot demonstrate a substantial
22   likelihood of success on the merits.

23         As I just stated a moment ago, the plaintiffs are
24   not the only members of the tribe.  Not only has this issue
25   been adjudicated, the Burleys have offered no evidence to

1    support their assertion that the list of 289 qualified

2    members are not members of the tribe.  They cannot meet

3    their burden of showing a clear and compelling legal right

4    based on undisputed facts.

5          In their reply brief on pages 6 and 7, the

6    plaintiffs acknowledge that the prior judicial holdings are

7    relevant, but contend they're better left for arguments on

8    the merits after the injunction is entered.  And that

9    assertion ignores the fact that, for injunctive relief to be

10    entered, it must demonstrate a likelihood of success on the

11    merits, and those prior judicial holdings demonstrate that

12    they cannot meet that test.

13          Second, there will not be any irreparable injury

14    if the election proceeds.

15          The claimed injury, the Bureau's recognition of a

16    tribal government, is currently speculative and uncertain.

17          As the government has already noted, the voting

18    process has not yet been completed.  And even if a majority

19    of the voters ultimately adopt a tribal Constitution, the

20    claimed injury is not irreparable because the Burleys would

21    have the right to submit a written challenge to the

22    chairperson of the election board.

23          In addition, the claim of irreparable injury is

24    based on the assertion that the Burleys have vested rights

25    as a tribe's governing and only members.  And as already

1   found by two Circuit Courts, that is simply not true.

2              Finally, Your Honor, the balance of hardships in

3   the public interest weighs in favor of the election

4   proceeding.  Each of the intervenors and each of the 229

5   members on the eligible voter list have vested rights to

6   participate in the tribe's election and reorganization.

7              The members of the tribe will be injured if

8   they're not allowed to participate in the election.  And

9   there's a very strong public interest in favor of permitting

10  the election and the Democratic process to proceed.

11             Accordingly, for the reasons set forth in our

12  opposition brief and for the reasons previously stated by

13  the government, we respectfully request that the motion for

14  Temporary Restraining Order be denied.  Thank you,

15  Your Honor.

16             THE COURT:  Okay, Mr. Loveland, you didn't need

17  those guys anyway.

18             Okay, Mr. Lepsch, you get the last word.

19             MR. LEPSCH:  Thank you, Your Honor.

20             You know, words are a powerful thing, a, and in

21  the law, we tend to take them seriously, especially when we

22  have guidance from the Supreme Court and others that we

23  actually read the plain language of the statute that

24  Congress actually has met -- written.

25             And there is no question that we admitted in our

 1   brief that the -- all of these other cases actually are
 2   relevant, but they're relevant only to a certain extent, to
 3   inform us that what we're asking for this Court actually
 4   hasn't been discussed yet in any court.

 5           And we're not here to argue today, and we may, in
 6   fact, be wrong because of the precedent, that we are
 7   currently the valid tribe.  I think that there's some
 8   other -- there's some very clear issues that we very well
 9   might be, and you may have to consider that in the context
10   of all of this.

11           But what we're here to determine today is whether
12   or not the convenient sort of, I would -- I don't want to go
13   as far to say that there's a misrepresentation of the
14   language used in the Ninth and the D.C. Circuit, but the
15   bottom line is that really all those court cases stand for
16   is that there are potentially more members.

17           It did not convert those people automatically to
18   members of the tribe.  That's just not the case.  That's not
19   what those cases stand for.  They were about whether or not
20   the whole community should participate, perhaps, in a
21   reorganization of the tribe.

22           But they certainly don't stand for the proposition
23   that -- and certainly, the *Washburn* memorandum of 2015,
24   December 2015, certainly didn't give the go-ahead to hold an
25   election by the eligible groups, as he called them in the

1   letter.  He said the tribe, under 25 C.F.R. Part 81, could

2   apply.

3          So we have a bit of a conundrum.  The issue, to

4   me, before this Court is is the Bureau of Indian Affairs and

5   the Department of Interior are stretching the definition of

6   "member" to allow the application of the IRA to reorganize

7   this tribe, based on, I think, a misunderstanding of what

8   has happened over the 15 years, the last 15 years.

9          And I will say, Your Honor, I think almost all of

10  the attorneys in this room are as new to this case as you

11  are.

12         And I will say that sometimes it's important for

13  all of us to take the rule of law seriously; to give things

14  a hard look; to take the very clear, plain meaning of the

15  statute and ask ourselves whether or not that prior

16  precedent actually created members sufficient enough to meet

17  the definition in Sections 16 and 19 of the statute that

18  Congress created to allow an Indian tribe to avail itself to

19  a reorganization.

