Exhibit 6

*California Valley Miwok Tribe v. Haaland*, 24-CV-947 (D.D.C.)

Motion to Dismiss

Manuel Corrales, Jr., Esq. SBN 117647
**ATTORNEY AT LAW**
17140 Bernardo Center Drive, Suite 358
San Diego, California 92128
Tel: (858) 521-0634
Fax: (858) 521-0633
Email: mannycorrales@yahoo.com

Attorney for Plaintiffs
CALIFORNIA VALLEY MIWOK TRIBE,
THE GENERAL COUNCIL, SILVIA BURLEY,
RASHEL REZNOR, ANJELICA PAULK and
TRISTIAN WALLACE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA VALLEY MIWOK TRIBE,** a federally-recognized Indian tribe, **THE GENERAL COUNCIL, SILVIA BURLEY, RASHEL REZNOR; ANJELICA PAULK;** and **TRISTIAN WALLACE**<br><br>                    Plaintiffs,<br><br>     vs.<br><br>**SALLY JEWEL,** in her official capacity as U.S. Secretary of Interior; **LAWRENCE S. ROBERTS,** in his official capacity as Acting Assistant Secretary of Interior – Indian Affairs; **MICHAEL BLACK,** in his official capacity as Director of the Bureau of Indian Affairs.<br><br>                    Defendants. | Case No.: 2:16-CV-01345-WBS-CKD<br><br>**FIRST AMENDED COMPLAINT**<br><br>**1.** For Order Setting Aside Arbitrary and Capricious Final Agency Action [5 U.S.C. §706(2)(A)]<br>**2.** Declaratory Relief<br>**3.** Injunctive Relief<br>**4.** Violations of Substantive and Procedural Due Process<br><br>**REQUEST FOR IMMEDIATE STAY OF AGENCY DECISION** |

Plaintiffs allege as follows:

### INTRODUCTION

1.   Plaintiffs seek to set aside an erroneous decision by the Assistant Secretary of Interior-Indian Affairs ("AS-IA") of the U.S. Department of Interior ("DOI" or "the Department") that illegally disavowed recognition of the existing governing body

of the California Valley Miwok Tribe ("the Tribe") that was established in 1998, and illegally directed that the Tribe be reorganized with participation by unenrolled members beyond the five (5) existing enrolled members.

### AUGUST 31, 2011 AS-IA DECISION

2.   On August 31, 2011, the AS-IA Larry Echo Hawk made the following decision concerning the Tribe:

a.   He reaffirmed that the Tribe is a federally recognized tribe whose entire citizenship, as of August 31, 2011, consists of five acknowledged citizens;

b.   The 1998 Resolution established a General Council form of government, comprised of all the adult citizens of the Tribe, with whom the Department may conduct government-to-government relations;

c.   The Department shall respect the validly enacted resolutions of the General Council; and

d.   Only upon a request from the General Council will the Department assist the Tribe in refining or expanding its citizenship criteria, or developing and adopting other governing documents.

### U.S. DISTRICT COURT DECISION REMANDING TO AS-IA

3.   Dixie challenged that decision in federal court.  In December 2013, the federal district court ("the District Court" or "U.S. District Court") granted summary judgment in favor of Dixie and his Tribal Faction and remanded to the AS-IA for him to "reconsider" his August 31, 2011 decision, because he "assumed" certain factual issues rather than determined them factually.  Specifically, the U.S. District Court remanded back to the AS-IA for him to reconsider his August 31, 2011 decision, because, according to the U.S. District Court, the AS-IA merely assumed the Tribe's membership is limited to five persons and further merely assumed that the Tribe is governed by a duly

---

constituted General Council, without setting forth its reasons for these conclusions, in light of the administrative record that questioned the validity of those assumptions. Indeed, although much of the decision is predicated on an existing Tribal leadership dispute, the court there did not have the benefit of the deposition transcript of Yakima Dixie taken in the California State case, wherein he admits resigning as Tribal Chairman, because it was not part of the administrative record.

4. As a result, the U.S. District Court was misled into thinking that Dixie still maintained that he never resigned as Tribal Chairman, and the court relied upon that on-going claim in her court as a basis for her ruling. For example, the U.S. District Court stated:

> Here, the August 2011 Decision fails to address
> *whatsoever* the numerous factual allegations in the
> administrative record that raise significant doubts
> about the legitimacy of the General Council. From as
> early as April 1999, Yakima contested the validity of the
> Council. *See* AR 000182 (April 21, 1999 letter from
> Yakima to the BIA stating that he "cannot and will not
> resign as chairman of the Sheep Ranch Indian Rancheria");
> *see also*, AR 000205 (October 10, 1999 letter from Yakima
> to BIA raising questions about Burley's authority); AR
> 001690, 000231(Yakima notifying the BIA of "fraud and
> misconduct" with respect to the Tribe's leadership).

CVMT v. Jewell (formerly Salazar) (D.C. Dist. Ct. 2013) 2013 U.S. Dist. LEXIS 174535. Accordingly, based solely on the administrative record, the U.S. District Court concluded that Dixie's claim that his resignation was forged and that he never resigned raised doubts about the validity of the General Council under the Burley Faction.

### AS-IA DECEMBER 30, 2015 DECISION

5. On remand, the AS-IA erroneously concluded that the Tribe's membership is more than five people, and that the 1998 General Council does not consist of valid representatives of the

Tribe.  It erroneously concluded that the Tribe was never properly "reorganized" back in 1998, leaving questions as to the overall membership of the Tribe, and therefore the Tribe must be reorganized.  It then wrongfully directed that unenrolled, potential members be allowed to participate in reorganizing the Tribe.  It refused to acknowledge the Tribe's governing document, Resolution #GC-98-01, which established the Tribe's General Council, despite the fact that this governing document has been in place for over 18 years.  It stated:

> At the time of its enactment, the 1998 Resolution undoubtedly seemed a reasonable, practical mechanism for establishing a tribal body to *manage the process* of reorganizing the Tribe.  But the actual reorganization of the Tribe can be accomplished only via a process open to the whole tribal community.  Federal courts have established, and my review of the record confirms, the people who approved the 1998 Resolution (Mr. Dixie, Ms. Burley, and possibly Ms. Burley's daughter Rashel Reznor) are not a majority of those eligible to take part in the reorganization of the Tribe.  Accordingly, I cannot recognize the actions to establish a tribal governing structure taken pursuant to the 1998 Resolution.  Ms. Burley and her family do not represent the CVMT [the Tribe].

(Page 5 of Washburn Decision).  This conclusion is erroneous and arbitrary and capricious for the reasons alleged herein.

### JURISDICTION AND VENUE

6.   This Court has jurisdiction over this action pursuant to 28. U.S.C. § 1331 because the asserted claims arise under the Constitution and laws of the United States.

7.   This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1361 in that the Tribe seeks to compel officers and employees of the United States and its agencies to perform duties owed to the Tribe.

8.   This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1362 because the Tribe is an Indian

tribe duly recognized by the Secretary of the Interior, and the matter in controversy arises under the Constitution, laws or treaties of the United States.

9.   Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiffs reside in this district and no real property is involved in the action.

10.   Judicial review of the agency action is authorized by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704 and 706.  The AS-IA's decision is final agency action under the APA and 25 C.F.R. § 2.6(c).

11.   The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201-2202.

12.   Plaintiffs have exhausted their administrative remedies and are not required to pursue additional administrative remedies before seeking and obtaining judicial relief.

13.   An actual case and controversy has arisen and now exists between the parties with regard to the AS-IA's violations of the constitutional provisions, statutes and regulations cited herein.

**PARTIES**

14.   Plaintiff CALIFORNIA VALLEY MIWOK TRIBE ("the Miwok Tribe" or "the Tribe") is a federally-recognized Indian Tribe located in Stockton, California.  The Tribe has a governing body under the leadership of Silvia Burley ("Burley"), who has been duly elected and appointed as the Tribe's Chairperson.

15.   Plaintiff GENERAL COUNCIL is the legitimate governing body of the Tribe.  The General Council consists of Silvia Burley, Rashel Reznor and Angela Paulk.

16.   Plaintiffs Silvia Burley, Rashel Reznor, Angela Paulk, and Tristian Wallace are members of the Tribe.  Yakima Dixie is

also a member of the Tribe, but he is not a party Plaintiff in this action.

17.   Defendant SALLY JEWELL is the U.S. Secretary of Interior, and is sued in her official capacity only.  Ms. Jewell is responsible for the supervision of the various federal agencies and bureaus within the DOI, including the BIA.

18.   Defendant LAWRENCE S. ROBERTS is the acting AS-IA and head of the BIA.  Mr. Kevin Washburn was the AS-IA who authored the December 30, 2015 decision being challenged in this action, but he retired immediately after rendering that decision.  Mr. Roberts is sued in his official capacity only.