20         If it did not and then we have to ask the

21  question, well, we have a problem, there is a hiatus

22  government in a federally recognized tribe, and that might

23  have to be something we apply here in the *Goodface* decision,

24  and that places our plaintiffs in a particular place where

25  they were the previously -- last previously recognized tribe

1   as -- in a letter dated October -- November of 2003.

2           I think the last step, there is --

3           THE COURT:  How would you decide who the members

4   of the tribe are?

5           MR. LEPSCH:  Well --

6           THE COURT:  You don't think BIA can do that?

7           MR. LEPSCH:  No.  I believe that the BIA has been

8   in the way for 15 years.

9           I believe that there are a set of circumstances --

10  the plaintiffs have indicated to me that they have been and

11  have been willing to admit new members to the tribe, but the

12  Bureau of Indian Affairs has been in the way.  And if they

13  step out of the way, we would be in a situation that the

14  plaintiffs could open, through the enrollment ordinance that

15  they have, an opportunity that many of those people would

16  meet the criteria to be in the tribe.  We know for a fact

17  today that the tribe's already done that.

18          The government, over the years, has always said

19  that there's only five members of the tribe when Yakima

20  Dixie was alive.  And actually -- after -- Yakima Dixie

21  died.  But what the plaintiffs tell me, my clients tell me,

22  there are actually ten members of the tribe, and they have

23  admitted new people since all of this has occurred over the

24  years.

25          From a balancing-of-interests perspective,

1   Your Honor, I will go back to -- I think the department

2   would like Your Honor to believe that this kind of decision

3   just is isolated to California, but it's -- but the

4   implications of this decision to small, non-IRA

5   traditionally organized tribes in the United States is

6   almost without bounds.  There could be a potential.

7           And this is in an era, Your Honor, where so many

8   people -- 40 years ago, nobody wanted to be an Indian, it

9   was -- certainly in California, you didn't want to be an

10  Indian.

11          But in the United States today, there is a certain

12  renaissance of the idea that I have Indian heritage, I'm a

13  Native American of some type.  And this is an opportunity

14  that we are uncertain, very uncertain.

15          This is the rare unicorn moment that people who

16  are not traditionally part, Your Honor, of what we always

17  know how we get to IRA.  The IRA always gets applied with --

18  we know there's a federally recognized tribe.  Historically,

19  the United States has had many communications with that

20  tribe, treaties, otherwise, and then they organize under the

21  IRA.  And then the other provisions of the IRA kick in,

22  where the members or the tribe themselves want to avail

23  themselves of the BIA's assistance to modify that

24  Constitution.

25          But this is the instance where the United States

1 agreed to help this tribe, in 1998, create traditional

2 governing documents, and then, six years later, somehow

3 decided they weren't happy because Yakima Dixie was unhappy

4 with the leadership.

5       Now, what's funny about this is -- and I'll go

6 back to the point that I made earlier today, Your Honor, is

7 that if Yakima Dixie, during this -- this would be almost

8 more like the *Cayuga* case that was just decided at the

9 beginning of March in this District Court.

10       That if Yakima Dixie had actually submitted a

11 petition under Part 81, I can't be standing here today

12 making the argument that I'm making, because then there is a

13 member of the tribe under Section 19 that actually has

14 petitioned to reorganize the government, and then there

15 might be slightly different arguments that we would be

16 standing here today.

17       But right now, the Ninth Circuit and the

18 D.C. Circuit do not say that these people are actual members

19 or enrolled members of the tribe. They are just potential

20 members.

21       And Kevin Washburn, the assistant secretary in

22 2015, very clearly said that they were eligible groups of

23 families that should participate, if there were to be a

24 Secretarial election.

25       But we are then faced with the very threshold

1    question, should we -- who can call that election?  Who may

2    actually invoke that election?

3            And after listening to the intervenors and the

4    Department of Justice, I still am not convinced that we have

5    any evidence in the record that doesn't suggest that we have

6    the likelihood of winning on the merits of this case and

7    because the Department of Interior has failed, on the face

8    of the December 2018 decision, to show that these are

9    members of the tribe.

10           And so, Your Honor, I want to address one final

11   thing related to the irreparable harm.

12           Given the context of American Indian affairs and

13   how poorly the United States, over the course of history,

14   has oftentimes treated tribes, sometimes living up to their

15   trust expectations, sometimes not.

16           But the fundamental principle, the black letter

17   law oftentimes is that we always -- the canons of Indian

18   construction always favor the Indian tribe itself, always

19   make sure that we protect tribal sovereignty, and the

20   government should take action to protect tribal sovereignty.

21           Here is an instance where the United States is

22   suggesting that -- we wouldn't be here today, Your Honor, if

23   the United States wasn't pushing the boundaries.