19.   Defendant MICHAEL BLACK is the Director of the Bureau of Indian Affairs with the DOI.  He is responsible for the day-to-day operations of the BIA, including its relations with federally recognized Indian tribes.  Mr. Black is sued in his official capacity only.

**GENERAL ALLEGATIONS**

20.   In 1916, the United States government purchased approximately 0.92 acres of land in Calaveras County, California, for the benefit of twelve (12) named Indians living on the Sheep Ranch Rancheria.  The Indian agent who recommended the purchase of the land for these Indians described the group as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as 'Sheepranch.'"

21.   In 1934, Congress passed the Indian reorganization Act ("IRA"), which, among other things, required the U.S. Secretary of Interior ("the Secretary") to hold elections through which the adult Indians of a reservation decided whether to accept or reject the applicability of certain provisions of the IRA to their reservation, including provisions authorizing tribes to organize and adopt a constitution under the IRA.  25 U.S.C.

---

Sections 476 and 478.  In 1935, Jeff Davis, the only Indian living on the Rancheria, voted in favor of the Tribe being organized under the Indian Reorganization Act of 1934 ("IRA"). However, the process was never followed through, and as a result the Tribe was never organized under the IRA.

22.   In 1958, in keeping with the then-popular policy of assimilating Native Americans into American society, Congress enacted the California Rancheria Act, which authorized the Secretary to terminate the federal trust relationship with several California tribes, including several Rancherias, and to transfer tribal lands from federal trust ownership to individual fee ownership. (Act of Aug. 18, 1958, Pub.L. No. 85-671, 72 Stat. 619).  To this end, the Bureau of Indian Affairs ("BIA") prepared a plan in 1966 to distribute the assets of the Sheep Ranch Rancheria as a prelude to termination.  At that time, Mabel Hodge Dixie was the only adult Indian living on the Rancheria who was entitled to receive the assets of the Rancheria.  She, therefore, voted to accept the distribution plan and was issued a deed to the land in 1966.

23.   Although the Sheep Ranch Rancheria land had been distributed to Mabel Dixie pursuant to a distribution plan, the Secretary never published a final notice of termination and had accepted the land back from Mabel Dixie through a quitclaim deed.  As a result, the Tribe was administratively "unterminated" before it could be formally terminated.  In other words, the Tribe was never terminated.

24.   In 1979, individuals from a number of terminated Rancherias filed an action in the U.S. District Court, Northern District, styled Hardwick v. U.S. (Civ. No. C-79-1710).  The Hardwick plaintiffs sought restoration of their status as Indians, entitlement to federal Indian benefits, and the right to re-establish their tribes as formal government entities.

Specifically, the Hardwick plaintiffs sought by injunction to undo the effects of the California Rancheria Act and to require the Secretary to "unterminate" each of the subject Rancherias and to "treat all of the subject Rancherias as Indian reservations in all respects."  The Hardwick lawsuit ended in a settlement between the tribes and the federal government, culminating in a series of stipulated judgments.  In the settlement, the Secretary agreed to restore "any of the benefits or services provided or performed by the United States for Indians because of their status as Indians" and to "recognize the Indian Tribes, Bands, Communities or groups of the seventeen Rancherias...as Indian entities with the same status as they possessed prior to distribution of the assets of these Rancherias under the California Rancheria Act." (Stipulation and Order, Hardwick v. United States, No. C-79-1710 (Dec. 22, 1983)).

25.  In 1994, Yakima Dixie ("Dixie"), the son of Mabel Dixie, wrote to the BIA asking for BIA assistance for home repairs on the Rancheria, and described himself as "the only descendent and recognized...member" of the Tribe.  At that time Dixie and his brother, Melvin Dixie, were the only surviving children of Mabel Dixie, but Melvin Dixie's whereabouts were unknown.  Melvin later died in 2008.

26.  In the mid-1990s, Burley contacted the BIA for information related to her Indian heritage.  The BIA provided her with this information, which showed that she was related to Jeff Davis who had initially voted in favor of the Tribe being organized under the IRA.  Burley was also related to Dixie.

27.  On August 5, 1998, Dixie, as "Spokesperson/Chairman" of the Tribe, signed a statement accepting Burley as an enrolled member of the Tribe, and also enrolled Burley's two daughters and her granddaughter.  As a result of Dixie's actions, the

Tribe in 1998 consisted of six enrolled members:  (1) Yakima Dixie; (2) Melvin Dixie; (3) Silvia Burley; (4) Anjelica Paulk; (5) Rashel Reznor; and (6) Tristian Wallace.

28.  In September of 1998, Yakima Dixie and Burley met at the Rancheria with BIA staff to discuss organizing the Tribe. One of the issues discussed was developing criteria for membership in the Tribe.  At the time, the whereabouts of Melvin Dixie, Yakima's brother, were unknown.  As a result, the BIA staff told Yakima Dixie that he had both the authority and the broad discretion to decide the criteria for membership. According to the BIA, Yakima Dixie, his brother Melvin Dixie, Burley and Burley's adult daughter were the "golden members" of the Tribe.  And because Melvin Dixie's whereabouts were unknown, the BIA concluded that the three adult members consisting of Yakima Dixie, Burley and her adult daughter were the General Council of the Tribe that had the authority to take actions on behalf of the Tribe.

29.  Because the Tribe was never formally terminated, there was no court decision, like Hardwick, supra, that affected the Tribe, and to which the Tribe and the BIA could look to so as to determine who was a member of the Tribe or otherwise entitled to organize it.  Typically, California tribes who had been unlawfully terminated by the federal government regained federal recognition through litigation like Hardwick, supra, and the court judgment in that litigation identified the class of persons entitled to organize the tribe, e.g., the distributes and their dependents, and their lineal descendants.  However, in the case of the Sheep Ranch Rancheria, although the land had been distributed to Mabel Dixie pursuant to a distribution plan preparatory to termination, the Secretary never actually followed through and published a final notice of termination. Instead, the Secretary accepted the land back from Mabel Dixie

through a quitclaim deed, thus essentially administratively "unterminating" the Tribe before it had ever been formally terminated.

30.   Therefore, because of the unique circumstance that the Sheep Ranch Rancheria found itself in never being terminated, the BIA concluded that "for purposes of determining the <u>initial</u> membership of the Tribe," Yakima Dixie and Melvin Dixie must be included, because they were the remaining heirs of Mabel Dixie. In addition to these two initial members, the BIA recognized that Yakima Dixie had adopted Burley, her two daughters, and her granddaughter, into the Tribe.  As a result, the BIA concluded that Burley and her adult daughter, together with Yakima and Melvin Dixie had "the right to participate in the initial organization of the Tribe."

31.   Melvin Dixie later died in 2008.

32.   On September 24, 1998, the BIA told Yakima and Burley that it "recommend[ed] the Tribe operate as a General Council," because of its "small size," so that they could elect or appoint a chairperson and conduct business.  To this end, the BIA offered the Tribe $50,000.00 in grant money for purposes of improving its tribal government, and provided Dixie and Burley with a draft resolution "form" for them to use in requesting the grant.  The draft resolution contained language establishing the General Council.

33.   Using the draft resolution form prepared by the BIA, Dixie and Burley prepared and signed a resolution on November 5, 1998, establishing a General Council consisting of all adult members of the Tribe, to serve as the governing body of the Tribe.  The resolution became known as Resolution #CG-98-01, which the BIA accepted as the governing document of the Tribe, and which is attached herewith and marked as Exhibit "1."  The document was signed by Yakima Dixie and Silvia Burley, and later

by Rashel Reznor, and specifically noted that the whereabouts of Melvin Dixie were at that time unknown.  Resolution #GC-98-01 vested the General Council with the governmental authority of the Tribe to conduct the full range of government-to-government relations with the United States.

34.  Pursuant to Resolution #GC-98-01, Yakima Dixie was appointed and elected as the Tribal Chairman.

35.  On April 20, 1999, Yakima Dixie signed a notice of resignation as Tribal Chairman.  A copy of this document is attached and marked as Exhibit "2."  On the same date, Yakima Dixie also signed a document confirming his resignation as Tribal Chairman and agreeing to the appointment of Silvia Burley to replace him as the new Tribal Chairperson.

36.  Sometime after he resigned, Yakima Dixie was approached by a non-Indian, Chad Everone, who sought Yakima's cooperation in taking control of the Tribe in order to build a gambling casino using the name and status of the Tribe.  The problem was that Yakima Dixie had already expressly resigned.  To regain control of the Tribe, Everone and others conspired with Yakima to have Yakima falsely say that he never resigned and that his written resignation was a forgery.  Yakima Dixie then told the BIA and others that he never resigned and that his resignation was forged.  This then created a Tribal leadership dispute between Yakima Dixie and Burley that has since 1999 caused havoc with the Tribe and crippled the Tribe's ability to operate effectively over the years.  Yakima maintained that claim from 1999 up through February 7, 2012, when he was deposed and testified in a California state action that he in fact resigned in April of 1999, that his resignation was not forged as he had previously claimed, and that the signatures on the Tribal resignation documents were in fact his.