24           This tribe could, over a 15-year period, might

25   have 30 or 40 or 50 members, if the United States hadn't

 1  been involved in helping people to their genealogy.  That's

 2  essentially, to me, all that the D.C. Circuit and the Ninth

 3  Circuit stand for, is that the BIA has the authority to help

 4  people do their genealogy.  Great.

 5          The bottom line is that the United States Congress

 6  did not give the Bureau of Indian Affairs and the Department

 7  of Interior the ability to make members of tribes out of

 8  whole cloth.

 9          For all the foregoing reasons, Your Honor, as well

10  as everything that we've written in our briefs, we

11  respectfully submit our arguments to the Court and we hope

12  that you rule in favor of the Temporary Restraining Order to

13  protect the tribe's interest and to protect the interests of

14  the United States Government and the United States Congress.

15          Thank you, Your Honor.

16          THE COURT:  All right.

17          Give me just a moment.

18          I found the arguments of counsel to be helpful.

19          I did read all the papers last night, I completed

20  that, and I will act on the Temporary Restraining Order and

21  preliminary injunction application now with an oral ruling

22  from the bench, so that counsel have the benefit of a ruling

23  today in the event they want to seek further review before

24  the election returns are opened on Monday.

25          This application turns on familiar facts and

1    familiar law.  The facts are familiar because, by my count,

2    this is the plaintiffs' fourth lawsuit concerning membership

3    in this tribe.

4           The law looks familiar because it follows the

5    common law -- the common four-part test for injunctive

6    relief that our Court of Appeals articulated most recently

7    in the *Archdiocese of Washington versus Washington*

8    *Metropolitan Area Transit Authority*.

9           Starting with the facts, in 1916, the

10   United States dedicated just under an acre of land as a

11   reservation for 12 homeless Indians near the old mining town

12   of Sheep Ranch, California.

13          Two decade later, after Congress passed the Indian

14   Reorganization Act, which I'll call the IRA, the tribe voted

15   one to nothing to accept the law, but then they never

16   formally organized under the law.

17          Two decades after that, the Bureau of Indian

18   Affairs determined only one Indian remained on the land:

19   Mabel Hodge Dixie.

20          After Mabel died, her interest in the land passed

21   to her husband and four sons.

22          There was one son, Yakima Dixie, who returned to

23   live on the reservations.

24          The plaintiff, Sylvia Burley, entered the story a

25   few decades later, when she asked the Bureau for help

1  tracing her Indian heritage and obtaining federal Indian

2  services.

3        She wasn't enrolled with a tribe, so the Bureau

4  suggested she ask Mr. Yakima Dixie to join his one-man band.

5  He agreed and he welcomed Ms. Burley and her daughters and

6  her granddaughter into the tribe.

7        At the Bureau's suggestion, the group formed a

8  General Council, essentially a direct democracy, with

9  Mr. Dixie as the chairman, at least until they could ratify

10  a formal Constitution and organize under the Indian

11  Reorganization Act, a step necessary to qualify for full

12  federal benefits and to receive annual payments from the

13  California Gaming Control Commission.

14        But the tribe never actually got around to making

15  a Constitution.

16        After sparring over governance issues, Mr. Dixie

17  resigned as chairman and Ms. Burley took over.

18        In 2004, after similar attempts in 2001, she sent

19  the Bureau a proposed Constitution restricting membership to

20  herself and her descendants.

21        The Bureau rejected the proposal, however, since

22  it did not account for the greater tribal community's views.

23        Burley had not reached out to surrounding Native

24  American communities to former residents of the land and

25  their descendants, or to people with cultural ties to the

1   land to identify other potential members.

2          Burley unsuccessfully challenged that decision in

3   this Court.

4          To paraphrase the D.C. Circuit, Ms. Burley's

5   "Antimajoritarian gambit deserved no stamp of approval" from

6   the Bureau of Indian Affairs.

7          More litigation followed; and in 2011, the

8   Assistant Interior Secretary made an admitted "180-degree

9   change of course" and decided the tribe actually had

10  organized, under the Indian Reorganization Act back in 1998

11  via a resolution signed by two tribal members.

12         The Assistant Secretary further found that there

13  were only five tribal members, Dixie Burley, Burley's two

14  daughters, and Burley's one granddaughter, and that they

15  alone could determine the Tribe's citizenship criteria.

16         But Dixie challenged this decision as arbitrary

17  and capricious, and this Court and agreed and remanded it to

18  the Interior Department.

19         On remand, the Assistant Secretary affirmed the

20  tribe was not formally organized under the Indian

21  Reorganization Act and extended the potential tribal

22  membership to descendants of all 12 homeless Indians for

23  whom the government acquired the land back in 1916.