37.   Despite Dixie's claim that he never resigned, the BIA chose to acknowledge Burley as the Chairperson of the Tribe, and, as a result, accepted and honored numerous Tribal resolutions passed by the General Council under Burley's leadership from 1999 through July 2005.

38.   From 1999 through July 2005, the BIA entered into annual P.L. 638 federal contracts with the Tribe under Burley's leadership, and awarded the Tribe federal contract funding.

**PROCEDURAL SUMMARY**

39.   On December 13, 2013, the District Court for the District of Columbia remanded this matter to the Department to reconsider and provide further explanation for its August 31, 2011 decision relating to the membership of the Tribe and the authority of its General Council.

40.   The District Court held that the Department's August 31, 2011 decision concerning membership of the CVMT[1] (the "August 2011 Decision") failed to provide sufficient explanation for its conclusions, because it did not adequately address: (i) whether the Burley family, which was admitted to the Tribe in 1998, fraudulently induced or otherwise coerced Yakima Dixie, the Tribal leader, to admit them; (ii) whether Tribal member Melvin Dixon's interests had been adequately protected when Yakima admitted the Burleys to the Tribe; (iii) how the Tribe could be comprised of only five people, when there were many more potential Tribal members; and (iv) why the General Council formed by the CVMT in 1998 was the legitimate Tribal government. *Id.* at 17-23.

41.   However, there was ample evidence to support the August 2011 Decision.  Indeed, the weight of the record was

---

[1]  Letter from Larry Echo Hawk, Assistant Secretary, Department of the Interior Bureau of Indian Affairs, to Ms. Silvia Burley and Mr. Yakima Dixie, August 31, 2011.

unequivocal that Yakima Dixie properly and voluntarily enrolled the Burleys, that Melvin Dixie's interests were not compromised when the Burleys were enrolled, that the Tribe is currently and properly comprised of five members, and that the 1998 General Council was properly established and is the legitimate Tribal government.  Indeed, to conclude otherwise, the Department would have had to ignore the record and history of the Department's own interaction with the CVMT over decades.  There is no evidence of impropriety in connection with the formation of the 1998 General Council, and the Department was required to adhere to long-standing precedent and defer to the General Council on matters of Tribal governance, including membership.

42.  Adequate review of the full record, with appropriate regard for the legal and policy precedent to which the Department should have adhered to, makes apparent that the August 2011 Decision was correct and that the Department should have reached the same conclusion.

43.  The Tribe's membership is presently comprised of five people and that Tribal governance—including membership—should be entrusted to the Tribe's General Council.

44.  The District Court held that the Department's August 2011 Decision did not recite sufficient record evidence to provide assurance that the Department had exercised adequate care over Tribal membership and governance.  However, on remand, the Department failed to reconsider each of the issues identified by the Court and failed to explain its position, by reference to record evidence.

45.  The AS-IA's decision was erroneous and unlawful for the following reasons:

a.  ***Yakima Dixie's enrollment of the Burleys in 1998 was appropriate***.  Yakima Dixie ("Dixie") enrolled the Burley family into the CVMT voluntarily and only after Dixie and Silvia Burley

("Burley") had corresponded for some years. There is no evidence that Dixie's decision to enroll the Burleys was subject to undue or inappropriate influence or was fraudulent in any respect. To the contrary, the contemporaneous evidence is unequivocal—Dixie freely chose to enroll the Burleys and promptly involved them in Tribal governance.

   **b.   *Dixie's enrollment of the Burleys did not compromise Melvin Dixie's interests*.** It is true that Yakima Dixie enrolled the Burleys into the Tribe and involved them in Tribal governance, but did not consult his brother, Melvin Dixie.  At that time, however, Melvin had not been involved in Tribal matters for decades and had not been in touch with Yakima for 30 years. Indeed, neither Yakima nor the Department then knew where Melvin lived.  When Melvin was found a couple of years later, he was invited to participate in Tribal affairs and was encouraged to avail himself of Tribal benefits to which he was entitled. Under the circumstances, Yakima's decision to enroll the Burleys without consulting Melvin was reasonable.  Moreover, Melvin is now deceased, and any supposed impairment of his interests is consequently moot.

   **c.   *Enrolling the Burleys in 1998 did not impair the interests of unrolled potential Tribal members*.** As discussed by the District Court, there is broad agreement that there are a number of unrolled <u>potential</u> Tribal members.  Those potential members had not sought to join the Tribe when Dixie enrolled the Burleys; nor did those potential members apply to the General Council for membership.  The potential members have instead emerged following and as a consequence of a Tribal leadership dispute between Dixie and Burley.  Because none of the potential members has been denied the opportunity to enroll in the Tribe, none of their interests have been impaired.  The proper course for the Department was to encourage the potential members to

apply to join the Tribe and for the Tribe to assess and evaluate each of their applications, not to unlawfully dismantle Tribal membership and require the Tribe to "reorganize" with participation of these non-members.

d. ***The Tribe's 1998 General Council is the authorized and legitimate Tribal government.*** Following enrollment of the Burleys in 1998, Dixie and Burley worked with the Department to organize the Tribe. To that end, the CVMT passed resolution #GC-98-01, which established a Tribal General Council. The Department recognized the General Council and compacted with it for a number of years. There is no record evidence that the formation of the General Council was tainted by fraud or in any way inappropriate. Moreover, the Department's years-long dealings with the General Council caused it and the enrolled members of the Tribe to develop reasonable and settled expectations that the Department would continue to maintain government-to-government relations with the Tribe through the General Council. As a consequence, the Department should have resumed recognition of the General Council, which can resolve any outstanding membership issues.

46. Thus, the CVMT is properly comprised of five members and is governed by the 1998 General Council.

**MATERIAL FACTUAL BACKGROUND**

47. By the 1990s, the CVMT had only one active member, Yakima Dixie ("Dixie").[2] From the early 1990s through 1998, Silvia Burley ("Burley") and her family researched their Indian roots, sought guidance from the Bureau of Indian Affairs ("BIA"), and applied to join the Tribe. Dixie enrolled the Burley family in 1998. Later that same year, Dixie and the

---

[2] In 1915, the Tribe had been reduced from a "large band of Indians" to 13 members, and by 1994, Yakima Dixie was the only active tribal member.

Burley family, with BIA advice, then organized the Tribe, through the establishment of a General Council. The Tribe then sought to organize under the Indian Reorganization Act ("IRA"), by seeking BIA approval of a Tribal Constitution. This effort subsequently slowed and then halted as a consequence of a disagreement between Dixie and Burley over the leadership of the Tribe, which has precipitated years of litigation.

**I.**

**YAKIMA DIXIE APPROPRIATELY ENROLLED THE BURLEY FAMILY IN THE TRIBE IN 1998**

48.   The events that led to the Burleys' enrollment and how the Tribe was governed in the immediate aftermath of their enrollment are as follows:

a.   In 1994, Dixie contacted the BIA and, with the help of the BIA representative Raymond Fry, identified himself as "the only descendant and recognized tribal member of the Sheep Ranch Rancheria, of Me-wuk [Miwok] Indians of California."

b.   A year later, Burley also contacted the BIA, seeking assistance documenting her Indian heritage.  On September 22, 1995, the BIA certified Burley as a California Indian named on the California Judgment Fund Roll, based on her ½ degree of Indian blood.[3]  The BIA's certification did not enroll Burley into the CVMT, because blood quantum alone does not qualify a person for membership.  The BIA also created Burley's genealogical chart.

c.   Burley and her family sought to join the Tribe and provided the BIA documentation to Dixie.  Before Dixie could make a membership decision, however, he went to prison.

d.   In 1998, the federal government recognized Yakima

---

[3]  Burley was the daughter of Mildred F. (Jeff) Burley, who was a 4/4 Miwok Indian. "Miwok" is a general term, which may refer to several different bands. Burley never applied for membership in any Miwok band other than the CVMT.