24         At least in this case, Interior had records to

25  track these 289 people down, relying on a 1915 census

1    document and the Indian Reorganization Act referendum

2    result.

3            The Bureau encouraged these potential members to

4    petition for an election supervised by the Interior

5    Secretary, the next step to adopt a Constitution and

6    formally organize them to the Indian Reorganization Act.

7            But bent on blocking any expansion of the Tribe's

8    membership, Burley fought that decision, this time in the

9    Eastern District of California.  Her challenge failed, and

10   the Ninth Circuit affirmed that on appeal.

11           So the greater tribal community finally seemed

12   poised to organize under the Indian Reorganization Act.

13   Over half of the eligible voters petitioned the Bureau for

14   an election as required.

15           After validating the petition, the Bureau of

16   Indian Affairs, in accordance with regulatory obligations,

17   notified the public and all potential tribal members that

18   voting would occur by mail from March 18th, 2019, to April

19   15th, 2019.

20           Of course, Burley tried a last-ditch

21   administrative appeal, but that Hail Mary failed in

22   complete.

23           So as of today, the election has been going on for

24   approximately four weeks, the election will be concluded on

25   Monday, and the votes will be counted.

1          That brings us to the law.  Burley and her family

2     make their final stand in this challenge in this Court to

3     the Bureau's validation of the petition.

4          To win the requested Temporary Restraining Order

5     or preliminary injunction and prevent the conclusion of the

6     election, they must show four things:  First, they must show

7     they're likely to succeed on the merits; second, that

8     they'll be irreparably injured without the

9     Temporary Restraining Order; third, that the

10    Temporary Restraining Order will not substantially harm

11    other parties; and, fourth, that the

12    Temporary Restraining Order would further the public

13    interest.

14         The Court finds that Burley lacks a good argument

15    for any element.  First, Burley and her family fight a steep

16    uphill battle on the merits.

17         Regardless of whether Burley was the last tribal

18    member to deal with the Federal Government, the Tribe is not

19    formally organized under the Indian Reorganization Act, and

20    the D.C. and the Ninth Circuits have independently rejected

21    Burley's arguments that her family constitutes its only

22    potential members.

23         Moreover, her argument that potential members

24    cannot call for a Secretarial election contravenes what

25    I think is the plain text of the Indian Reorganization Act

```
 1   provisions and the Interior regulations providing for tribal
 2   organization and for constitutionally adequate notice to all
 3   parties, notice which the Bureau did provide here.
 4          And importantly, in addition to textual conflict,
 5   Burley's argument further flouts Interior's reasonable
 6   regulations [sic] of the Indian Reorganization Act and its
 7   own regulations.
 8          Second, Burley and her family will not be
 9   irreparably injured without the Temporary Restraining Order.
10          For one, until the election results are known, any
11   injury remains speculative.  And in any event, Interior
12   regulations prescribe successive steps before the results
13   become final.
14          A group of tribal representatives and Bureau
15   officials first publish the election results and give any
16   registered voter five days to challenge them.
17          So notwithstanding the Temporary Restraining
18   Order, the Burleys can challenge the results then.  And
19   after that, the results go to the Bureau's regional
20   director, who has 45 days to call for a recount or a new
21   election before the Tribe-approved Constitution
22   automatically takes effect.
23          Of course, the director can affirmatively approve
24   a tribal Constitution sooner.  That approval or disapproval
25   constitutes final agency action, which can then be
```

1    challenged under the Administrative Procedures Act.

2           At bottom, then, the Burleys retain two

3    opportunities to challenge the election results, even

4    without a Temporary Restraining Order.

5           Third, I find that the Temporary Restraining Order

6    would harm other parties, including the intervenors,

7    proposed intervenors here.

8           It would frustrate hundreds of potential tribe

9    members' attempts to participate in tribal organizations,

10   further denying them access to federal programs, services,

11   and funding.

12          And, fourth, the public interest seems more likely

13   to fit those who want to participate in this election,

14   rather than the self-interest of the named plaintiffs here.

15          So all in all, Burley and her family have failed

16   to justify the issuance of a Temporary Restraining Order,

17   preliminary injunction.

18          I'll issue a written order saying that, for the

19   reasons stated on the record in open court, their motion has

20   been denied.

21          The Court will be in recess.

22          Thank you very much, Counsel.

23          DEPUTY CLERK:  You all may be dismissed.

24          (Proceedings concluded at 12:08 p.m.)

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: April 13, 2019_____   /S/__William P. Zaremba_____

                        William P. Zaremba, RMR, CRR