Dixie and his brother, Melvin Dixie, as the only members of the CVMT who had the right to organize the Tribe.  Melvin Dixie, however, had not been involved in Tribal affairs for decades.

e.   That same year, Burley again contacted the BIA seeking assistance enrolling in the CVMT. The BIA directed Burley to Yakima Dixie, who was then out of jail.  The BIA provided Dixie's contact information to Burley.  Burley contacted Dixie, renewing her effort to join the Tribe.

f.   On August 5, 1998, Dixie—who was then authorized to act on behalf of the CVMT —signed an order enrolling Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace (the "Burley family") into the Tribe.

g.   On September 24, 1998, the BIA confirmed the enrollment of the Burley family, stating that "as the Spokesperson of the Tribe, [Dixie] accepted Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace as enrolled members of the tribe. Therefore, these persons..., provided that they are at least eighteen years of age, possess the right to participate in the initial organization of the tribe."  The BIA letter further explained that future action by the Tribe would include determination of "what enrollment criteria should be applied to future prospective members."

h.   Shortly thereafter, the adult acting members of the Tribe—Dixie, Burley and Reznor—enacted tribal resolution #GC-98-01, which formed a General Council (the "1998 General Council"). The 1998 General Council as a whole can make authoritative decisions for the Tribe, even without a Chairperson.

i.   The federal government maintained a government-to-government relationship with the CVMT from November 1998 until at least 2005, through the 1998 General Council.  Over that time, the BIA entered into 10 contracts with the General Council under Pub. L. 93-638, which funded the Tribe through 2008.

49.   There is no evidence that anyone other than the Burleys sought to join the CVMT from the 1960s at least through formation of the 1998 General Council.

## II.

**ALTHOUGH A LEADERSHIP DISPUTE BEGAN IN 1999 AND CONTINUES TODAY, THE TRIBE'S GOVERNANCE STRUCTURE PERMITS DIRECT OVERSIGHT OF THE TRIBE BY THE GENERAL COUNCIL**

50.   Between November 1998 and late April 1999, Dixie led the General Council.  In April 1999, a disagreement arose between Dixie and Burley over whether Dixie had resigned as Tribal Chairperson, to be succeeded by Burley.  Despite their falling out, Dixie informed the BIA that he "g[ave] [Burley] the right to act as a delegate to represent the Sheepranch Indian Rancheria."  The leadership dispute remains unresolved to this day, as both Dixie and Burley purport to lead the CVMT.

51.   However, in 2012, Dixie was deposed in a related California State case over receipt of Revenue Sharing Trust Fund ("RSTF") distributions belonging to the Tribe.  Dixie admitted under oath that he in fact resigned as Tribal Chairman in 1999.

52.   The leadership dispute, however, should not paralyze the Tribe or its governance, because the Tribe's General Council resolution entrusts governance of the Tribe to the General Council as a whole:

> RESOLVED, That Yakima Dixie, Silvia Fawn Burley, and Rashel Kawehilani Reznor, as a majority of the adult members of the Tribe, hereby establishes a General Council to *serve as the governing body of the Tribe.*

53.   The resolution further allows that "all other inherent rights and powers not specifically listed herein shall vest in the General Council, provided that the General Council may specifically list such other rights and powers through subsequent resolution of the General Council." (*Id.*) Thus, even in the absence of consensus over the Chair of the Tribe, the

General Council has the power to make all decisions necessary for Tribal governance. August 2011 Decision at 8 ("The 1998 Resolution established a General Council form of government, comprised of all the adult citizens of the Tribe, with whom the Department may conduct government-to-government relations."). *See also Samuel George, William Jacobs, Chester Isaac, Bernadette Hill, and Inez Jimerson v. Eastern Regional Director, Bureau of Indian Affairs*, 49 IBIA 164 (May 4, 2009) ("The governing body is the Council . . . It has no written law, court, or body other than the Council itself for resolving disputes that arise within the Council.")

### III.

**THE LEADERSHIP DISPUTE EVOLVED INTO A MEMBERSHIP DISPUTE, AS DIXIE SOUGHT TO CIRCUMVENT THE 1998 GENERAL COUNCIL**

54.  Dixie first contested the scope of the Burley's Tribal membership in 2000, in an effort to reclaim unilateral control over the Tribe. Dixie argued to the BIA then that the Burleys' Tribal membership was limited to participation in social welfare programs and did not permit them to participate in Tribal governance.  The BIA examined the evidence proffered by Dixie and rejected his claim, concluding that the evidence on which he relied did not support his position; that contemporaneous enrollment documentation did not purport to limit the Burleys' Tribal membership; and that Burley and Reznor had participated with Dixie in Tribal governance for many months before Dixie first claimed that their membership was limited to the receipt of benefits.

55.  From mid-1999 until 2004, the BIA recognized "the General Council chaired by Ms. Sylvia [sic] Burley" as the legitimate Tribal government.  For example, the BIA referred two potential Tribal members—Yakima and Melvin's alleged sons—to the 1998 General Council for determination of their membership,

because "what evidence is acceptable for establishing [] lineal descendancy is an internal matter to be determined by the Tribe." During that period, the Department regularly compacted with the Tribe, through Burley as the Chair of the General Council.

56. The purported membership dispute on which the District Court opinion focused arose in earnest in late 2003, after the leadership disagreement had remained unresolved for some years and after Dixie had allied himself with gaming developers, who orchestrated a membership contest as a means to restore Dixie as Tribal Chairman and thereby further their development interests.

57. In 2004, the BIA abruptly changed its position and pressed the Tribe to involve the "whole tribal community," comprised of potential members, in the adoption of enrollment criteria. Consistent with that approach, the BIA took the position in subsequent litigation that, as Chair, Burley had not given adequate consideration to potential Tribal members, when the Tribe sought to organize under the Indian Reorganization Act ("IRA"). *See California Valley Miwok Tribe v United States*, 424 F. Supp. 2d 197 (D.D.C. 2006) *("CVMT I")*. In its briefs, the Department did not explain either the legal status of "potential" Tribal members or the implications to the Tribe of their potential membership but represented that it believed the Tribe actually consisted of this larger pool of potential members. The Department did not explain its dramatic change in policy.

58. To effect the position it was then taking in litigation, the Department sought to force a General Council meeting in 2007 that included both enrolled and potential members, at which potential members would be permitted to participate in determining Tribal membership criteria. Burley challenged the BIA's effort before the Interior Board of Indian

Appeals ("IBIA"), referred the membership issue to the AS-IA, who ultimately rejected the BIA's plan in August 2011. The AS-IA reasoned that compelling the CVMT to include potential members in a General Council meeting would effectively turn potential members into actual members, which would impermissibly involve the BIA in the resolution of membership questions.

**IV.**

**THE DEPARTMENT'S AUGUST 2011 DECISION RESTORED THE DEPARTMENT'S PRIOR RECOGNITION OF THE 1998 GENERAL COUNCIL**

59. The August 2011 Decision was premised on the Department's long-standing relationship with the CVMT, considered the full administrative record then before the Department, and sought to correct the BIA's earlier effort to force the CVMT to include potential members in its governmental and membership decisions. August 2011 Decision at 2.

60. In the August 2011 Decision, Assistant Secretary Echo Hawk recognized the CVMT had a functioning Tribal government and affirmed that the 1998 General Council "may conduct the full range of government-to-government relations with the United States since [a]lthough this current General Council form of government does not render CVMT an 'organized' tribe under the [IRA] . . . a federally recognized tribe is not required 'to organize' in accordance with the procedures of the IRA." *Id.*; *see* 25 U.S.C. § 476 (permitting but not requiring tribes to organize under the IRA). In addition, the Department told the District Court that it will protect potential members' interests, stating in its briefs that, "[i]f the Tribe, acting through its General Council, endeavors to organize under either 476(a) or 476(h) in a manner that thwarts the participation of the tribal community, then the Assistant Secretary will be bound by his legal duties outlined in *Miwok I* and *Miwok II*."

61. Dixie challenged the August 2011 Decision in the

District Court. The Court ultimately held that the Department's August 31, 2011 Decision did not adequately consider record evidence suggesting that the Tribe was actually comprised of more than five members (Order at 17-20) and did not adequately explain its bases for recognizing the 1998 General Council (Order at 20-23).

GENERAL ALLEGATIONS

62.  As the District Court noted in reviewing the August 2011 Decision, the Department has a "distinctive obligation of trust" with respect to Indian tribes. Order at 20 (quoting *Seminole Nation*, 316 U.S. 286, 296 (1942)). The Department's trust obligation is based on "the fact that the Nation is a sovereign entity and, as such, has the right to self-government." *Seminole Nation of Oklahoma v. Norton*, 223 F. Supp. 2d 122, 131-32 (D.D.C. 2002). Thus, whether to interfere in Tribal membership questions "should be resolved in favor of tribal self-determination and against Federal Government interference."

63.  In the present case, the Department has played a constructive role consistent with both its trust obligation and its appropriate deference to tribal self-governance, in reviving the CVMT over the years, by evaluating the merits of the Burley family's potential membership, by referring the Burleys to Yakima Dixie, by advising the CVMT about the formation of the General Council, and then by engaging in government-to-government relations with the Tribe.  The Department exercised appropriate and judicious care in evaluating the CVMT's enrollment of new members and its creation of a nascent governance structure.

64.  Consistent with the Department's August 2011 Decision, the record demonstrates that Yakima Dixie properly enrolled the Burley family in 1998, that their enrollment did not harm Melvin

Dixie, and that the Tribe is in fact presently comprised of five enrolled members. As a consequence, the AS-IA's August 2011 Decision was correct to recognize the authority of the General Council formed by the CVMT in 1998 and to defer to the General Council concerning the enrollment of potential Tribal members.

**I.**

**THE CALIFORNIA VALLEY MIWOK TRIBE'S CURRENT MEMBERSHIP IS PROPERLY COMPRISED OF YAKIMA DIXIE, SILVIA BURLEY, RASHEL REZNOR, ANGELICA PAULK, AND TRISTIAN WALLACE**

65.   The District Court questioned whether the August 2011 Decision had given adequate consideration to the validity of Dixie's enrollment of the Burley family.  Order at 17-19. However, review of the administrative record confirms that Assistant Secretary Echo Hawk's August 2011 Decision was in fact correct: enrollment of the Burley family was a legitimate exercise of Tribal governance and was not induced by fraud; the Burleys' enrollment did not undermine Melvin Dixie's rights; and the interests of potential but unenrolled members are adequately protected.

**A.   *Dixie Properly Enrolled the Burley Family in the Tribe***

66.   The District Court held that the August 2011 Decision did not address whether the Burley family took undue advantage of Dixie, when he enrolled them in the Tribe in 1998.  Order at 19.  However, no such fraud or coercion occurred.  In fact, there is *no* evidence that Burley fraudulently induced or otherwise coerced Dixie to enroll the Burley family in the Tribe.  To the contrary, Dixie willingly and voluntarily enrolled the Burleys only after he and Burley had interacted over a number of years.

67.   Burley's relationship with the CVMT and Dixie dated to Burley's childhood.  In 1995, shortly after Burley contacted Dixie about enrolling in the Tribe, Dixie went to jail.  Over

the next few years, Burley and Dixie occasionally corresponded. In 1998, shortly after Dixie had been released from prison and at the BIA's suggestion, Burley approached him about enrolling in the Tribe, and Dixie voluntarily chose to enroll Burley and her family into the CVMT.

68.   The District Court opinion notes that, when Burley was introduced to Dixie in 1995, he was incarcerated and physically ill and disabled. Order at 19.[4]   Dixie, however, did not enroll the Burleys in 1995; he waited another three years, *after* he was out of prison. There is no record evidence whatsoever that Burley misled Dixie or coerced him into enrolling her family. Indeed, even Dixie's own allegation that Burley engaged in fraud pertains only to the "*change in Tribal leadership during April and May 1999.*"  Dixie himself does not allege that the Burleys tricked or coerced him into admitting them.

69.   The contemporaneous record of the BIA's interaction with the CVMT confirms that Dixie's decision to enroll the Burleys was deliberate and intended to benefit the Tribe.  For example, shortly after the enrollment of the Burley family, Dixie told BIA representatives Raymond Fry and Brian Golding that Burley would be an asset to the Tribe and expressed his admiration for Burley's education in Tribal Business Administration.  During that meeting with Fry and Golding, Dixie and Burley together participated in a thoughtful conversation about how the CVMT could develop a tribal government and potentially enroll additional members.

70.   There is no evidence indicating that in 1998 Burley induced Dixie to admit her family through fraud or coercion.

---

[4]  Given the incarceration rates and health indicators in Indian Country, any suggestion that ability to lead a tribe should be contingent on a clean arrest record and/or physical health would rob tribes of valuable potential leaders. *See e.g.,* "A Quiet Crisis: Federal Funding and Unmet Needs of Indian Country" US Commission on Civil Rights (July 2003).

Rather, the record of the Burley family's enrollment and the subsequent interaction with the BIA confirms that Dixie willingly admitted the Burley family to the Tribe, soon thereafter involved them in Tribal governance, and sought to work with Burley and the BIA to advance Tribal interests.  When Dixie first challenged the scope of the Burley family's Tribal membership, the BIA reviewed the evidence presented by Dixie, found his claims disingenuous and unsupported by the record, and concluded that the Burleys had been properly admitted to the Tribe, without any limits on the scope of their membership.

**B.   *Enrollment of the Burleys in the CVMT Did Not Compromise Melvin Dixie's Interests***

71.   The District Court separately expressed concern that the Department may not have adequately protected Melvin Dixie's interests when it permitted Yakima to enroll the Burley family. *See* Order at 20. The Court reasoned that, because Yakima Dixie did not consult Melvin before enrolling the Burley family, Yakima left Melvin's Tribal rights "at the mercy of the Burleys." *Id.* at 20. The Court's concern with interests of Melvin was misplaced for two reasons.

72.  ***First***, Yakima had a good reason for not consulting Melvin: at the time of the Burleys' enrollment Melvin had not been involved in Tribal matters for more than 30 years. Melvin's interests were not and could not have been impaired, because he was then playing no role at all in Tribal governance or affairs. Before enrolling the Burleys in 1998, Yakima had for years been the only person who purported to act on behalf of the Tribe, and the BIA had recognized him as the leader of the CVMT.  When addressing enrollment of the Burley family in 1998, however, the BIA nevertheless asked Yakima about the whereabouts of his brother.  Yakima told the BIA that he believed, through second-hand information, that Melvin lived in Sacramento but he made

clear that he and Melvin had not spoken in over 30 years.

73.   During that discussion, the BIA's Brian Golding acknowledged Melvin's rights but noted that, because the BIA did not know Melvin's location, Tribal decision-making would be vested in Yakima, Burley, and Reznor.  When the BIA verified the Burley family's enrollment later in 1998, the BIA affirmed that the "whereabouts of . . . Melvin Dixie, were presently unknown."

74.   When the BIA located Melvin two years later, it advised him that he was entitled to participate in Tribal governance.  The BIA also informed Melvin that he could request financial or technical assistance and should inform the Tribe of any circumstances, which would limit his ability to participate in Tribal affairs.  Upon learning that Melvin was in contact with the BIA, Burley sought and received Melvin's contact information and invited him to participate in Tribal governance. Melvin did not respond to Burley's outreach.

75.   The record thus demonstrates that Melvin Dixie voluntarily abandoned the Tribe decades before Yakima enrolled the Burley family.  Their enrollment consequently had no discernible effect on Melvin's interests, because at the time, Melvin himself had chosen not to participate in Tribal governance or to interact with the Tribe or the BIA.

76.   ***Second***, in all events, this question is academic—Melvin is now deceased. Whether his interests were compromised in 1998 by the Burleys' enrollment therefore is legally irrelevant.

C.   ***Potential Tribal Members Are Not Entitled to the Same Consideration as Enrolled Members of the Tribe***

77.   In its August 2011 Decision, the Department distinguished between the five enrolled Tribal members and the approximately 250 potential but unenrolled members of the Tribe. The Department concluded that "the Tribe is not comprised of

both citizens and potential citizens. Rather, the five acknowledged citizens are the only citizens of the Tribe, and the General Council of the Tribe has the exclusive authority to determine the citizenship criteria for the Tribe."

78.   The District Court, however, concluded that the Department had "ignore[d] ... evidence that the Tribe's membership is potentially larger than just these five individuals." Order at 18.  The District Court also referred to a D.C. Circuit opinion that mentions Burley's acknowledging 250 "potential" members of the Tribe. *CVMT II*, 515 F.3d at 1265. Plaintiffs agree that that there are additional potential members of the Tribe, though the potential members to whom she was then referring were not necessarily CVMT members. Rather, Burley was discussing potential members of all Miwok bands in the area, rather than the CVMT alone. *See supra* n.3. To resolve CVMT membership specifically, potential members' eligibility must be certified; the General Council must evaluate whether to enroll them; and the General Council then must act to admit them.  A full consideration of all record evidence makes clear that the Department's initial decision was correct, and the Department should have confirmed that conclusion on remand.

79.   The Burleys were properly enrolled in the Tribe and possessed, with Yakima Dixie, the right to organize the Tribe and determine membership.  There was substantial evidence in the record that, in contrast to the Burleys, the potential but unenrolled members to whom the District Court referred had not applied to enroll in the Tribe at the time that Dixie admitted the Burleys, did not apply to the General Council for admission after the Tribe began to organize, and are not entitled to avoid the usual membership application process by appeal to the Department.

80.   Assuming that the potential members apply for

membership to the General Council and satisfy membership criteria, they will receive appropriate consideration by the General Council. In the event the Tribe chooses to organize under the IRA, the Department has indicated it will review the Tribe's membership procedures.

**(1)   As the Only Active Tribal Member and the BIA-Recognized Tribal Spokesperson in 1998, Yakima Dixie Properly Enrolled the Burley Family.**

81.   In the 80 years before admission of the Burleys, the Tribe was fading and nearly defunct.  In 1915, the Government identified 13 Indians living on 160 acres in or near Calaveras County. By the time Congress enacted the IRA in 1934, however, only one identifiable CVMT member, Jeff Davis, remained.  None of the Indians identified in the 1915 census contested that Davis was the only remaining Tribal member.  In 1965, the Government again identified only one Tribal member, Mabel Hodge Dixie, a descendant of Jeff Davis.  To ensure that Dixie was the only remaining Tribal member, the BIA sent a letter to descendants of the Indians identified in the 1915 census and published Tribal membership criteria once weekly for three weeks in the local newspaper.  The BIA allowed 15 days for anyone to challenge its conclusion that Dixie was the only remaining Tribal member and to claim membership in the Tribe.

82.   Dora Mata contested the BIA's determination, claiming that she and some of her family were Tribal members.  The BIA, however, found that none of Mata's family met the established membership criteria.  The BIA consequently determined that Mabel Hodge Dixie was the last remaining Tribal member of the CVMT in 1965.  Following Mabel Hodge Dixie's death, the BIA determined, based on the Department of Interior's Office of Hearing and Appeals Order of Determination of Heirs, that Yakima and Melvin Dixie were the remaining members of the Tribe.

83.  By the mid-1990s, Melvin was not participating in Tribal affairs, and Yakima was the last participating Tribal member.  Yakima, whom the BIA recognized as the sole Tribal authority, enrolled the Burley family in the CVMT in 1998.

84.  At the time that Dixie enrolled the Burley family, the Department was not obliged to scour the historic Sheep Ranch area, to determine whether other residents might be potential members of the Tribe.  Because the CVMT was never terminated it need not be restored to recognition and does not need assistance from the Assistant Secretary to become reorganized.  Thus, the CVMT itself—through its duly constituted General Council—was and remains entitled to make membership determinations, as potential members apply to enroll in the Tribe.

**(2)   Potential Tribal Members Had Not Sought to Enroll in the Tribe Until After The Enrollment of the Burley Family; Nor Have They Ever Applied to the General Council for Membership.**

85.  The District Court held that Assistant Secretary Echo Hawk did not adequately explain how the Tribe has only five members, despite evidence of a greater tribal community of around 250 people.  Order at 18.

86.  The Tribe's small membership is not suspect.  It is instead an unsurprising consequence of the Tribe's decline and near annihilation. As stated, the Sheep Ranch had been decimated by the early 20th century, leaving only 13 members in 1915. Between 1930s and the 1990s, the Tribe never had even five members.

87.  There is no evidence—nor did the District Court refer to any—that potential members other than the Burleys sought to join the Tribe at any point before the CVMT established its General Council in 1998.  Indeed, the evidence before AS-IA Washburn showed the potential members sought to join the Tribe only *after* the General Council had been established and *after*

the leadership dispute had arisen between Dixie and Burley.  It is also ironic that Dixie now appears to contend that Burley is ignoring the interests of unenrolled potential members. In 1998, Dixie told Burley and the BIA that he "would like to keep [Tribal membership] restricted, you know, just to a few . . ."

88.   Because the potential members never applied to the General Council to enroll, it is premature either to assume that the potential members are in fact entitled to membership (*e.g.,* do they in fact have Miwok ancestry?) or to conclude that they would not receive appropriate membership consideration if they were to apply to the General Council.

## II.

### RESOLUTION #GC-98-01 ESTABLISHED THE LAST UNCONTESTED CVMT GENERAL COUNCIL AND REMAINS THE PROPER TRIBAL GOVERNMENT

89.   The District Court held that Assistant Secretary Echo Hawk did not adequately consider whether "a duly constituted government actually exists." Order at 20-22. The Court noted that the August 2011 Decision's recognition of the 1998 General Council, including deferring to the General Council on Tribal membership, upset the reliance interests of the 250 potential members, because the Department previously appeared to have said those potential members should have an immediate say in CVMT governance. This is inaccurate.

90.   There is overwhelming evidence that the 1998 General Council was organized appropriately, with the guidance of the BIA, and that recognizing the authority of the 1998 General Council would not improperly undermine potential members' interests.  To the contrary, only the General Council is in a position to give proper and due consideration to potential members' qualifications to join the Tribe.

### A.   *The 1998 General Counsel Was Properly Formed*

91.   Shortly after enrollment of the Burley family and with

guidance from the BIA, the active adult membership of the tribe—Yakima Dixie, Silvia Burley, and Rashel Reznor—formed a General Council through Tribal resolution #GC-98-01, which Dixie and Burley signed.  Following adoption of #GC-98-01, Dixie yielded his unilateral authority over Tribal matters, and the 1998 General Council became the governing authority of the Tribe.

92.   The District Court questioned whether #GC-98-01 is compromised, either because it was not actually approved by an appropriate quorum of adult members or because Dixie has "contested the legitimacy of the Council." Order at 21-22.  Such concerns are unfounded.

93.   ***First***, the District Court noted that neither Reznor nor Melvin Dixie signed the accompanying Resolution. Order at 7 n.7. Reznor did not sign #GC-98-01 because she was away at college and therefore participated in the meeting by phone. She voted in favor of the resolution and has since endorsed its validity.  As stated, Melvin Dixie was not in touch with or involved in the Tribe in 1998.

94.   Thus, all three participating Tribal members voted in favor of adopting #GC-98-01, and even counting Melvin Dixie, three of the four enrolled adult Tribal members alive in 1998 endorsed #GC-98-01. Consistent with its uncontested adoption at the time, the BIA regularly and repeatedly has recognized the General Council as the governing body of the Tribe since 1998. As noted earlier, the BIA also has entered into 10 contracts with the 1998 General Council under Pub. L. 93-638.

95.   ***Second***, the District Court questioned the authority of #GC-98-01, on the basis that Dixie has alleged that Burley became Tribal Chair through fraud. Order at 21-22.  The District Court decision, however, confused the acknowledged *leadership* dispute between Dixie and Burley with a non-existent dispute over the *formation* of the Tribe's government, the General

Council.  Not one of the documents on which the District Court premised its finding concerned any alleged deficiency in the formation or organization of the General Council.  The documents to which the District Court referred instead repeat Dixie's allegations about the impropriety of Burley's assuming the Chairmanship.

96.  Dixie has consistently contended that Burley purloined the Chairmanship through fraud; he has not, however, argued or offered any evidence that the creation of the 1998 General Council was tainted by fraud.  To the contrary, Dixie and Burley have agreed over the years that #GC-98-01 was authorized, appropriately undertaken, and legitimate.  Indeed, Dixie himself chaired the General Council for at least five months after adoption of #GC-98-01.  And, consistent with the legitimacy of the General Council and its authority over Tribal affairs, Dixie told the BIA even after the leadership dispute arose that he "g[ave] [Burley] the right to act as a delegate to represent the Sheepranch Indian Rancheria."

97.  The disagreement between Dixie and Burley that underlies this entire matter is a leadership dispute.  And leadership disputes in Indian Country, while inconvenient, are not uncommon or unprecedented.  In the event of an internal tribal leadership dispute, this Department's established policy is to recognize the last uncontested tribally elected council.  In this case, the last undisputed General Council is the 1998 General Council established by #GC-98-01.

**B.  *Recognizing the Authority of the 1998 General Council Would Not Improperly Undermine Potential Members' Interests***

98.  The District Court correctly held that the Department must provide a "detailed justification" for changing a policy that "had engendered serious reliance interests." Order at 14, 20 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

515 (2009)).  The Court found that the Department's August 2011 Decision was a "180 degree-change of course" from prior BIA positions dating to 2004 that appeared to favor giving potential Tribal members a say in CVMT governance matter, presumably including their own membership applications.  The Court consequently held that the Department did not provide an adequate explanation in 2011 for recognizing the General Council's authority to govern Tribal affairs, including membership.  Opinion at 18.

99.  On remand, the Department should have concluded that: (i) there is no evidence that any potential Tribal members interest has yet been compromised, and (ii) examination of the record back to the 1990s supports the conclusion that the Tribe has five members.  Its failure to reach this conclusion was erroneous for the following reasons.

100. *First*, there was no evidence in the record that potential Tribal members would not be admitted if they were to apply to the General Council for membership.  The record was therefore devoid of any basis to conclude that any actual interest in membership for any potential Tribal members has yet been compromised.  Absent evidence of such an injury, it was premature to conclude that potential members' interests have been injured.

101. *Second*, the District Court characterized the Department's position that the "Tribe's membership was limited to only Yakima in 1998 (and the Burleys after Yakima enrolled them)" as "newly adopted." Order at 19.  Examination of the full record, however, demonstrates that the Department has long held a consistent position on the Tribe's membership and on the propriety of Dixie's enrolling the Burleys.

102. Between 1998 and 2004, the Department interacted regularly with the CVMT.  Its approach to the Tribe during that

period was deliberate and careful and also created settled expectations by recognizing the right of the five-member Tribe to organize, including establishing a General Council and determining "what enrollment criteria should be applied to future prospective members."  Indeed, in the years after formation of the 1998 General Council, the CVMT compacted with the federal government, sought to prepare a constitution, and tried to enroll new members.

103. By comparison, potential members' interests are inchoate. Although the Department has at times taken the position that potential members may participate in enrollment decisions, the Department has never determined the legitimacy of those potential members' claims to Tribal membership.  Nor has the Department participated in or organized or ratified processes to determine the method by which the potential members' applications to join the CVMT should be adjudicated. The potential members' reliance interest in the Department's position is therefore at best limited.

104. The interests of the members of the 1998 General Council reflect a lengthy and substantial interaction with the Department, including years of government-to-government relations. That type of interaction engendered more substantial reliance by the members of the General Council than the interest in *possible* membership that potential members may have acquired as a consequence of the policy and litigation positions taken by the Department between 2004 and 2011.

C.   ***Enrollment of Potential Members of the Tribe Must Be Entrusted to the General Council***

105. The Department's position between 2004 and 2011 has been that potential Tribal members should receive appropriate and fair process when they apply to join the Tribe.  The 1998 General Council is best positioned to determine and then provide

that process.

106. Consistent with longstanding judicial and Department precedent and policy, the August 2011 Decision concluded that the BIA could not compel the Tribe to enroll potential members to its citizenship, because the Tribe already had an existing membership and form of government. August 2011 Decision at 6.

107. The Department should have referred the unenrolled, potential Tribal members to the CVMT for a membership determination, as it once referred Burley to Dixie.

### FIRST CAUSE OF ACTION

**(Arbitrary and Capricious Agency Action in Violation of the Administrative Procedures Act, as against all Defendants)**

108. The allegations in paragraphs 1 through 107 are re-alleged and incorporated herein by reference.

109. The Administrative Procedures Act ("APA") provides that a court must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. "  5 U.S.C. §706(2)(A).

110. The AS-IA's December 30, 2015 decision constitutes "final agency action."

111. The AS-IA's December 30, 2015 decision violates APA §706(2)(A) because it unlawfully opened and addressed issues that were not within the scope of jurisdiction of the Board of Appeal from which the decision arose, and contrary to the instructions on remand from the U.S. District Court, for the reasons alleged herein.  It is arbitrary and capricious because it failed to consider relevant evidence bearing on the issues before the AS-IA and ignored evidence contradicting his position.  This includes, but is not limited to, the allegations herein alleged and the following:
///

**THE AS-IA FAILED TO CONSIDER ON REMAND DIXIE'S DEPOSITION TESTIMONY**

112. Dixie's deposition testimony that he resigned, that his resignation was not forged after all, and that he signed Tribal documents appointing Burley to replace him as Tribal Chairman, were highly relevant to the issues for resolution on remand.  Indeed, the issue of the Tribal leadership dispute, i.e., Dixie's claim that he, not Burley, is the rightful Chairman of the Tribe, is referenced throughout the U.S. District Court decision.  (Page 7 ["leadership dispute brewing between Yakima and Burley…], ["On October 10, 1999, Yakima raised concern about the leadership dispute"], [December 1999 "Yakima again alleged 'fraud and misconduct relative to the change in Tribal leadership during April and May 1999' and maintained that he is the rightful Chairperson of the Tribe"], page 8 [BIA writes Yakima and Burley advising them to resolve the dispute internally within a reasonable time], page 9 ["The leadership and membership dispute between Yakima and Burley continued"], page 11 ["by November 2006, the BIA concluded that "the ongoing leadership dispute [was] at an impasse…"]).

113. Based on these facts in the administrative record raising doubts about the Tribal leadership dispute, the U.S. District Court concluded that the August 31, 2011 decision was required to address them.  It stated:

> Here, the August 2011 Decision fails to address *whatsoever* the numerous factual allegations in the administrative record that raise significant doubts about the legitimacy of the General Council.  From as early as April 1999, Yakima contested the validity of the Council (citing Dixie's letter to the BIA stating that he "cannot and will not resign as chairman of the Sheep Ranch Indian Rancheria").

(Page 21 and 22 of U.S. District Court decision).

114. Significantly, the Court stated that Dixie contested the "validity of the Council" from April of 1999," knowing full well that the General Council was established in November 1998 under Resolution #CG 98-01.  Thus, reference here is to Dixie's claim that he never resigned and that his resignation was forgery, not that the establishment of the 1998 General Council under Resolution #CG 98-01 was "void at the outset."

**THE VALIDITY OF THE ESTABLISHMENT OF THE GENERAL COUNCIL IN 1998 WAS NEVER REFERRED TO THE AS-IA FOR RESOLUTION**

115. In fact, whether the establishment of the 1998 General Council was void or invalid at the outset was never an issue the IBIA referred over to the AS-IA for resolution.  As the IBIA decision aptly states:

> Understood in the context of the history of this Tribe, and the BIA's dealings with the Tribe since approximately 1999, this case is properly characterized as an enrollment dispute…

51 IBIA 103, 122.

116. Here, the IBIA casts the dispute for resolution from the time the leadership dispute arose in April 1999, not at the time the General Council was established in November 1998.  The AS-IA was never referred for review any issue regarding the validity of the establishment of the 1998 General Council. Specifically, the IBIA referred over the following issue to the AS-IA:

> [Whether] the BIA improperly determined that the Tribe is "unorganized," failed to recognize [Burley] as the Tribe's Chairperson, and is improperly intruding into Tribal affairs by determining the criteria for a class of putative tribal members and convening a General Council meeting that will include such individuals.

51 IBIA at 123.

117. The issue of whether the Tribe is "unorganized" involves whether the Tribe can operate under a General Council

or whether it must re-organized under the Indian Reorganization Act of 1934 ("IRA") to receive federal funding and have an ongoing government-to-government relationship with the federal government.  The issue is not whether the General Council was properly organized in 1998.  That was never the intent of the IBIA referral.  Indeed, nothing in the IBIA decision referring the "enrollment dispute" over to the AS-IA mentions the challenge of the establishment of the General Council under Resolution #CG 98-01 in November 1998.

118. There was no dispute that arose out of the validity of the General Council that Dixie and Burley established in 1998. No such issue was ever tendered to the IBIA for resolution, and the IBIA has never referred such an issue to the AS-IA for resolution.

119. It is also undisputed that the Miwok Tribe is federally-recognized, and thus is "an already existing tribal entity."  Thus, the dispute between Dixie and Burley is an "ordinary tribal government dispute, arising from an internal dispute in an already existing tribal entity."

## DIXIE IS ESTOPPED FROM OBJECTING TO THE VALIDITY OF THE 1998 GENERAL COUNCIL

120. Yakima Dixie signed the 1998 Resolution establishing the General Council confirming that the "whereabouts of Melvin Dixie are unknown."  Yakima Dixie also had the power to adopt Burley and her daughters as members of the Tribe, which he exercised prior to his execution of the 1998 Resolution.  Dixie cannot object to his own actions as a basis to claim the 1998 Resolution establishing the General Council is invalid.  He affirmatively represented that he did not know the whereabouts of Melvin Dixie at the time of the establishment of the General Council in 1998, and cannot now claim that the whereabouts of

Melvin were in fact known and that he should have been contacted.

121. Here, the BIA and Burley and the other adopted members relied on Yakima Dixie's representations that he did not know the whereabouts of Melvin Dixie at the time the 1998 Resolution was executed and the General Council established.  The doctrine of promissory estoppel prevents him from now claiming the General Council's creation is invalid because he purportedly in fact knew of Melvin Dixie's whereabouts.

## DIXIE'S OBJECTIONS TO THE VALIDITY OF THE GENERAL COUNCIL IS BARRED BY THE STATUTE OF LIMITATIONS

122. It is undisputed that Dixie and his followers sued the federal government in its challenge to the August 31, 2011 decision.  As part of that challenge, the Dixie Faction sought to claim that the General Council established under Resolution #CG-98-01 was invalid at the outset, as a result of the BIA's actions.  While this claim was never tendered to the AS-IA by the IBIA for resolution, the Dixie Faction nonetheless asserted it as a claim within their challenge of the August 31, 2011 decision.  However, the claim is barred by the statute of limitations.

123. Accordingly, upon reconsideration, the Department should have but failed to consider this fact as a basis for rejecting the Dixie Faction's claim that the General Council was invalid when it was formed in November of 1998.  Because this claim was barred by the statute of limitations, the AS-IA had no jurisdiction to consider it and declare it invalid.

124. The Indian Claims Commission Act required all claims accruing before August 13, 1946, to be brought during a five-year period ending in 1951.  The claims may not "thereafter be submitted to any court or administrative agency for consideration."  Indian Claim Commission Act of 1946, §12, 60

Stat. 1049 (*formerly* 25 U.S.C. §70k); COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 2012 edition, §5.06[5], pp. 443-444.  Claims accruing after that date must now be brought within six (6) years from the date the claim first accrues.  28 U.S.C. §2501(Court of Federal Claims), 28 U.S.C. §2401(civil actions in federal district courts).

125.  Here, Dixie has acknowledged executing the 1998 Resolution establishing the General Council.  He was aware of its creation through the BIA's assistance since it was first drafted.  He was the first Tribal Chairman appointed under that newly formed General Council, and he claimed for many years after April 1999 that he never resigned from the position of Tribal Chairman of that General Council, a claim we now know was false.  Yet he never filed any administrative claim or federal lawsuit claiming that the General Council was invalid at the outset, until his federal suit challenging the August 31, 2011 AS-IA decision in October 2011, i.e., 13 years later. Accordingly, Dixie's claim that the General Council was purportedly invalid at the outset is time-barred under 28 U.S.C. §2501 and 28 U.S.C. §2401 for having failed to commence any action on that claim within 6 years of the date he executed the November 1998 Resolution.

126.  Pursuant to the directions on remand, the AS-IA failed to consider this fact in reconsidering its decision, rendering the decision erroneous as a matter of law.

**CLAIMING TO BE THE CALIFORNIA VALLEY MIWOK TRIBE AND THEN SUING IN THAT NAME REFUTES THE ASSERTION THAT THE GENERAL COUNCIL WAS INVALID AT THE OUTSET**

127.  It is undisputed that the Dixie Faction filed suit in federal court challenging the August 31, 2011 AS-IA decision as Plaintiff CALIFORNIA VALLEY MIWOK TRIBE.  However, it is also undisputed that the Tribe was formerly called the Sheep Ranch

Rancheria of Me-Wuk Indians of California.  That was the name the Tribe called itself when it organized its governing body as a General Council in November 1998 under Dixie and Burley's signature.  However, the record shows that the General Council under Burley's leadership thereafter passed a resolution changing the name of the Tribe to the California Valley Miwok Tribe, which the BIA accepted and then made that change in the Federal Register.

128. Rather than sue under the original name, the Dixie Faction instead sued under the new name of the Tribe, thus confirming and ratifying that the General Council under Burley's leadership had the authority to pass such a resolution affecting the Tribe.  The Dixie Faction cannot in good faith maintain that the General Council was invalid at the outset, and then purport to sue under the changed name of the Tribe by the authority it disputes.  The AS-IA's December 2015 Decision ignored this salient point.

129. As a direct and legal result of the December 30, 2015 decision, Plaintiffs have been, are, and will continue to be denied the benefits of Tribal membership and will suffer irreparable injury and financial loss, according to proof.

130. As a direct and legal result of the December 30, 2015 decision, Plaintiffs have been, are, and will continue to be denied the use of PL 638 funds available through the BIA, the California State RSTF distribution payments made available by the California Gambling Control Commission, and will suffer irreparable injury and financial loss.

### SECOND CAUSE OF ACTION
#### (Declaratory Relief)

131. The allegations in paragraphs 1 through 130 are re-alleged and incorporated herein by reference.

---

132. An actual controversy has arisen and now exists between Plaintiffs and the Defendants concerning the validity and scope of the AS-IA's December 30, 2015 decision, including, but not limited to whether the DOI/BIA has the right to "reorganize" the Tribe's governing body, without the present members' consent, and allow, without the present members' consent, other unenrolled members to participate in reorganizing the Tribe.  The dispute also requires resolution of whether the AS-IA has jurisdiction or the right to cancel the presently governing body of the Tribe, established in 1998, and require the Tribe to be reorganized under another form of government not agreed to by the Tribe.  The dispute also requires resolution of whether any challenge to the 1998 resolution establishing the General Council is time-barred as a matter of law, and whether the AS-IA ever had jurisdiction to consider a challenge to the validity of the 1998 Resolution establishing the General Council, since that was not within the scope of referral from the Interior Board of Indian Appeals in the first instance.  The dispute also requires resolution of whether the AS-IA had the right to expand the Tribal membership beyond the five enrolled members without the tribe's consent, and all other issues herein alleged that the December 2015 Decision is erroneous as a matter of law.

**THIRD CAUSE OF ACTION**

**(Injunctive Relief)**

133.     The allegations in paragraphs 1 through 132 are re-alleged and incorporated herein by reference.

134. Plaintiff has no adequate remedy at law.

135. Grounds exist for injunctive relief, because the requested relief involves an obligation arising from a trust relationship between the federal government and a federally-recognized tribe.  The AS-IA had a duty to follow and apply the

law so as to not deny Plaintiffs benefits under the law as herein alleged.

136. Accordingly, Plaintiff requests the court order Defendants to cease and desist from implementing the AS-IA's December 30, 2015 decision, temporarily until this action is resolved, and then permanently, upon successful resolution.

**FOURTH CAUSE OF ACTION**

**(Violation Of Substantive and Procedural Due process)**

137. The allegations in paragraphs 1 through 136 are re-alleged and incorporated herein by reference.

138. The December 2015 Decision violates Plaintiffs' substantive due process rights under the 5th Amendment to the U.S. Constitution because it arbitrarily deprives Plaintiffs of their fundamental rights as Tribal members, including rights to citizenship, political representation, and self-government, and for the following reasons.

139. During the Dixie Faction's challenge of the August 2011 AS-IA Decision, Plaintiffs were barred from participating as intervenors in the federal litigation. As a result, they were not able to assert their position against the Dixie Faction's claims, which enabled the Dixie Faction to "set the stage" for having the U.S. District Court remand the August 2011 AS-IA Decision for reconsideration based on points and argument Plaintiffs' were not able to address in the U.S. District Court. As a result, the December 2015 AS-IA's Decision was preconditioned to favor the Dixie Faction to the detriment of Plaintiffs.

140. Upon information and belief, the Dixie Faction engaged in ex parte contacts with the staff at the DOI in order to influence a reconsidered decision in its favor.

///

## REQUEST FOR IMMEDIATE STAY

141. The AS-IA's August 2011 Decision was stayed pending resolutions of Dixie's challenge to it in federal court. Likewise, Plaintiffs are entitled to, and hereby request, an immediate stay of the implementation of the AS-IA's December 2015 Decision pending resolution of this federal action challenging that decision.

142. Attached as Exhibit "3" is a copy of the August 31, 2011 AS-IA Decision.

143. Attached as Exhibit "4" is a copy of the U.S. District Court Decision dated December 13, 2013.

144. Attached as Exhibit "5" is a copy of the December 30, 2015 AS-IA Decision.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the Court issue the following orders:

1.    Vacating and setting aside the December 2015 AS-IA Decision as arbitrary, capricious, unsupported by substantial evidence in the record, an abuse of discretion and otherwise not in accordance with law;

2.    Declaring that the Secretary (acting through the AS-IA) violated his fiduciary duty to the Tribe and its individual members by adopting the December 2015 AS-IA Decision, refusing to recognize the General Council established under Resolution #GC-98-01, refusing to follow the August 2011 AS-IA's Decision limiting membership to five enrolled members and allowing non-enrolled members to participate in "reorganizing" the Tribe.

3.   Declaring that the December 2015 AS-IA's Decision denied Plaintiffs substantive and procedural due process.

4.   Directing the AS-IA and the BIA to recognize the General Council established under Resolution #GC-98-01 and resume government-to-government relations with that General Council.

5.   Preliminarily and permanently enjoining the Secretary, the AS-IA and the BIA from taking any action to implement the December 2015 AS-IA Decision, including awarding any federal funds to anyone other than the General Council established under Resolution #GC-98-01;

6.   Awarding Plaintiffs' damages, attorneys' fees and costs incurred in connection with this action;

7.   Granting such other relief as the Court deems just and proper.

DATED:  6/17/2016

Manuel Corrales, Jr., Esq.
Attorney for Plaintiffs
CALIFORNIA VALLEY MIWOK
TRIBE, THE GENERAL COUNCIL,
SILVIA BURLEY, RASHEL REZNOR,
ANJELICA PAULK and TRISTIAN
WALLACE

FIRST AMENDED COMPLAINT

45